**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 13, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

KARL FONTENOT,

     Petitioner - Appellee,

v.

SCOTT CROW, Interim Director,

     Respondent - Appellant.

No. 19-7045

_____

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:16-CV-00069-JHP)**
_____

Sheri M. Johnson, Assistant Attorney General (Mike Hunter, Attorney General of Oklahoma, Matthew D. Haire and Theodore M. Peeper, Assistant Attorneys General on the briefs), Oklahoma City, Oklahoma, for Respondent - Appellant Scott Crow.

Tiffany R. Murphy, Fayetteville, Arkansas, for Petitioner - Appellee Karl Fontenot.
_____

Before **McHUGH**, **EBEL**, and **EID**, Circuit Judges.
_____

**McHUGH**, Circuit Judge.
_____

# TABLE OF CONTENTS

I. FACTUAL AND INVESTIGATIVE HISTORY ............................................2

    A.   Ms. Haraway's Abduction.................................................................2

       1.  McAnally's.................................................................................2

       2.  J.P.'s Pak-to-Go .......................................................................5

       3.  McAnally's Customers .............................................................8

       4.  Obscene Phone Calls................................................................9

    B.   Fontenot and Ward ........................................................................13

       1.  Suspects...................................................................................13

       2.  Confessions .............................................................................15

       3.  Search......................................................................................20

    C.   Confessions vs. Facts ....................................................................22

II. PROCEDURAL HISTORY.........................................................................30

    A.  Joint Trial (1985).........................................................................30

    B.  First Appeal (1985–87) ................................................................32

    C.  New Trial (1988).........................................................................34

    D.  Second Appeal (1988–94).............................................................36

       1.  OSBI Disclosures....................................................................36

2.  The OCCA's Decision .................................................................39

E.   State Postconviction (2013–14)..............................................42

   1.  Mr. Fontenot's application.................................................42

      a.  Actual innocence ..................................................43

      b.  Brady claim...........................................................44

   2.  State Court Rulings ...........................................................45

F.   Federal Habeas (2016–present)................................................46

   1.  Initial Proceedings............................................................46

   2.  Second Amended Petition..................................................48

   3.  District Court Order ..........................................................51

   4.  Federal Appeal .................................................................53

III.  THRESHOLD ISSUES................................................................53

A.   Exhaustion .............................................................................54

   1.  Exhausted Claims.............................................................57

   2.  Exhaustion of *Brady*........................................................58

   3.  Unexhausted Claims .........................................................61

   4.  Anticipatory Procedural Bar .............................................63

      a.  Post-Conviction Procedure Act.............................63

      b.  Laches ...................................................................66

    B.    Procedural Barriers................................................................72

        1.  Procedural Default .......................................................72

        2.  Statute of Limitations..................................................72

        3.  Exceptions...................................................................73

    C.    Actual Innocence ...................................................................75

        1.  New Evidence .............................................................79

        2.  Standard of Review.....................................................83

        3.  Analysis......................................................................85

            a.  Alibi evidence .....................................................86

            b.  Obscene phone calls.............................................91

            c.  James Moyer's affidavit .......................................95

            d.  Karen Wise's affidavit .......................................103

            e.  Pickup descriptions ...........................................112

            f.  Medical Examiner report ...................................115

        4.  Total Record.............................................................117

IV.   MERITS .........................................................................................126

    A.    Chance to Address Merits ....................................................127

    B.    Standard of Review ..............................................................133

    C.    Brady Claim .........................................................................135

1. Suppressed by the State...................................................................136

    a. Known but not disclosed .................................................136

    b. Knew or should have known............................................142

2. Favorable to the Defense.................................................................145

    a. Alibi evidence ................................................................146

    b. Witness statements.........................................................149

    c. Floyd DeGraw ..............................................................156

    d. Jeff Miller & Terri McCartney .......................................158

    e. Obscene phone calls.......................................................163

    f. Floral blouse ..................................................................167

3. Prejudice........................................................................................173

D. Remedy...........................................................................................177

V. CONCLUSION .....................................................................................178

Karl Allen Fontenot was twice tried and found guilty of the 1984 kidnapping, robbery, and murder of Donna Denice Haraway in Ada, Oklahoma. Almost no evidence connected him to the crime other than his own videotaped confession, a confession that rang false in almost every particular. Nearly thirty years after his second conviction, Mr. Fontenot brought a petition for habeas corpus in federal district court, arguing the actual innocence gateway allowed for his constitutional claims to be heard on the merits. The district court agreed, and granted relief on all of Mr. Fontenot's claims, including his assertion that the prosecution suppressed material evidence prior to his trial. The district court ordered the State of Oklahoma to release Mr. Fontenot or to grant him a new trial.

The State's arguments for reversing that order lack merit. Mr. Fontenot has brought forth new evidence that is sufficient to unlock the actual innocence gateway and to allow his substantive claims to be heard on the merits. And Mr. Fontenot has also established that evidence suppressed by the State prior to his new trial in 1988 led to a violation of his constitutional right to due process. Exercising jurisdiction under 28 U.S.C. § 2253(a), we affirm the district court's grant of Mr. Fontenot's petition for habeas relief to prevent the further perpetuation of a fundamental miscarriage of justice.

\*\*\*

This opinion proceeds in four main parts. Because of the fact-intensive nature of Mr. Fontenot's argument that he suffered a fundamental miscarriage of justice, we discuss the history of the 1984 crime and its investigation at length in Part I. Part II traces the procedural history of Mr. Fontenot's direct appeals and postconviction challenges in state and federal court. Part III concerns the threshold issues that must be addressed

before reaching the merits of Mr. Fontenot's habeas petition: exhaustion, procedural default, and timeliness. Finally, Part IV addresses the State's argument that it did not receive an adequate opportunity in the district court to contest the substance of Mr. Fontenot's constitutional claims, before proceeding to the merits of the alleged *Brady* violation.

## I. FACTUAL AND INVESTIGATIVE HISTORY[1]

### A. *Ms. Haraway's Abduction*

### 1. McAnally's

On Saturday, April 28, 1984, at approximately 8:45 p.m., 24-year-old Donna Denice Haraway was abducted from the McAnally's gas station and convenience store at 2727 Arlington Street, on the eastern edge of Ada, Oklahoma. At the time of her abduction, she was the sole employee working the McAnally's night shift.

Gene Whelchel and his nephews, Lenny and David Timmons, stopped at McAnally's around 8:45 p.m. that evening, or a few minutes before. Mr. Whelchel, in one car, and the Timmons brothers, in another, needed change for a Saturday night poker game at Mr. Whelchel's house. They parked on the west side of the store, which sat on the south side of Arlington. Mr. Whelchel and David Timmons stayed in their vehicles, while Lenny, David's older brother, got out and headed toward the entrance.

---

[1] We use the following abbreviations to cite to documents in this voluminous record: SAP = second amended petition; Ex. = second amended petition exhibit number (1–103); Vol. = Record Volume number; P/H = 1985 joint Fontenot/Ward preliminary hearing transcript; J/T = 1985 joint Fontenot/Ward trial transcript; N/T = 1988 Fontenot new trial transcript.

Just as Lenny Timmons walked into McAnally's, a man and a woman walked out of the store together. In interviews with the police several days later, Mr. Whelchel described the man as neatly dressed, in his early 20's, around 5'8 and 150 pounds, with blond, possibly ear-length hair. David Timmons described him as short and stocky, with dishwater blond hair slightly shorter than earlobe length. Lenny described him as around 5'8, medium build, with blond hair cut to mid-ear. Lenny described the woman as approximately the same height as the man, with blond, curly, shoulder-length hair. Mr. Whelchel also thought she was around the same height as the man, and that she possibly fit the description of Ms. Haraway, whom he had seen before. David agreed that the woman he saw looked similar to a picture of Ms. Haraway, who was 5'5 with brown eyes and long, sandy brown hair. David believed the man might have had his arm around the woman's waist as they walked out of the store.

The unidentified man and the woman—whom Mr. Whelchel later identified as Ms. Haraway—walked directly to a pickup truck parked in front of the store. The pickup was parked facing east, parallel to the gas pumps and the front door, taking up several spaces. David and Lenny Timmons observed the man and woman both get in on the passenger side, the door closer to the store. The woman got in first, followed by the man. According to David, the woman did not appear afraid or apprehensive, and nothing stood out as unusual. The pickup then immediately pulled out of the McAnally's lot and headed east on Arlington, a four-lane highway.

None of the three eyewitnesses noticed anyone else inside or outside of the pickup truck before the man and woman got in, and none noticed who drove the truck away from

3

McAnally's. But all three were able to describe the vehicle. Mr. Whelchel said it was a light-colored, full-sized pickup, possibly an early 70's model. He was pretty sure it was not a narrow-bed style. David Timmons thought it might have been a 1972 Chevy, possibly a dull dark blue, with gray primer spots and a conventional straight side bed. Lenny Timmons described it as an older model pickup truck, late '60s or early '70s.

No one was in the store or behind the counter when Lenny Timmons entered McAnally's. He noticed the cash register drawer was open and that most of the cash was gone, except for the ones and the change. A cigarette was still burning in an ashtray on the counter. The ashtray was positioned such that the person who placed the cigarette there must have been standing behind the counter.[2] Lenny spent about five minutes trying to locate the clerk, checki+ng the restroom and freezer and opening the front door again to sound the notification bell, before heading back outside. Lenny and Mr. Whelchel then called the Ada Police Department ("APD"). Mr. Whelchel found a number for the McAnally's store manager, Monroe Atkeson, and called him as well.

The call to the APD went out at 8:50 p.m. Officer Harvey Phillips arrived at McAnally's around ten minutes later, where he found Mr. Whelchel, Lenny Timmons, and two other unidentified men. Officer Phillips observed the empty cash register and a purse and keys behind the counter. Inside the purse was an Oklahoma driver's license for Donna Denice Haraway. Ms. Haraway's schoolbooks lay open on the counter and her car was parked on the side of the store.

---

[2] Ms. Haraway did not smoke.

Mr. Atkeson, the store manager, arrived a few minutes after Officer Phillips. He compared the cash register tape to the money in the machine and determined that about $167 was missing. The last sale registered was for seventy-five cents; the only item that sold for that amount was a tallboy beer. After looking around McAnally's and speaking with the police, Mr. Atkeson began the process of closing the store. Officer Phillips failed to secure the scene to preserve evidence. By the time an APD detective arrived, roughly an hour after Ms. Haraway's disappearance, multiple people had been in and out of the store, and it had been cleaned and prepared for opening the next day. The cigarette butt still burning in the ashtray when Lenny Timmons first entered was tossed away, and no fingerprints were taken.

2. **J.P.'s Pak-to-Go**

J.P.'s Pak-to-Go, another convenience store, sat approximately a quarter mile east of McAnally's on Arlington.



Karen Wise was working the 3-to-11 p.m. shift at J.P.'s on the Saturday evening of April 28, 1984. At around 4 p.m., Ms. Wise noticed two men in the store who made her nervous. They bought beer and a half gallon of wine. These men left for a time, then returned to J.P.'s at around 7 p.m., proceeding to shoot pool in the store's back game room for around an hour and a half. Ms. Wise described one of the men as 5′7″ to 5′8″ and 130 to 145 pounds, in his early twenties, with light-colored eyes, dishwater blond hair in a neat, feathered cut, and possible acne scars on his cheek bones. She described the other man as around 6′0″, in his early twenties, with sandy brown collar-length hair, a slender build, and a protruding Adam's apple. Ms. Wise thought this man might have had blue eyes and some facial hair on his upper lip. The two men drove a pickup that roughly matched the description of the truck seen at McAnally's: an older step-side, short-bed model with a jacked up back that was coated with primer, mostly red with some gray spots.

Jack Paschal, a local resident who often helped out at J.P.'s, came by the store shortly before 8 p.m. on April 28.[3] Ms. Wise told Mr. Paschal she was nervous about two young men in the back pool room area. While Ms. Wise and Mr. Paschal were talking, one of these men came to the front counter to get quarters for the pool table. Mr. Paschal described him as a slender 5′10″ to 5′11″, with brown hair that came just below the ear, and a slim, hollow-cheeked face. He described this man's companion as a husky 5′9″ to

---

[3] Ms. Wise placed the time of Mr. Paschal's arrival significantly later, at around 8:30 p.m.

6

5′11″, with sandy blond hair and a ruddy complexion. Around ten minutes after

Mr. Paschal arrived, these two men exited J.P.'s and headed west, back in the direction of

town and McAnally's. Mr. Paschal saw them leave. He described the pickup they drove

as a mid '60s to early '70s Chevy with primer paint. Mr. Paschal did not notice the

truck's color, but something about the tailgate stuck out to him: it was either missing or

badly bent.

The official investigation into Ms. Haraway's disappearance centered almost

immediately on the two suspicious men who had been shooting pool at J.P.'s earlier that

evening.[4] The APD interviewed Ms. Wise that night, and developed profiles of the two

suspects believed to be involved in Ms. Haraway's abduction from McAnally's based on

Ms. Wise's descriptions of the men she saw at J.P.'s. Two days later—after the

Oklahoma State Bureau of Investigation ("OSBI") was brought in to investigate—an

OSBI agent created composite sketches of the two suspects based on Ms. Wise's

recollection. Suspect #1 was described as a slenderly built white male in his early

twenties, 6′0″ to 6′2″, with slightly wavy, shoulder-length sandy brown hair; blue or

green eyes; a fair complexion; and noticeable arm hair. Suspect #2 was described as a

white male in his early twenties, around 5′8″, with a medium athletic build; light, collar-

length, straight blond hair; a fair complexion; and slight acne scars. The pickup they

---

[4] In her 2009 affidavit, Ms. Wise stated that she called the police earlier in the day on April 28 "because some young men in the store were making [her] nervous." Ex. 13, Vol. 2 at 61. But contemporaneous police reports do not note any call from Ms. Wise on April 28, nor is such a call documented in APD radio logs. Ms. Wise also testified at the preliminary hearing that she did not call the police at any point that night.

7

drove was described as possibly a late '60s or early '70s Chevy, in rough condition, with light color gray primer spots.

3. **McAnally's Customers**

In the first few days after Ms. Haraway's disappearance, several men who were in McAnally's on that Saturday evening contacted the APD.

James Boardman, an employee of an Ada newspaper, told police that he observed two men who looked suspicious inside McAnally's between 5 and 6 p.m. on April 28. One of the men had brown hair and one was blond, and Mr. Boardman thought they were driving an old, light-colored pickup, a Chevy or a Ford.

James Moyer told police that he was in McAnally's on April 28 around 7:30 p.m. He saw a pickup pull in between the door and the ice machine, which appeared to be a '67-69 Chevy, light gray and rough-looking. About a minute before he left the store, a dark-haired man entered, followed by a blond-haired man. Mr. Moyer didn't get a good look at the dark-haired man, who was at the back of the store.

APD Officer Richard Holkum stopped at McAnally's on his way home after finishing his shift, arriving sometime between 7:30 and 7:45 p.m. While at the counter talking to Ms. Haraway, he saw two vehicles parked parallel to each other near the gas pumps at the eastern edge of the store—one a green Ford Torino or Mercury Montego, the other a Chevy or GMC pickup painted primer gray. Their drivers appeared to be conversing. The two vehicles were still parked next to each other when Mr. Holkum left shortly thereafter.

8

John McKinnis stopped at McAnally's between 7:50 and 8 p.m. on the night of April 28. He saw only one vehicle parked in front of the store when he arrived: a late '70s Chevy pickup, light-colored, with a short, conventional bed and gray primer spots. While paying for his items, he noticed a man standing behind the counter a few feet from Ms. Haraway. This man appeared to be someone Ms. Haraway knew, and he looked unhappy or concerned, although Ms. Haraway did not seem upset.

Gary Haney told police he was in McAnally's shortly after 8 p.m. on April 28 with his son. They were there for around 10 minutes, during which time no other customers were in the store. Mr. Haney spoke with Ms. Haraway, who seemed to be her normal, happy, polite self.

Guy Keys told police he was in the store with his wife and children shortly before 8:30 p.m. He, too, saw no one else besides Ms. Haraway and noticed nothing out of the ordinary.

4. **Obscene Phone Calls**

In April 1984, Ms. Haraway had been working at McAnally's for about a year. The previous August, she had married Steve Haraway, the son of a local dentist. At the time she disappeared, Ms. Haraway was days away from obtaining her undergraduate teaching degree from Ada's East Central University. She had finished her classroom work at East Central and was student-teaching a second-grade class during the day. The weekend night shifts at McAnally's—she worked Thursdays 2:30 to 10 p.m., Fridays and Saturdays 2:30 to 11 p.m., and Sundays 2:30 to 9 p.m.—provided Ms. Haraway a temporary income while she prepared for her future career as a schoolteacher.

9

Ms. Haraway was uncomfortable working at McAnally's late at night. She told her younger sister, Janet Weldon, that she hated working at the convenience store because it had no alarm and a lot of "weirdos" came in and out. Ex. 43, Vol. 4 at 294. Ms. Haraway also told her sister that she was going to look for another job because she felt "uneasy" working at McAnally's alone at night. *Id*. The day before her disappearance, April 27, 1984, Ms. Haraway spoke with Darlene Adams, a customer who often stopped by McAnally's on her way to work the night shift at the Solo Cup factory in Ada. Ms. Adams remembered that when she was in the store that Friday night, Ms. Haraway told her the same thing she told her sister: that working in McAnally's alone late at night made her "uneasy." Ex. 1, Vol. 2 at 25.

Ms. Haraway did not tell Ms. Adams the specific source of her concern, but she did confide in her sister. Ms. Weldon called Ms. Haraway sometime between 6:30 and 7:30 p.m. on the night of April 28, 1984. Ms. Weldon was working at a convenience store that evening in Shawnee, some 50 miles north of Ada. The sisters frequently chatted over the phone when both were working. Ms. Haraway told Ms. Weldon—in either this conversation or one that took place a day or two earlier[5]—"that the phone calls had

---

[5] A summary of the police interview with Janet Weldon, included in the "prosecutorial" transmitted from the OSBI to the Pontotoc County District Attorney's Office (but not disclosed until 1992), does not clarify whether Ms. Haraway conveyed this information to her sister during their phone conversation on the night of April 28 or in some earlier call. While the report seems to indicate that this information was indeed conveyed by Ms. Haraway in the call on the night of April 28, Ms. Weldon testified at trial that her sister gave no indication during that phone call that anything was wrong. It is possible this information was conveyed in an earlier call, even in a prior call on April 28, during which Ms. Haraway cancelled plans to shop that Saturday with Ms. Weldon because Ms. Haraway had to work at McAnally's. Ms. Weldon then decided "to

started again." Vol. 4 at 294. Ms. Weldon explained to the police that Ms. Haraway "had been receiving some calls at work from a man [who] said he was going to come out to the store some night and wait outside while she was working." *Id*. Ms. Weldon said that Ms. Haraway was upset because she had asked for that Saturday night off, but a coworker refused to fill in, and so she had to take her regularly scheduled shift. The April 28 phone call ended when Ms. Haraway told Ms. Weldon she had to go because she was getting busy but would call back in twenty minutes. Ms. Haraway never returned the call.

In addition to her sister, Ms. Haraway also spoke on the phone with her husband shortly before she disappeared. Sometime between 6:30 and 7:30 p.m., Steve Haraway received a call from Ms. Haraway, who was studying for her teacher's examination during slow periods at McAnally's and wanted him to look up a word in the dictionary. The call lasted five or ten minutes, and Ms. Haraway gave no indication anything was wrong. In an interview on April 30, Mr. Haraway told police he was not aware of anyone causing his wife problems, but that Ms. Haraway had received two to three "obscene" phone calls at the store, the last occurring two or three weeks prior. Ex. 44, Vol. 8 at 24. In another April 30 interview conducted by the police, Mr. Atkeson confirmed that Mr. Haraway had previously told him that Ms. Haraway had received several "obscene" telephone calls at work. Ex. 44, Vol. 5 at 26.

Ms. Haraway also told a McAnally's coworker about these troubling phone calls. James David Watts worked the shift immediately prior to Ms. Haraway on April 28,

_____

come down on Monday April 30th to spend the week with [Ms. Haraway]." Ex. 43, Vol. 4 at 294.

11

1984, ending at 2:30 p.m. The APD, however, did not question Mr. Watts, and it was not until summer 1985 that Loyd Bond, an investigator from the Pontotoc County District Attorney's Office, interviewed him. Mr. Watts informed Investigator Bond that Ms. Haraway told Mr. Watts of some "obscene" phone calls she received at the store that upset her "a great deal." Ex. 62, Vol. 26 at 207. The specific description of the calls as "obscene" was Ms. Haraway's. Ex. 15, Vol. 2 at 72. Ms. Haraway told Mr. Watts that she could not recognize the voice of the man over the phone. According to Mr. Watts, the calls to Ms. Haraway stopped about a month before she disappeared.

Ms. Haraway told at least one McAnally's customer about these calls, too. In 1988, a man named Anthony Johnson recounted a conversation he had with Ms. Haraway a week before she disappeared. Mr. Johnson had been in McAnally's on several occasions while wearing a holstered handgun in plain view, and on the occasion in question, Ms. Haraway asked him where she could buy a gun. When Mr. Johnson asked why she needed one, Ms. Haraway cited "some funny phone calls she had recently been receiving," where "the caller never really said anything, just did some heavy breathing." Ex. 22, Vol. 2 at 260. When Mr. Johnson asked Ms. Haraway whether she had any ex-boyfriends who could be making the calls, she gave him a blank stare in response. Mr. Johnson got the impression Ms. Haraway knew who was making the calls.

Neither the APD nor OSBI ever investigated the obscene phone calls.

## B.  *Fontenot and Ward*

1. **Suspects**

The APD requested help from the public to locate the two men in the composite drawings of the suspects seen at J.P.'s on April 28. In the first few days after the abduction, the police fielded a number of calls from locals who said that Suspect #2, the shorter individual with blond hair, resembled an Ada man named Tommy Ward. Mr. Ward, 23 years old at the time of the crime, was described as 5′8″ and 145 pounds, with blond hair and blue eyes.[6] On May 1, working off these phone tips, APD Detective Dennis Smith spoke with Mr. Ward, who said that on that past Saturday he was fishing all day with a friend of his, Karl Fontenot. Mr. Ward said that afterward, he and Mr. Fontenot went to a party next door to Janette Roberts's apartment. He mentioned that the police had shown up at this party later that night. According to Mr. Ward, he and Mr. Fontenot both spent the night at Ms. Roberts's apartment.

Mr. Fontenot, who had known Mr. Ward for six or seven years, was 19 years old at the time of the crime. He was described as having diminished cognitive and emotional skills.[7] Police reports described him as 5′8″ to 5′9″ and 120 to 132 pounds, with dark

---

[6] The OSBI "Descriptive Data" sheet on Mr. Ward contained in the prosecutorial lists his hair color as brown.

[7] In his 2017 deposition, Mr. Fontenot's defense counsel, George Butner, described Mr. Fontenot as follows:

> [Mr. Fontenot] is not or was not, I believe, able to recall and remember too much of anything.
>     . . . I mean, specifics to Mr. Fontenot, a specific was not in his vocabulary. He was a young person . . . and what happened two days ago in

13

brown or black hair, green eyes, and tattoos on both his right and left arms.[8] In April 1984, he was living at the home of Janette and Mike Roberts and their children, at 509 ½ South Townsend in Ada.[9]

The APD first contacted Mr. Fontenot on May 1, after Mr. Ward told police that he and Mr. Fontenot were together on April 28. Two APD detectives confronted Mr. Fontenot outside the Roberts residence and said they "wanted to talk to him about what h[e] and Tommy [Ward] had done the day of the 28th." P/H, Vol. 32 at 552. Mr. Fontenot told the police he was heading to work but could come in to talk to them

---

Karl's life he, in all probability, could not remember or could not recall. . . . Karl was difficult to prove where he was two weeks before. . . .
. . . I'm not sure Karl grasped at that time the gravity . . . and the issues because he was—he was a little quiet . . . .

Ex. 81, Vol. 28 at 128.

[8] Mr. Fontenot's hair was described at trial as black.

[9] Mr. Fontenot was essentially without a home prior to being taken in by the Roberts family in September 1983. His father abandoned the family when Mr. Fontenot was 12, and his mother was struck by a car and killed in October 1982 while attempting to cross a highway after the vehicle she and Mr. Fontenot were riding in broke down. Mr. Fontenot blamed himself for his mother's death. After interviewing him in May 1988, a psychiatrist employed by the defense reported that because of guilt associated with his mother's death, Mr. Fontenot "believes in his own mind in some talion law . . . that even though he never met Denise Haraway . . . he was willing to take the rap for her murder." Ex. 64, Vol. 26 at 214. In a June 1985 letter to Mr. Butner (which Mr. Butner never received and which was first disclosed in 2019), Mr. Fontenot wrote: "I have been thinking of dying ever since I seen my mother die and I was the only one ever to see her die in my whole family believe me George it really hurt my mind, memory, and me." Ex. 95, Vol. 30 at 533.

14

later. Mr. Fontenot never came by the station, and the police did not follow up with him at the time.

## 2. Confessions

Months later, working off information provided by a man named Jeff Miller, the police turned their focus back to Mr. Ward. On October 12, 1984, APD Detectives Mike Baskin and Dennis Smith questioned Mr. Ward in Norman, Oklahoma. Mr. Ward denied kidnapping Ms. Haraway. But his explanation of his April 28 whereabouts changed from what he initially told police on May 1—rather than fishing with Mr. Fontenot, he claimed he had spent most of that Saturday working on his mother's plumbing with his brother-in-law. Mr. Ward's account of where he was that Saturday night remained the same. Sometime after 9 p.m. he had walked over to Ms. Roberts's apartment at 509 ½ South Townsend in Ada and had then gone to the keg party of her neighbor, Gordon Calhoun. Mr. Ward again asserted that the police had been called out to the party on a noise complaint, because Mr. Calhoun was playing the drums and a "guy from Konawa" was playing the guitar. J/T, Vol. 41 at 49. Mr. Ward said he spent the night at the party and never left. He agreed to take a polygraph test the following week.

On October 18, 1984, the police gave Mr. Ward a polygraph at OSBI headquarters in Oklahoma City. OSBI polygraph examiner Rusty Featherstone began questioning Mr. Ward around 10:30 a.m. Agent Featherstone brought up the inconsistency between the May 1 and October 12 statements regarding what Mr. Ward was doing on the afternoon of April 28. Agent Featherstone stated that he had "the impression that [Mr. Ward] had some type of burden that he needed to get rid of." J/T, Vol. 41 at 664. At

15

that point, Mr. Ward told Agent Featherstone that while he had nothing to do with the abduction, he had dreamed he was involved after the police questioned him six days before. Per Agent Featherstone's account, Mr. Ward had dreamed that he (Mr. Ward) was riding with Mr. Fontenot and a man named Odell Titsworth in a pickup. They drove to McAnally's, left the store with Ms. Haraway, and then drove to a power plant on the west side of Ada, where Mr. Titsworth threatened to rape Ms. Haraway. At this point, in his dream, Mr. Ward went home. Agent Featherstone told Mr. Ward that some of the facts from his dream matched previously undisclosed facts about the crime. According to Agent Featherstone, Mr. Ward then admitted "that he only had wished it was a dream, but that it had been, in fact, the truthful events." *Id.* at 665.

What began that morning as a polygraph examination of Mr. Ward turned into an interrogation at around 1 p.m. At 6:58 p.m., roughly eight and a half hours after Mr. Ward arrived at OSBI headquarters, Agents Featherstone and Gary Rogers of the OSBI and Detective Smith of the APD turned on a videotape to record his statement. In this recording, which lasted until 7:29 p.m., Mr. Ward confessed to the kidnapping, rape, and murder of Ms. Haraway, while implicating Mr. Fontenot and Mr. Titsworth as his accomplices. *See* P/H, Vol. 32. at 637–78.

On October 19, 1984, the day after Mr. Ward inculpated him, the APD arrested Mr. Fontenot and brought him in for questioning. This was the first contact between Mr. Fontenot and the police since the fruitless May 1 encounter. Mr. Fontenot had since moved out of the Roberts's apartment in Ada and was living with a different couple, Joyce and Robert Cavens, in Hominy, Oklahoma. Following his arrest in Hominy, OSBI

16

Agent Rogers and APD Detective Smith interrogated Mr. Fontenot at the Ada police station.

Agent Rogers began interrogating Mr. Fontenot at 1:30 p.m. on October 19, 1984. Agent Rogers stated that Mr. Ward had already confessed and implicated Mr. Fontenot, and that the police knew Mr. Fontenot was involved. For the first ten minutes, Mr. Fontenot repeatedly denied knowing anything about Ms. Haraway's abduction. At that point, Agent Rogers told Mr. Fontenot that they knew he, Mr. Ward, and Mr. Titsworth were at a party on South Townsend, knew they had left the party, and knew where they had gone. This was the first time the name of Mr. Titsworth had been mentioned. Mr. Fontenot then agreed with the law enforcement agents that he had been involved in the crime.

An hour and forty-five minutes after the questioning began, at 3:15 p.m., Mr. Fontenot gave a videotaped statement confessing to the kidnapping, rape, and murder of Ms. Haraway on April 28, 1984. *See* J/T, Vol. 41 at 780–816. In his confession, which lasted until 3:50, Mr. Fontenot stated that he, Mr. Ward, and Mr. Titsworth left a party in the early evening of April 28 in Mr. Titsworth's Chevy pickup. They abducted Ms. Haraway from McAnally's, drove to the Ada power plant, and raped her at knifepoint in the back of the truck. Next, they drove to an abandoned house near the plant, where Mr. Titsworth stabbed Ms. Haraway to death. They then placed her body in a rotten spot in the floor of the abandoned house, doused it with gasoline, and lit a fire, burning down the house with Ms. Haraway inside.

17

In confessing to Ms. Haraway's kidnapping and murder, both Mr. Ward and Mr. Fontenot gave a detailed description of the blouse she was wearing on the night of April 28. Mr. Ward said it was a white button-up with blue roses and "little fringe deals around her collar." P/H, Vol. 32 at 671. Mr. Fontenot described it as a short-sleeve button-up with elastic in the sleeves and "ruffles around the collar." J/T, Vol. 41 at 788.

Two days after Mr. Fontenot's confession, on October 21, 1984, the OSBI gave him a polygraph exam at the Pontotoc County jail. In a pre-test interview with Agent Featherstone, Mr. Fontenot recanted his confession from two days earlier, denied any involvement in the crime, and "adamantly stated that none of the statement he gave to the agent involving him in the crime is true and that he also lied when the video confession was taped." Ex. 44, Vol. 16 at 43. He told Agent Featherstone that "he only gave the statement to the agent because the agent told him the story he was supposed to have been involved in and he simply agreed to it." *Id*. He said he had never been in McAnally's and had never seen Ms. Haraway.

In his October 21 statement, Mr. Fontenot told Agent Featherstone that on the night of April 28, he went to a party at the apartment of Gordon Calhoun on South Townsend, next door to where he was then living with the Roberts family. Mr. Fontenot stated he arrived at Mr. Calhoun's apartment around dark, "or shortly after the kegs arrived." *Id.* at 42. He said he drank and smoked marijuana at the party, then returned to the Roberts's apartment around 11:30 p.m. or midnight. Mr. Fontenot indicated that Mr. Ward was also at the party and that he also spent the night at the Roberts's apartment.

18

Mr. Fontenot stated there were around 25 people at the Calhoun keg party. Besides Mr. Ward, Mr. Calhoun, and Ms. Roberts, he identified several other attendees: Bruce and Johnny, last names unknown, both from Konawa, Oklahoma, and Michael Shane Lindsay, Ms. Roberts's son. He recalled someone at the party playing the drums. Mr. Fontenot said he did not leave the party at any point. He also stated that he had never met Mr. Titsworth and that he did not see anyone at the party who even looked like Mr. Titsworth.

During the polygraph test itself, Mr. Fontenot denied stabbing Ms. Haraway, having sex with her, or helping dispose of her body. Agent Featherstone found his responses inconclusive but bordering on deceptive. At Agent Rogers's request, Agent Featherstone also administered a "peak of tension" polygraph test to Mr. Fontenot in an attempt to determine if he knew the location of Ms. Haraway's remains. *Id.* at 45. Agent Featherstone asked whether Ms. Haraway's body was in a field, a creek, a well, a building, or a vehicle, and whether it was burned or buried. Agent Featherstone determined "that there was no definitive pattern indicating knowledge on behalf of the subject as to the exact whereabouts of the body of Donna Denice Haraway." *Id*.

During a post-test interview, Mr. Fontenot once more admitted to being involved, but then reversed course again, stating "that he was only telling the examiner these statements as he felt that's what everyone wanted to hear." *Id.* at 44–45. "Ultimately," according to the police report summarizing the polygraph exam, Mr. Fontenot "stuck with his adamant denial of having anything whatsoever to do with the crime at hand." *Id*. at 45.

On the evening of October 21, following the polygraph, Detective Smith returned to the county jail to speak further with Mr. Fontenot. Mr. Fontenot could not pick Mr. Titsworth out of a photo lineup, and Detective Smith determined that Mr. Fontenot did not know Mr. Titsworth. Mr. Fontenot again told Detective Smith that his confession was a lie and that he was not involved in the crime.

On November 7, 1984, nineteen days after Mr. Fontenot's arrest, he and Mr. Ward were charged with the kidnapping, rape, and murder of Ms. Haraway. No charges were brought against Mr. Titsworth, who refused to confess and who presented proof that he was not involved. Specifically, on April 26, 1984, Mr. Titsworth broke his arm in an altercation with the police, putting him in a cast for weeks and thus making him unable to participate in an abduction, rape, and murder on April 28. The police also examined a pickup truck owned by Mr. Titsworth's mother, finding no evidence it had been used in the crime.

On December 11, 1984, the police showed Ms. Wise, Mr. Paschal, and Mr. Moyer each a seven-man lineup containing Mr. Fontenot. Neither Ms. Wise nor Mr. Paschal identified Mr. Fontenot as one of the men in J.P.'s on April 28. *See* Ex. 43, Vol. 4 at 320 (Ms. Wise: "I can't tell anyone of them."); *id.* at 321 (Mr. Paschal: "Sorry, I don't think I can be any help."). Mr. Moyer said he would "still have to go with number five" in the lineup, which was Mr. Fontenot. *Id.* at 188.

3. **Search**

Based on the confessions, authorities mobilized a search at the Ada power plant on October 19, 1984. Ms. Haraway's body was not found. They conducted another extensive

search on November 1. Although the searchers located a burned-down house on the property, it had burned in 1983, the year prior to Ms. Haraway's disappearance.

At some point in late October, Detectives Smith and Baskin brought a sack of bones obtained from East Central University to the county jail, including a human skull and various unidentified animal bones. The detectives showed the skull and bones to both Mr. Fontenot and Mr. Ward, in an effort "to find out if what they had previously told about the body was the truth." P/H, Vol. 32 at 557.

Mr. Ward and Mr. Fontenot gave police a number of locations to look for Ms. Haraway's body, none of which led to its discovery. Despite repeated, extensive searching in and around Ada, Ms. Haraway remained missing. The state tried Mr. Ward and Mr. Fontenot together in September 1985, while Ms. Haraway remained missing. The jury convicted them both of murder. *See infra* Part II.A.

On January 20, 1986, almost twenty-one months after Ms. Haraway disappeared, a trapper named Alan Tatum came across human skeletal remains in hilly, rough brushland several miles southwest of Gerty, Oklahoma. Gerty, in Hughes County, is roughly 30 miles east of Ada, in Pontotoc County. A comparison of dental records revealed the remains to be those of Ms. Haraway. Her skull showed "an entry gunshot wound to the left occiput and an exit GSW to the right temporal region." Ex. 46, Vol. 23 at 37. The probable cause of death was therefore determined by the Oklahoma Office of the Chief Medical Examiner ("OCME") to be a single gunshot wound to the head. Several markings on a rib bone were initially deemed consistent with having been made by a knife. However, a reassessment of these markings led OCME to determine they were

caused by animal activity "to a 98% degree of certainty." *Id.* at 61, 71–72, 75. There was no evidence Ms. Haraway's body had been burned.

Found near Ms. Haraway's remains were a gold and red earring, decomposing items of clothing, and the soles and partial uppers of a pair of white tennis shoes. Mr. Tatum also found a small piece of clothing material he characterized as multi-colored gingham or calico.[10] No material with a lace or floral print design was discovered.

### C.   *Confessions vs. Facts*

By the time investigators located Ms. Haraway's body, it was apparent that many of the details provided in the confessions of Mr. Ward and Mr. Fontenot were false. Below is a comparison between those confessions and the actual facts:

Both Mr. Ward and Mr. Fontenot were unfamiliar with Mr. Titsworth. Mr. Ward misstated Odell Titsworth's last name as Titsdale six times during his confession, and could not recall Mr. Titsworth's first name until Detective Smith provided it. In his confession, Mr. Fontenot was unable to accurately describe Mr. Titsworth. Mr. Fontenot stated that Mr. Titsworth's hair fell "a little below his ears," and when asked whether Mr. Titsworth had any marks or tattoos, responded that he "didn't see any of that." P/H, Vol. 32 at 709. In fact, in April 1984, Mr. Titsworth had hair down to the middle of his

---

[10] In May 1984, Detective Smith told law enforcement officers in Texas who were assisting with the case that Ms. Haraway was wearing "a red and blue plaid cotton shirt, that looked like flannel" on the night she was abducted. Ex. 44, Vol. 19 at 37. This information came from a tip the police received on April 29 from a man who said he was in McAnally's the night before and thought Ms. Haraway had been wearing a plaid shirt. The missing person report on Ms. Haraway also stated that she may have been wearing a plaid shirt on April 28.

22

waist and numerous tattoos up and down both arms. Several days after his confession, Mr. Fontenot was unable to pick Mr. Titsworth out of a photo lineup and also failed to recognize Mr. Titsworth when he was presented at Mr. Fontenot's jail cell.

Mr. Ward's description of what happened inside McAnally's did not comport with the evidence. According to Mr. Ward, Mr. Titsworth entered McAnally's and began throwing "potato chips and stuff that was on the aisle, the side aisle right when you go in the door" on the floor. *Id.* at 650–51. Mr. Ward explained that Ms. Haraway came "out from behind the counter and [Mr. Titsworth] grabbed her and pushed her over to me." *Id.* at 648. But neither Mr. Whelchel nor Lenny Timmons, the first two people in McAnally's after Ms. Haraway's abduction, mentioned anything about the store being disorderly or about seeing any items strewn on the floor near the entrance, and the police reported that "[n]o sign of struggle was found at the scene." Ex. 44, Vol. 17 at 46.

Mr. Ward and Mr. Fontenot did correctly identify the approximate amount of money stolen from McAnally's. Mr. Ward indicated in his confession that "it was more than a hundred dollars. . . . I knew that just by looking at [it]." P/H, Vol. 32 at 667. Mr. Fontenot described the amount as "[c]lose to a hundred and fifty or maybe a little over. It was around in there." *Id.* at 704. These descriptions were roughly accurate; the perpetrators took $167 from the McAnally's cash register. Although the knowledge of this amount might otherwise be inculpatory, it was less so here because the exact amount taken was published in Ada's Daily Evening News on April 30, 1984, well before Mr. Ward's and Mr. Fontenot's confessions.

23

Mr. Fontenot's description of who walked Ms. Haraway out of McAnally's conflicts with the accounts of Mr. Ward and the eyewitnesses. In his confession, Mr. Fontenot stated that Mr. Titsworth walked Ms. Haraway out of McAnally's to the waiting pickup truck. In contrast, Mr. Ward stated that he walked Ms. Haraway out of the convenience store. The eyewitnesses, Mr. Whelchel and the Timmons brothers, described a blond man roughly similar in appearance to Mr. Ward walk out with Ms. Haraway.

Mr. Fontenot's and Mr. Ward's accounts of how Ms. Haraway entered the pickup truck are also inconsistent with the other testimony. Mr. Fontenot reported that when Mr. Titsworth took Ms. Haraway from the store, he and Mr. Ward were standing between the pickup and the gas pumps, "by the passenger door." P/H, Vol. 32 at 683. But the pickup was seen parked parallel to the store and the gas pumps, facing east, so that standing between the pickup and the gas pumps would mean standing by the *driver-side* door. Additionally, Mr. Whelchel and the Timmons brothers saw no one standing near the pickup prior to when the blond man exited the store with Ms. Haraway.

Mr. Fontenot further stated that "[Mr. Titsworth] forced [Ms. Haraway] around to the other side—or . . . forced her into our side. She got in, then me and [Mr. Ward] got in." P/H, Vol. 32 at 683. Mr. Ward stated that he brought Ms. Haraway out of McAnally's, and that Mr. Titsworth then "grabbed her from me, and they walked around. And I got in the pickup and Karl Fontenot got in the back of the pickup. And she was sitting in the middle." *Id.* at 649. According to Mr. Whelchel and the Timmons brothers, after exiting McAnally's the blond man and Ms. Haraway walked straight to the pickup's passenger side door—the door closest to the store—and entered the truck that way. The

24

eyewitnesses saw no one walk "to the other side" of the pickup or "walk[] around" it. Moreover, Mr. Whelchel and the Timmons brothers saw no one in the back of the pickup, nor anyone inside it other than the blond man and Ms. Haraway before the truck drove away.

Mr. Fontenot's confession is also inaccurate about the ownership of the pickup truck. Mr. Fontenot stated that they were in Mr. Titsworth's pickup when they abducted Ms. Haraway. But the police conducted a forensic examination of a Chevy pickup used by Mr. Titsworth, but owned by his mother, and determined it was not involved in the crime.

No evidence was found to indicate the power plant identified by both Mr. Fontenot and Mr. Ward was the location of the crime. Mr. Fontenot and Mr. Ward both confessed they drove from McAnally's to a power plant off the Richardson Loop bypass on Reeves Road, on Ada's western edge. Both men stated they parked at the power plant, then proceeded to rape Ms. Haraway before she was stabbed to death. But despite thorough searches, the authorities found no evidence of the crime at the power plant. *See* N/T, Vol. 36 at 334 ("Q [Defense counsel]: Did you at any time find any evidence at the power plant that this incident had taken place there? A [Detective Smith]: No physical evidence.").

Mr. Ward's and Mr. Fontenot's descriptions of the alleged rape were inconsistent. Mr. Ward confessed that "I was so drunk, that when I did try to rape [Ms. Haraway], that I couldn't rape her." P/H, Vol. 32 at 656. But Mr. Fontenot confessed that "me and [Mr. Titsworth] stood there and holded her while [Mr. Ward] raped her. . . . He raped her

25

while me and [Mr. Titsworth] was holding her." *Id.* at 693–94. Eventually, the State dropped the rape charges due to the lack of independent evidence corroborating the confessions. *See Fontenot v. State* [*Fontenot II*], 881 P.2d 69, 82 n.17 (Okla. Crim. App. 1994).

Mr. Fontenot also provided information about the use of a knife on Ms. Haraway that is contrary to both the evidence and Mr. Ward's confession. Mr. Ward admitted that he used a knife on Ms. Haraway, stating: "I cut her a little bit on the side and across her arm." P/H, Vol. 32 at 660. But Mr. Fontenot made it clear that only Mr. Titsworth stabbed Ms. Haraway: "[Mr. Titsworth] was the only one that had the knife at the time. Me or [Mr. Ward] never handled the knife." *Id.* at 696. And when asked directly, "at any point in time, did you stab her?," Mr. Fontenot replied, "No, I did not, nor did [Mr. Ward]. [Mr. Titsworth] done all the stabbing . . . ." *Id.* at 707.

The police concluded shortly after Mr. Fontenot's arrest that Mr. Titsworth was not involved in the crime. On April 26, 1984, the police broke Mr. Titsworth's arm during a "scuffle," and it was in a cast at the time of Ms. Haraway's disappearance two days later. *Id.* at 727. As a result, the APD had cleared Mr. Titsworth as a suspect by October 22, 1984, three days after Mr. Fontenot's confession. *Id.* at 728, 824; *see Fontenot v. State* [*Fontenot I*], 742 P.2d 31, 32 (Okla. Crim. App. 1987).

Mr. Ward and Mr. Fontenot incorrectly specified the location of Ms. Haraway's body. Both men inaccurately stated that Ms. Haraway's body was left in a house by the power plant. Mr. Ward said that when it came time to find "a good place to get rid of her," he told his accomplices about a house that was a quarter mile to the west. P/H,

Vol. 32 at 664. Likewise, Mr. Fontenot confessed that Mr. Titsworth carried Ms. Haraway "to the house out behind the plant." *Id.* at 696. Extensive searches of the remains of this house near the power plant, however, failed to turn up a body. Ms. Haraway's body was eventually found around 30 miles east of Ada in rough, hilly brushland near the town of Gerty, in Hughes County.

Mr. Fontenot's story about burning the house down with the body in it is also patently false. He stated:

> And then [Mr. Titsworth] put [Ms. Haraway] off in the rotten place in the floor. . . . He placed her down in there, we put the gas on her. And after that, . . . somewhere around in the morning time, we burned her. And then we come back and burned the house. . . .We lit the house. We lit the gas and burned the house and her.

P/H, Vol. 32 at 697–99. The house near the power plant referenced in the confessions burned down in 1983, the year before the crime. And when Ms. Haraway's remains were found, there was no evidence her body had been burned. *Fontenot I*, 742 P.2d at 32.

Neither Mr. Ward nor Mr. Fontenot accurately described the cause of death. Agent Featherstone asked Mr. Ward, "[W]ere there any other weapons that you know of[,] of any type, like guns or clubs?" Mr. Ward responded, "No, just the knife." P/H, Vol. 32 at 670. And Mr. Ward indicated that Ms. Haraway died of the stab wounds. During his confession, Mr. Fontenot never described any weapon other than a knife. After the body was found, the medical examiner concluded that Ms. Haraway's cause of death was a single gunshot wound to the head. There was no evidence she was stabbed. *Fontenot I*, 742 P.2d at 32.

27

Mr. Fontenot's description of what was done with Ms. Haraway's clothes was also contrary to the evidence. According to Mr. Fontenot's confession, he and Mr. Ward "went and got [Ms. Haraway's clothes] and brought them back to the house, put them in the hole with her and burned them." P/H, Vol. 32 at 706–07. He also stated they burned her shoes and all of her belongings. But when Ms. Haraway's remains were discovered 30 miles from the power plant, there was no evidence her body or her clothes had been burned. Decayed remnants of clothing, including shoes, socks, and jeans, were found with her remains.

Mr. Ward and Mr. Fontenot each gave a relatively detailed description of Ms. Haraway's blouse. Mr. Ward testified:

Q: Can you tell me what her blouse looked like that she was wearing?
A: . . . [I]t was white with little blue roses on it, I think, blue roses.
Q: It had roses on it?
A: . . . I believe that's what it was, little roses.
Q: So it was a white blouse. Button-up or slip-on?
A: It's button-up.
Q: Did it have buttons on the collar?
A: Uh-huh.
Q: Or would it be just a regular collar?
A: It had buttons on the collar and then it had little fringe deals around her collar and around the end of her arm, end of the sleeves.
Q: By little fringe, do you mean a lace kind of deal?
A: Yeah, uh-huh.
Q: So it had lace on the sleeves, and lace on the collar?
A: Collar.
Q: And it was a floral-type pattern, flowers on her shirt.
A: Yeah.

P/H, Vol. 32 at 671–72.

Mr. Fontenot provided a similar description of Ms. Haraway's blouse in response to questioning:

28

Q: What kind of shirt did she have on? Was it a pullover type or button-up type, Karl?
A: Button-up.
Q: Did it have anything that you noticed about it, as far as any designs or—
A: Just the ruffles around the buttons and sleeves. The sleeves had elastic like in them.
Q: Was it a short-sleeved shirt?
A: Yes, it was short-sleeved.
Q: Did it have any lace around the collar?
A: Yes, it had ruffles around the collar like the front.

*Id.* at 689.

On April 29, 1984, the day after Ms. Haraway disappeared, Mr. Holkum told Detectives Smith and Baskin that when he stopped at McAnally's the night prior, she was wearing "a light colored lavender or light blue" blouse "with small print or design on it" and "a lace design around the collar." N/T, Vol. 36 at 160, 162. In August 1984, prior to the confessions, Ms. Weldon told the APD that a blouse matching this description appeared to be missing from Ms. Haraway's closet: a button-up light lavender blouse with blue flowers, lace around the collar, and elastic around the sleeves.

Although Mr. Ward and Mr. Fontenot provided descriptions of the blouse that matched those provided to the police, no lace-collared floral blouse was found near Ms. Haraway's remains. Instead, Alan Tatum found "[b]its and pieces of clothing material" near Ms. Haraway's body that he described as "gingham cloth, multi-colored as in calico cat." Ex. 17, Vol. 1 at 236.

## II. PROCEDURAL HISTORY

### A. *Joint Trial (1985)*

The Pontotoc County District Court appointed George Butner to represent Karl Fontenot.

A joint preliminary hearing to determine whether probable cause existed to bind Mr. Fontenot and Mr. Ward over for trial on the charges of robbery, kidnapping, and murder was conducted over a two-week span in January and February 1985. At this hearing, Karen Wise failed to identify Mr. Fontenot as being in J.P.'s on the night of April 28, 1984, other than to state the second man in the store "[g]enerally looked like" him. P/H, Vol. 32 at 166–67, 169. The record reflected that although Ms. Wise recognized Mr. Fontenot, she could not definitively state he was in J.P.'s that night. Jack Paschal also failed to identify Mr. Fontenot as being the second man he saw in J.P.'s when he stopped at the store shortly before 8 p.m. that night. Mr. Paschal admitted that he had no idea who this second man was. Both Ms. Wise and Mr. Paschal identified Mr. Ward as being the blond-haired man they saw in J.P.'s.

Mr. Moyer did identify Mr. Fontenot as being one of the men he saw in McAnally's at around 7:30 p.m. on April 28, 1984. He was the only witness who placed Mr. Fontenot in McAnally's on the evening of Ms. Haraway's abduction. He further testified that the dark-haired man in the store whom he identified as Mr. Fontenot was wearing boots, and was taller than his companion, the light-haired man, whom Mr. Moyer identified as Mr. Ward.

30

On January 14, 1985, the videotaped confessions of both Mr. Fontenot and Mr. Ward were played for the court.

On January 16, the State called Terri McCartney to the stand. Ms. McCartney was an inmate at the Pontotoc County Jail on October 19, 1984, the date Mr. Fontenot was first placed in custody. She testified that Mr. Fontenot confessed his involvement in the crime shortly after arriving at the jail. According to Ms. McCartney, Mr. Fontenot said that he, Mr. Titsworth, and Mr. Ward took Ms. Haraway out to an old house by the power plant and raped her there, after abducting her from McAnally's. Mr. Titsworth then stabbed Ms. Haraway to death, and the three men put her "in a rotty part of the floor and poured gasoline on her and burned her." *Id.* at 910.

On February 4, the last day of the preliminary hearing, the defense called Ms. Wise back to the stand. Ms. Wise testified that right around the time of her initial hearing testimony, she called the police to her home at around midnight because she was frightened by a man watching her apartment from a nearby alley. This man, who had on cowboy boots and a cowboy hat, was described by Ms. Wise as of medium build and tall, with sandy brown hair. Ms. Wise testified that "he looked like the man I saw that night at J.P.'s with Ward." She told this to the APD at the time she called them about the man in the alley. She also testified that the second man she saw in J.P.'s on the night of April 28 had lighter-colored hair than Mr. Fontenot and was taller.

At no point during the preliminary hearing was any testimony elicited that mentioned the obscene phone calls Ms. Haraway received while working at McAnally's in the weeks leading up to her disappearance.

31

At the conclusion of the hearing, the trial court bound both Mr. Ward and Mr. Fontenot over for trial on the charges of robbery, kidnapping, and murder.

On February 20, 1985, Mr. Fontenot filed a comprehensive discovery motion which requested, among other things: written statements or oral statements reduced to writing of any witness; all written or recorded statements made by Mr. Fontenot, and summaries or memoranda of any of his oral or written statements; any and all tape recordings and stenographic transcription of admissions, confessions, or statements by Mr. Fontenot; and "[a]ll information of whatever form, source or nature, which tends to exculpate the Defendant either through an indication of his innocence or through the potential impeachment of any state witness." Ex. 75, Vol. 26 at 309–10.

The joint trial of Mr. Ward and Mr. Fontenot took place September 9–25, 1985. *See* Vols. 40–43. The videotaped confessions of both Mr. Ward and Mr. Fontenot were introduced and played for the jury. Both men were found guilty of kidnapping and first-degree murder, and both were sentenced to death.

### B. *First Appeal (1985–87)*

Mr. Fontenot was represented on appeal by Terry Hull of the Oklahoma Appellate Public Defender's Office (now known as the Oklahoma Indigent Defense System, or "OIDS").

On October 21, 1985, Ms. Hull filed a motion for new trial based primarily on insufficiency of the evidence. Ms. Haraway's remains were found while this motion was pending. Ms. Hull then filed a motion to disclose and produce in state district court, requesting, among other things, any information in possession of the State connected with

32

the discovery of Ms. Haraway's remains, and "[a]ll material or information known by any agent or member of any Federal, State, County, or Municipal governmental agency which is exculpatory in nature or favorable to the Defendant, or may lead to the discovery of exculpatory or favorable material, or may be used to impeach prosecution witnesses presented at Defendant's trial." Ex. 57, Vol. 25 at 94.

On March 3, 1986, the state district court granted this motion as to all requested categories except for oral statements never reduced to writing. In response, the D.A.'s office produced a total of five pages, all related to the discovery of Ms. Haraway's remains: three pages of the medical examiner's report, and two pages of an OSBI criminalistics examination of the scene of Ms. Haraway's remains, identifying seventeen items found near her body.

On August 7, 1986, based on the mismatch between the evidence found at the scene of Ms. Haraway's remains and Mr. Fontenot's confession, Ms. Hull filed a motion in the Oklahoma Court of Criminal Appeals ("OCCA") for a new trial on newly discovered evidence. Meanwhile, on August 25, 1986, Ms. Hull filed Mr. Fontenot's brief on direct appeal.

On August 11, 1987, the OCCA reversed Mr. Fontenot's conviction and remanded for a new trial. *See Fontenot I*, 742 P.2d at 33. It concluded that the trial court's admission of Mr. Ward's confession at the joint trial, where Mr. Ward did not testify, violated Mr. Fontenot's Sixth Amendment right to confront witnesses. *Id.* at 32 (citing *Cruz v. New York*, 481 U.S. 186 (1987), and *Bruton v. United States*, 391 U.S. 123 (1968)). The OCCA further determined that Mr. Ward's statement lacked sufficient

33

indicia of reliability to allow for its direct admission against Mr. Fontenot. *Id.* (citing *Lee v. Illinois*, 476 U.S. 530 (1986)).

In reaching this holding, the OCCA set forth the facts as follows:

The evidence at trial revealed that two men, one of whom was positively identified as Tommy Ward, played pool at J.P.'s convenience store in Ada, Oklahoma, from about 7:00 p.m. until about 8:30 p.m. the evening of April 28, 1984. Around 8:30 p.m., the two men left the store. Shortly thereafter, Tommy Ward was seen leaving with Haraway from the convenience store where she worked which was across the road and a quarter of a mile away from J.P.'s. Fontenot was said to resemble the man with Ward at J.P.'s, but could not be identified by the people who saw Ward there. In fact, the second man was described as having sandy brown hair and being six foot to six foot two inches tall. Fontenot had dark brown hair and was several inches shorter than the description given. One witness went so far as to tell a detective and a private investigator, and attempted to tell the District Attorney, without success, that Fontenot was not the man he saw in J.P.'s.[11] *Other than the statements given by Ward and Fontenot, there was no other evidence linking appellant to the crimes.*

*Id.* (emphasis added). The OCCA also noted that when Ms. Haraway's remains were discovered in Hughes County, "there was no evidence of charring or of stab wounds, and there was a single bullet wound to the skull." *Id.*

### C. *New Trial (1988)*

After Mr. Ward's conviction was overturned on identical legal grounds,[12] the State retried both men separately. Mr. Fontenot's new trial came first, in June 1988, after a change of venue from Pontotoc to Hughes County. Mr. Butner again represented him.

---

[11] The witness referenced here is James Moyer. The mention of J.P.'s is in error—Mr. Moyer was in McAnally's on April 28, 1984, not J.P.'s. *See infra* Part III.C.3.c.

[12] *See Ward v. State*, 755 P.2d 123 (Okla. Crim. App. 1988).

On December 2, 1987, Mr. Butner filed a comprehensive Motion to Disclose and Produce in state district court. In preparation for Mr. Fontenot's new trial, this motion requested forty categories of evidence, including: any information related to the discovery of Ms. Haraway's remains; any information that is exculpatory or favorable, or that may lead to discovery of the same; "[a]ll written or recorded statements and summaries of memoranda of any oral or written statements" of Mr. Fontenot; "[w]ritten or oral statements reduced to writing of any witness to the alleged crime"; "[t]ypewritten records in the manner and mode of conducting the lineup"; "[a]ll information that could be used to impeach any witness for the State"; and "[a]ny inconsistent statements of any witnesses or information of misidentification of [Mr. Fontenot] by any source or witness." Ex. 72, Vol. 26 at 297–301.

Mr. Butner also moved for an order "requiring the prosecution to produce for inspection by the Court any and all materials and information that the Prosecutor contends to be 'work product' of the prosecutor." *Id.* at 301. Mr. Butner requested the court "to inspect all of any such material and information and to make a judicial determination as to what material and information is, in fact, 'work product' and which is not, and what portion of said material and information should be furnished to Defendant" so as not to violate his constitutional rights. *Id.*; *see infra* Part IV.C.1.a.

On May 27, 1988, around ten days prior to the start of the new trial, Mr. Butner met with Dr. Larry Balding, an OCME forensic pathologist, regarding Ms. Haraway's remains. Dr. Balding's contemporaneous notes state "Mr. Butner here to discuss case representing Mr. Fontenot as court appt. defense. I showed him our file & we discussed

my findings. I told him it was possible she was stabbed but was no evidence of it on skeletal remains." Ex. 46, Vol. 23 at 54.

Mr. Fontenot's separate new trial took place June 7–14, 1988. *See* Vols. 35–37. Among the key State's witnesses were Gordon Calhoun, Karen Wise, and James Moyer. As at the preliminary hearing, no mention was made of the obscene phone calls received by Ms. Haraway at McAnally's prior to her abduction. Mr. Butner presented no alibi defense. The State again played Mr. Fontenot's videotaped confession for the jury, and the jury again found Mr. Fontenot guilty of first-degree murder and sentenced him to death.[13]

## D. *Second Appeal (1988–94)*

### 1. OSBI Disclosures

Ms. Hull remained Mr. Fontenot's attorney for the initial stages of his second direct appeal, but she left OIDS in the summer of 1992, prior to the filing of Mr. Fontenot's appellate brief. His representation was assumed by Cindy Brown Danner, who filed the "Brief-in-Chief challenging Mr. Fontenot's convictions and sentences" on October 6, 1992. Vol. 31 at 601.

After filing Mr. Fontenot's brief-in-chief, Ms. Danner filed a separate Motion to Produce Documents and Things in the Possession, Custody, or Control of the Oklahoma State Bureau of Investigation. The OCCA granted this motion on December 1, 1992,

---

[13] The following year, Mr. Ward was also again convicted of Ms. Haraway's murder. He was sentenced to life imprisonment without the possibility of parole.

calling for the OSBI to turn over all responsive documents and things for copying by

OIDS "on December 17, 1992 . . . or at a mutually agreed upon time." Ex. 38, Vol. 4

at 155–56. In response, the OSBI disclosed 860 pages of reports related to the Haraway

case.[14] Ms. Danner explained the limited effect this disclosure had on Mr. Fontenot's

direct appeal in an affidavit submitted with his 2013 state application for postconviction

relief:

> At the time these additional records were requested and received, Mr.
> Fontenot's direct appeal brief had already been filed and the case was
> pending before the OCCA. Under my understanding of the OCCA rules at
> that time, my belief was that any evidence discovered through the gathering
> of these records could be used by lawyers handling the post conviction
> application for Mr. Fontenot if his conviction and death sentence were
> affirmed. I am not presently aware of any Rule or proceeding that would
> have permitted use of these records in the direct appeal process after the
> filing of the Brief in Chief.

Vol. 31 at 601. The State does not contest this characterization of the OCCA's rules.

Mr. Butner attested that during his trial representation of Mr. Fontenot, he was

never provided with the material in the 1992 disclosure. *See* Ex. 16, Vol. 1 at 232 ("I did

not receive any of the OSBI Reports from the Pontotoc District Attorney's Office or from

OSBI prior to either of Mr. Fontenot's trials."). Likewise, Ms. Hull attested to never

having seen the 860 pages of OSBI material during her appellate representation. *See*

Ex. 11, Vol. 1 at 208 ("After I reviewed these documents, I confirmed . . . that I do not

recall ever having seen them before."). These 860 pages disclosed in 1992 included:

---

[14] It is unclear whether the OSBI turned these documents over on December 17, 1992—the date indicated in the OCCA order—or at some later point. As the exact timing does not affect our analysis, we use 1992 as a shorthand for the actual disclosure date.

- The Fontenot/Ward "Prosecutorial": The OSBI compiled a 160-page summary of the Haraway investigation, with a focus on the involvement of Mr. Fontenot and Mr. Ward. This was transmitted to the Pontotoc County District Attorney's Office on December 31, 1984, to serve as the prosecution's main roadmap for trying the two men. Included in this prosecutorial document is the following information:

  - Summaries of police interviews conducted between April 30 and May 1, 1984 of Officer Harvey Phillips, Gene Whelchel, Lenny Timmons, David Timmons, Steve Haraway, Monroe Atkeson, and Karen Wise.

  - A summary of Janet Weldon's account of phone conversations with her sister that took place on April 28 and in the days just prior.

  - An August 1984 summary of information provided by Ms. Weldon regarding a blue floral blouse that was missing from Ms. Haraway's wardrobe.

  - A summary of the May 1, 1984 interview of Mr. Ward, and a subsequent interview of Mr. Ward on October 31, 1984.

  - Summaries of the in-person lineups conducted of Mr. Ward and Mr. Fontenot in November and December 1984, respectively, for James Moyer, Karen Wise, and Jack Paschal.

  - A summary of a November 1984 interview of Jack Paschal.

  - Summaries of two interviews of Gordon Calhoun by a Pontotoc County D.A. investigator, in November and December 1984.

  - A summary of an October 1984 interview of Janette Roberts.

  - A summary of a November 1984 interview of David Yockey, containing information about a gray-primered pickup truck owned by an Ada man named Brian Cox.

  - A summary of an undated interview with an Ada man named Jim Bob Howard, containing further information about Mr. Cox's pickup.

  - Summaries of the pre-polygraph interviews conducted with Mr. Ward, on October 18, 1984, and Mr. Fontenot and Mr. Titsworth, both on October 21, 1984.

- Floyd DeGraw information: Approximately 75 pages of the OSBI materials concerned an alternate person of interest, Floyd DeGraw, who emerged as a suspect early in the investigation into Ms. Haraway's disappearance. *See infra* Part IV.C.2.c.

- Bruce DePrater interview: Mr. DePrater, who attended the keg party at Mr. Calhoun's apartment on April 28, 1984, was interviewed by the OSBI in October 1984. *See infra* Parts IV.C.3.a, V.C.2.a.

- Steve Bevel interview: In September 1984, an OSBI agent and a D.A. investigator interviewed Steve Bevel, the man whom both James Moyer and Karen Wise later recognized at the preliminary hearing as looking similar to one of the two men they saw on the night of April 28.

- Polygraph information: The OSBI materials contained reports on the polygraph examinations and attendant interviews of Mr. Ward (on October 18, 1984), Mr. Titsworth and Mr. Fontenot (on October 21), and Mr. Cox (on December 14).

- Hypnosis information: The OSBI materials contained summaries of hypnosis sessions conducted at the request of Agent Rogers with Lenny and David Timmons in May 1984.

## 2. The OCCA's Decision

On June 8, 1994, the OCCA issued its decision in Mr. Fontenot's second direct appeal.[15] *See Fontenot II*, 881 P.2d 69. It affirmed Mr. Fontenot's convictions for first-degree murder, kidnapping, and robbery.

Mr. Fontenot raised ten trial errors on appeal, including that his confession was rendered involuntary by improper police tactics; that the evidence was insufficient to convict; that his right to confront witnesses was violated; that prosecutorial misconduct denied him a fair trial; and that his trial counsel was ineffective. *See id.* at 74 n.1. With regard to his insufficiency claim, Mr. Fontenot argued there was no independent evidence

---

[15] Why it took nearly six years to adjudicate Mr. Fontenot's appeal is unclear.

to corroborate his confession, rendering it untrustworthy and not reliable enough to

support his conviction. *Id.* at 77. In rejecting this argument, the OCCA found

Mr. Fontenot's confession corroborated in nine separate ways:

1. Additional inculpatory statements: Gordon Calhoun testified that Mr. Fontenot mentioned he knew the identity of the perpetrator of the Haraway abduction. Additionally, Leonard Martin, an inmate at the Pontotoc County Jail, overheard Mr. Fontenot say "I knew we'd get caught" while awaiting trial. *Fontenot II*, 881 P.2d at 78.

2. Method of abduction: David Timmons, Lenny Timmons, and Gene Whelchel saw a man take Ms. Haraway out of McAnally's to an old, gray-primered Chevy pickup, and saw Ms. Haraway enter from the passenger side with the man following, as Mr. Fontenot described. *Id.*

3. Access to pickup: An insurance agent testified that he insured a truck for Mr. Ward's brother matching the description of the pickup used in the abduction. *Id.* J.T. McConnell, who knew both Mr. Ward and Mr. Fontenot, testified that the two were friends and that he had seen them riding together in a gray-primered Chevy pickup. *Id.*

4. James Moyer testimony: Mr. Moyer entered McAnally's just prior to the abduction. He testified to seeing two men "generally matching Fontenot's and Ward's descriptions inside the store," that these two men were driving an old, gray-primered pickup, and that one of the men acted in a hostile manner. *Id.*

5. Karen Wise testimony: Ms. Wise testified to seeing "two men meeting Ward's and Fontenot's descriptions" in J.P.'s on the evening of Ms. Haraway's abduction. The two men were watching Ms. Wise and making her uncomfortable. When they left at 8:30 or 9 p.m., they headed toward McAnally's in a red- and gray-primered truck. *Id.*

6. Amount of money: The amount taken from the McAnally's register was $167, and Mr. Fontenot stated that around $150 was taken in the robbery. *Id.* at 79.

7. Ms. Haraway's blouse: Ms. Haraway was wearing a button-up blouse with lace around the collar and cuffs, and Mr. Fontenot said that she had worn a blouse with "ruffles" around the sleeves and collar. *Id.*

8. Ms. Haraway's shoes: Soft-soled, canvas shoes were found with the remains of Ms. Haraway, and Mr. Fontenot described Ms. Haraway's shoes as soft-soled. *Id.*

40

9. Abduction: "[M]ost generally," Mr. Fontenot's statement that Ms. Haraway was abducted, and did not leave McAnally's voluntarily, was corroborated by trial testimony establishing that Ms. Haraway was happy and content with her life. *Id.*

The OCCA acknowledged the "by no means inconsequential" inconsistencies between Mr. Fontenot's confession and the evidence, including the method of killing, the location of the body, the fact the body was not burned, and the complete lack of Odell Titsworth's involvement. *Id.* "Unless inconsistencies between the confession and the other evidence so overwhelm the similarities that the confession is rendered untrustworthy," however, "it remains within the province of the jury to determine whether the confession is credible." *Id.* The OCCA found the inconsistencies did not rise to such level, and that the evidence presented independent of the confession was sufficiently corroborative to render it trustworthy. *Id.* at 80–81. As a result, the evidence was sufficient to support the conviction—that is, "[a] rational trier of fact faced with this evidence could have found Fontenot guilty beyond a reasonable doubt of the crimes charged." *Id.* at 80.

Finding error in the lack of a jury instruction on the potential for life without parole, the OCCA vacated Mr. Fontenot's death sentence and remanded for resentencing. *Id.* at 74. Mr. Fontenot's petition for rehearing was denied on September 30, 1994. *Id.* at 87–88. After remand, Mr. Fontenot entered a negotiated settlement with the State, whereby he received a sentence of life imprisonment without the possibility of parole.

41

1. **Mr. Fontenot's application**

In 2013, nineteen years after his second conviction was affirmed on direct appeal, Mr. Fontenot filed an application for postconviction relief in Pontotoc County District Court and moved for additional discovery. On September 16, 2013, the state district court granted this motion and ordered the APD, the Pontotoc County Sheriff's Office, and the OSBI to "provide a complete inventory of the records and evidence, relating to their investigations of the murder of Donna Denice Haraway, to this Court on or before December 31, 2013." Vol. 29 at 818.

After receiving this additional discovery, Mr. Fontenot filed an amended application for postconviction relief on April 18, 2014. He argued that newly discovered evidence of actual innocence required the state court to grant relief, and he presented five substantive claims: that his trial counsel was ineffective; and that his due process rights were violated by (a) the State's suppression of material evidence within the meaning of *Brady v. Maryland*; (b) police misconduct in coercing a false confession; (c) prosecutorial misconduct in knowingly introducing a false confession; and (d) police misconduct that permeated the Haraway investigation.

Mr. Fontenot presented two categories of newly discovered evidence: that which was not previously in the State's possession and that which was. The former largely consisted of affidavits from witnesses to various events pertinent to Ms. Haraway's abduction; some of these witnesses testified at Mr. Fontenot's trial and some did not. The latter consisted primarily of the 860 pages disclosed by the OSBI in 1992. Additionally,

Mr. Fontenot's petition referenced the following items of evidence disclosed through the

2013 discovery agreement with the Pontotoc County D.A.'s Office:

- Photos of the McAnally's cash register tape from the night of April 28, 1984, showing handwritten notes made by the police or the prosecution connecting customers to the time of their purchases.

- A summary of a July 1985 interview of James David Watts by D.A. investigator Loyd Bond, in which Mr. Watts, Ms. Haraway's McAnally's coworker, stated that Ms. Haraway told him she received obscene calls at the store.

- Forty-six pages of OCME documents regarding Ms. Haraway's remains, at least two of which Mr. Fontenot claimed had not previously been disclosed: a report decrying various ways in which law enforcement botched the processing of Ms. Haraway's remains, and a report stating that marks on Ms. Haraway's pelvic bone indicated she had given birth to at least one child.

   a. *Actual innocence*

Mr. Fontenot argued that five categories of newly discovered evidence established

his actual innocence:

1. Evidence showing that Ms. Haraway was being harassed and stalked by an unknown man while working at McAnally's in the weeks prior to her abduction.

2. Evidence from the OCME report showing the investigation at the scene of Ms. Haraway's remains was botched and indicating Ms. Haraway may have borne a child before her death.

3. Evidence tending to establish Mr. Fontenot's alibi of being at the keg party at Gordon Calhoun's apartment on the night of Saturday, April 28, 1984.

4. An affidavit from James Moyer, the one eyewitness who placed Mr. Fontenot in McAnally's, recanting his identification.

5. An affidavit from J.P.'s clerk Karen Wise, stating she was pressured by police to conform her testimony to their theory of the case and to not disclose all she knew, and asserting that there were actually four men rather than two in J.P.'s on April 28, 1984.

b. Brady *claim*

Mr. Fontenot claimed the Pontotoc County D.A.'s Office, as a matter of policy, did not receive all exculpatory or impeachment evidence from law enforcement. Rather, law enforcement provided only a subset of their investigatory work—the prosecutorial—containing evidence relevant to the suspect(s) believed to be involved. *Id.* This policy "resulted in exculpatory, impeachment, and other valuable evidence not only being withheld from the district attorney . . . , but ultimately from the defense as well," leading to a systemic due process violation. *Id.* at 358–59. Mr. Fontenot alleged that the Pontotoc County District Attorney during both of his trials, Bill Peterson, failed to comprehend the full scope of his duties under *Brady*, and that both the APD and the OSBI were improperly trained on those duties.

Turning to the specific impact on Mr. Fontenot's trial, Mr. Fontenot claimed that five categories of suppressed evidence contained in the 1992 OSBI disclosures were favorable and material: (1) police reports pertaining to Mr. Fontenot's alibi; (2) the identity of four McAnally's customers on the night of April 28; (3) the OSBI investigation into alternate suspect Floyd DeGraw; (4) interview reports and taped statements of Jeff Miller and Terri McCartney; and (5) interviews with Ms. Haraway's sister and husband indicating that she was being harassed at work by obscene calls from an unknown male in the weeks leading up to her abduction. Mr. Fontenot produced an affidavit from Mr. Butner swearing that he did not receive any of the 860 pages prior to either of the trials.

44

In addition to the OSBI material, Mr. Fontenot also claimed the D.A.'s office violated *Brady* by failing to turn over a summary of its 1985 interview with Ms. Haraway's coworker James David Watts that referenced the obscene calls.

## 2. State Court Rulings

On December 31, 2014, in a two-page order, the state district court denied Mr. Fontenot's application for postconviction relief on the ground of laches. *See* Vol. 31 at 674–75. The court found that Mr. Fontenot had been in possession of the 860 pages of OSBI documents since 1992 and the OCME report on Ms. Haraway's remains since 1986, and thus could have submitted his claims of actual innocence, ineffective assistance of counsel, prosecutorial misconduct, and *Brady* violations much earlier. Citing *Thomas v. State*, 902 P.2d 328 (Okla. Crim. App. 1995), the court found that "[s]imply, too much time has elapsed due to Petitioner's own inaction." *Id.* at 675.

Mr. Fontenot appealed to the OCCA. Regarding the finding of laches, Mr. Fontenot argued he was not at fault for any delay. He was personally unaware of the 860 pages of OSBI materials transmitted to OIDS in 1992, as they arrived following briefing in his second appeal. Without knowing these documents existed, and without the assistance of counsel after resentencing, "Mr. Fontenot was unable to review, investigate, and litigate the subsequent constitutional claims arising from these documents." Vol. 31 at 689. Furthermore, Mr. Fontenot asserted that in 2003, a lawyer who "held himself out as counsel for both Mr. Ward and Mr. Fontenot" took custody of all of Mr. Fontenot's files without authorization. *Id.* at 690. According to Mr. Fontenot, this attorney held these files between 2003 and 2013 without filing a petition, despite there being a conflict of

45

interest in representing both Mr. Fontenot and Mr. Ward. Mr. Fontenot argued that this negated the assertion of laches, because it was not until 2013 that conflict-free counsel gained access to the information underlying his actual innocence plea.

On October 29, 2015, the OCCA affirmed the district court's finding that laches barred any relief for Mr. Fontenot. *See* Vol. 31 at 711–14. The OCCA determined that the doctrine of laches "may prohibit the consideration of an application for post-conviction relief where petitioner has forfeited the right through his own inaction," while also noting that in Oklahoma, the State is not required to show it was prejudiced by the delay in filing. *Id.* at 714 (quoting *Thomas*, 903 P.2d at 332). The OCCA held Mr. Fontenot had not shown that the district court erred in its application of laches to his claims.

## F. *Federal Habeas (2016–present)*

### 1. Initial Proceedings

On February 24, 2016, Mr. Fontenot filed a 28 U.S.C. § 2254 petition for habeas corpus in federal district court for the Eastern District of Oklahoma, with seventy-seven evidentiary exhibits attached. The district court subsequently allowed Mr. Fontenot to conduct additional discovery and serve federal subpoenas on the Pontotoc County D.A.'s Office, the APD, and the OSBI. *See* Rules Governing § 2254 Cases in the United States District Courts, Rule 6 (providing that a judge may authorize discovery "for good cause"); *see also Bracy v. Gramley*, 520 U.S. 899, 909 (1997) ("Rule 6(a) makes it clear that the scope and extent of such discovery is a matter confided to the discretion of the District Court."). On August 18, 2017, after deposing Pontotoc County prosecutors Bill Peterson and Chris Ross, defense attorney George Butner, and OSBI Agent Gary Rogers,

46

reviewing files in possession of the D.A., and receiving an additional cache of law enforcement reports on the Haraway case, Mr. Fontenot filed an amended petition for habeas corpus with an additional fourteen exhibits. The State filed a response on December 8, 2017, styled as a motion to dismiss.

After receiving Mr. Fontenot's reply to the State's motion to dismiss his amended petition, the district court ordered the State to file an additional brief "specifically address[ing] Petitioner's alleged Brady violations and the newly discovered evidence outlined" by Mr. Fontenot. Dist. Ct. ECF No. 108. The State filed a 35-page brief with supporting exhibits on October 17, 2018. *See* Dist. Ct. ECF No. 109 ("Okla. *Brady* Br.").

On January 31, 2019, before the district court ruled on the amended petition, Mr. Fontenot's counsel discovered that the APD had sent previously undisclosed police reports on the Haraway investigation to counsel for Mr. Ward. These documents were released pursuant to subpoenas served in Mr. Ward's state postconviction proceeding without contacting Mr. Fontenot, despite Mr. Fontenot having served federal subpoenas on the APD in February 2017. In response to the 2017 subpoenas, Mr. Fontenot's counsel received a letter from the Ada City Attorney on March 7, 2017, stating the APD "no longer has any of the documents requested." Vol. 29 at 801, 820. On February 6, 2019, Mr. Fontenot's counsel received the new materials from the Ada City Attorney, who explained the delayed production in an email:

> I responded in March, 2017 to a subpoena in the above referenced Fontenot case that the Ada police department informed me they no longer had documents/evidence regarding Mr. Fontenot's case. Recently, the City of Ada received another subpoena regarding Mr. Ward. I again inquired of the Ada Police Department and after searching, some reports/evidence were

47

located. I am now supplementing my response and forwarding the email with attached reports/evidence in the possession of the Ada Police Department which I previously sent to [Mr. Ward's counsel] . . . .

*Id.* at 835. The APD records newly disclosed in February 2019 included:

- A summary of information provided "a few days" after April 28 by James Boardman, who saw two suspicious individuals in McAnally's between 5 and 6 p.m. whom he thought were driving a light-colored pickup. Ex. 93, Vol. 30 at 516; Vol. 30 at 381. Mr. Boardman failed to identify Mr. Fontenot in a photo lineup conducted around November 1, 1984.

- Notes of April 29, 1984 phone calls from two men, Guy Keys and John McKinnis, who told police they were in McAnally's between 8 and 8:30 p.m. the prior evening. These notes indicated that Mr. McKinnis saw an unknown man standing behind the counter with Ms. Haraway around 8 p.m.

- Handwritten 1985 letters from Mr. Fontenot to his trial attorney, Mr. Butner, which were never delivered and which Mr. Butner had never before seen. Among other matters, the letters detailed Mr. Fontenot's alibi defense and listed various individuals who were at the Calhoun keg party.

- A police report from April 30, 1984 containing Gene Whelchel's detailed description of the man he saw leaving the store with Ms. Haraway.

- A summary of a November 1984 interview of Duney Alford, who recalled seeing a dark-haired man standing at the front of McAnally's on April 28 and a chalky gray colored pickup parked outside.

- Summaries of interviews from April and November 1984 of James Moyer regarding his recollection of seeing two men in McAnally's on April 28, one dark-haired and one light-haired, and a gray pickup outside. In the November interview, Mr. Moyer stated he "did not get a very good look at" the dark-haired man. Ex. 102, Vol. 30 at 552.

2. **Second Amended Petition**

Based on these newly disclosed documents, Mr. Fontenot received the district court's permission to amend his petition a second time. The State did not oppose this request. *See* Appellant Br. at 5. Filed on March 15, 2019, the second amended petition

48

added 12 exhibits, bringing the total to 103. It also added a new claim: violation of the Sixth Amendment right to counsel via interference with the attorney-client relationship, stemming from the APD's possession of undelivered 1985 letters that Mr. Fontenot wrote to Mr. Butner while awaiting trial at the county jail.

Mr. Fontenot presented a gateway assertion of actual innocence, based on newly discovered evidence that (a) he was at the Calhoun keg party all night on April 28; (b) Ms. Haraway was being harassed at work by an unknown man; (c) Mr. Moyer recanted his identification of Mr. Fontenot; (d) the police pressured Ms. Wise to alter her account; (e) inconsistent statements were made regarding the gray-primered pickup; (f) the crime scene of Ms. Haraway's remains was botched, and analysis of those remains revealed she may have given birth prior to her death.

Mr. Fontenot then laid out nine substantive constitutional claims. Three had been first presented to the OCCA on direct appeal: that (1) the evidence at trial was insufficient to convict, (2) Mr. Fontenot's right to confront witnesses was violated by the injection of inadmissible hearsay, and (3) Mr. Fontenot's due process rights were violated by police misconduct during his interrogation. Four had been first presented to the OCCA on appeal of Mr. Fontenot's state application for postconviction relief: that (1) his trial counsel was ineffective, and that his due process rights were violated by (2) the suppression of material evidence under *Brady*, (3) the prosecution's knowing admission of a false confession, and (4) police misconduct throughout the Haraway investigation. Finally, two claims were new, having not previously been presented to the OCCA either on direct appeal or in postconviction proceedings: (1) a violation of the right to counsel

49

based on interference with the attorney-client relationship, and (2) a violation of the right to effective assistance of appellate counsel.

| # | Constitutional Claim | Brought in State Direct Appeal? | Brought in State Postconviction? |
|---|---|---|---|
| 1 | Sufficiency of Evidence | Yes | No |
| 2 | Confrontation Clause | Yes | No |
| 3 | Due Process – Interrogation | Yes | Yes |
| 4 | Ineffective Assistance (Trial) | No* | Yes* |
| 5 | Due Process – *Brady* | No | Yes |
| 6 | Due Process – False Evidence | No | Yes |
| 7 | Due Process – Investigation | No | Yes |
| 8 | Attorney-Client Relationship | No | No |
| 9 | Ineffective Assistance (Appellate) | No | No |

*Mr. Fontenot did bring a claim for ineffective trial assistance on direct appeal, but its factual basis was distinct from the claim brought in state postconviction/federal habeas.*

The State filed a response to the second amended petition on April 29, 2019, again in the form of a procedural motion to dismiss. It first argued that the petition was time-barred by the one-year statute of limitations established by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2244(d)(1), as well as procedurally barred by the state court's application of laches to deny postconviction relief. It next argued that Mr. Fontenot had sufficiently demonstrated neither cause and prejudice for the procedural default nor his actual innocence, as would allow a federal court to entertain the claims on the merits. Lastly, the State asserted that Mr. Fontenot presented two unexhausted claims—ineffective appellate counsel and interference with the attorney-client relationship—which rendered the petition "mixed" and required its dismissal.

### 3. **District Court Order**

The federal district court granted Mr. Fontenot's second amended petition on August 21, 2019. *See Fontenot v. Allbaugh* [*Fontenot III*], 402 F. Supp. 3d 1110 (E.D. Okla. 2019). It excused all threshold procedural barriers to entertaining Mr. Fontenot's claims on the merits, and then found all his substantive constitutional claims meritorious.

The district court found that Mr. Fontenot's state court procedural default on grounds of laches and his failure to abide by AEDPA's time bar were both excused by passing through the actual innocence gateway. *Id.* Mr. Fontenot's probable innocence was established by the six categories of newly discovered evidence advanced in his petition, according to the court, which made it evident that "more likely than not, no reasonable juror would have convicted him." *Id.* at 1132 (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

The district court acknowledged that Mr. Fontenot's petition was "mixed," containing unexhausted as well as exhausted claims, but found it could "be reviewed on the merits due to the futility of exhaustion." *Id.* at 1149. "[I]t is futile for a petitioner to return to state post-conviction when state courts fail to provide substantive review of constitutional claims," as occurs when "a state routinely imposes a procedural bar on those claims which are being exhausted." *Id.* at 1150. The district court determined that "Oklahoma's successor state post-conviction process is ineffective in providing any hope of substantive review of Mr. Fontenot's constitutional claims," and that the claims the State argued were unexhausted "would be procedurally barred in a successor application" based on "a consistent pattern and practice of the" OCCA. *Id.*

51

Turning to the merits, the district court found that five categories of material evidence were suppressed by the State in violation of *Brady*: (1) alibi evidence helping establish Mr. Fontenot's presence at the Calhoun keg party on the night of April 28; (2) police reports relaying information from customers who were in McAnally's that evening; (3) the investigation into alternate suspect Floyd DeGraw; (4) two recorded interviews of Jeff Miller and one of Terri McCartney; and (5) evidence that Ms. Haraway was receiving obscene phone calls at work in the weeks leading up to her abduction. According to the court, "[t]he impact this evidence would have had on either of Mr. Fontenot's trials or how Mr. Butner would have utilized such evidence is incalculable," *id.* at 1191, and "would have certainly affected the jury's judgment of guilt on all the charges," *id.* at 1160. The court deemed it evident Mr. Fontenot did not receive a fair trial in the absence of such evidence, as the cumulative assessment required under *Brady* "places clear doubt on an already weak case against Mr. Fontenot." *Id.* at 1193.

The district court proceeded to find all of Mr. Fontenot's remaining claims meritorious. It then concluded that no independent evidence corroborated Mr. Fontenot's confession, and that "no rational juror who was able to set aside the tragedy of Ms. Haraway's death could find beyond a reasonable doubt that Mr. Fontenot should be convicted based solely on his unsubstantiated confession." *Id.* at 1240. Mr. Fontenot's writ of habeas corpus was granted and ordered to issue unless the State either granted him a new trial or ordered his permanent release from custody within 120 days. *Id.*

52

4. **Federal Appeal**

The State timely filed a notice of appeal, then moved in this court to stay the district court's grant of habeas relief pending appeal to prevent Mr. Fontenot's immediate retrial or permanent release. On November 4, 2019, we granted a stay of the new trial order but denied the request to stay Mr. Fontenot's release. As a result, Mr. Fontenot was released from custody on December 19, 2019, 120 days after the district court's order, and 35 years after he was first arrested and jailed for the murder of Ms. Haraway. He agreed to be subject to conditions of release pending this appeal.

## III.    THRESHOLD ISSUES

We must first address whether the district court erred in finding that Mr. Fontenot overcame the threshold barriers to the evaluation of his constitutional claims on the merits—specifically, the requirement to exhaust all claims in state court before presenting them in federal habeas, an adequate and independent state procedural default, and AEDPA's statute of limitations. The district court's legal conclusions regarding these threshold issues are reviewed de novo, while its factual findings are reviewed for clear error. *See Richie v. Mullin*, 417 F.3d 1117, 1120 (10th Cir. 2005).

Any factual findings by the state courts that bear upon these threshold issues are presumed correct, unless rebutted by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1). "The presumption of correctness also applies to factual findings made by a state court of review based on the trial record." *Al-Yousif v. Trani*, 779 F.3d 1173, 1181 (10th Cir. 2015) (quoting *Morgan v. Hardy*, 662 F.3d 790, 797–98 (7th Cir. 2011)). "Clear and convincing" is "an intermediate standard of proof," *Santosky v. Kramer*, 455

53

U.S. 745, 756 (1982), satisfied by evidence that would "place in the ultimate factfinder an abiding conviction that the truth of its factual contentions are 'highly probable,'" *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984) (quoting C. McCormick, Law of Evidence § 320, p. 679 (1954)). In the § 2254(e)(1) context, this standard "is demanding but not insatiable." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005).

## A. *Exhaustion*

"A threshold question that must be addressed in every habeas case is that of exhaustion." *Harris v. Champion*, 15 F.3d 1538, 1554 (10th Cir. 1994). "A state prisoner generally must exhaust available state-court remedies before a federal court can consider a habeas corpus petition." *Bland v. Sirmons*, 459 F.3d 999, 1011 (10th Cir. 2006). This doctrine began as a judicially created prudential principle based on federal-state comity before its 1948 codification in the habeas statutes. *Rose v. Lundy*, 455 U.S. 509, 515–16 (1982); *see* 28 U.S.C. § 2254(b)(1). "Although the exhaustion rule is not jurisdictional, it creates a 'strong presumption in favor of requiring the prisoner to pursue his available state remedies.'" *Bear v. Boone*, 173 F.3d 782, 784 (10th Cir. 1999) (quoting *Granberry v. Greer*, 481 U.S. 129, 131 (1987)). "The exhaustion requirement is designed to avoid the unseemly result of a federal court upsetting a state court conviction without first according the state courts an opportunity to correct a constitutional violation." *Davila v. Davis*, 137 S. Ct. 2058, 2064 (2017) (internal quotation marks omitted) (quoting *Rose*, 455 U.S. at 518).

"To exhaust a claim, a state prisoner must pursue it through 'one complete round of the State's established appellate review process,' giving the state courts a 'full and fair

opportunity' to correct alleged constitutional errors." *Selsor v. Workman*, 644 F.3d 984, 1026 (10th Cir. 2011) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). "A claim has been exhausted when it has been 'fairly presented' to the state court." *Bland*, 459 F.3d at 1011 (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)); *see generally Grant v. Royal*, 886 F.3d 874, 890–92 (10th Cir. 2018) (analyzing what amounts to "fair presentation"). "[T]he crucial inquiry is whether the 'substance' of the petitioner's claim has been presented to the state courts in a manner sufficient to put the courts on notice of the federal constitutional claim." *Prendergast v. Clements*, 699 F.3d 1182, 1184 (10th Cir. 2012) (quoting *Picard*, 404 U.S. at 278).

If a federal constitutional claim has been fairly presented to the state courts, the lack of a merits adjudication does not preclude that claim from being deemed exhausted: "A habeas petitioner who has defaulted his federal claims in state court meets the technical requirements for exhaustion; there are no state remedies any longer 'available' to him." *Coleman v. Thompson*, 501 U.S. 722, 732 (1991) (quoting 28 U.S.C. § 2254(b)).

A habeas petition is "mixed" if it includes both exhausted and unexhausted claims. In *Rose v. Lundy*, the Supreme Court held "that a district court must dismiss such 'mixed petitions,' leaving the prisoner with the choice of returning to state court to exhaust his claims or of amending or resubmitting the habeas petition to present only exhausted claims." 455 U.S. at 510. But "[t]he rule in *Rose* is not absolute." *Harris v. Champion*, 48 F.3d 1127, 1131 n.3 (10th Cir. 1995). "If a federal court that is faced with a mixed petition determines that the petitioner's unexhausted claims would now be procedurally barred in state court, 'there is a procedural default for purposes of federal habeas.'" *Id.*

(quoting *Coleman*, 501 U.S. at 735 n.1). "Therefore, instead of dismissing the entire petition, the court can deem the unexhausted claims procedurally barred and address the properly exhausted claims." *Id.* That is, in appropriate circumstances the court can apply an "anticipatory procedural bar" to functionally transform unexhausted claims into exhausted ones, thus obviating the need to dismiss a mixed petition. *See Anderson v. Sirmons*, 476 F.3d 1131, 1139 n.7 (10th Cir. 2007) ("Anticipatory procedural bar occurs when the federal courts apply procedural bar to an unexhausted claim that would be procedurally barred under state law if the petitioner returned to state court to exhaust it." (internal quotation marks omitted)).

The exhaustion requirement is also excused if returning to state court to present any unexhausted claims "would have been futile because either 'there is an absence of available State corrective process' or 'circumstances exist that render such process ineffective to protect the rights of the applicant.'" *Selsor*, 644 F.3d at 1026 (quoting 28 U.S.C. § 2254(b)(1)(B)(i), (ii)). The petitioner bears the burden of proving either that state remedies were exhausted or that exhaustion would have been futile. *Id.*

Here, Mr. Fontenot had two procedural avenues to exhaust his claims in state court: his direct appeals, decided in 1987 and 1994, and his application for postconviction relief, decided in 2014. We must "carefully parse" the nine substantive claims presented in Mr. Fontenot's second amended petition "to determine whether any of them ha[ve] not been properly exhausted." *Moore v. Schoeman*, 288 F.3d 1231, 1234 (10th Cir. 2002). Exhaustion is a question of law we review de novo. *Allen v. Zavares*, 568 F.3d 1197, 1200 n.4 (10th Cir. 2009).

1. **Exhausted Claims**

Six of Mr. Fontenot's nine claims were fairly presented to the OCCA on direct appeal, in state postconviction proceedings, or both, rendering them exhausted:

- Ineffective assistance of trial counsel: In his state postconviction application, Mr. Fontenot argued that Mr. Butner was ineffective for failing to 1) introduce a prior sworn statement by Mr. Ward; 2) investigate the harassing phone calls received by Ms. Haraway; and 3) investigate the McAnally's cash register tape to develop potentially exculpatory witness testimony. *See* Vol. 31 at 394–403. He makes the same three arguments in his second amended petition. *See* SAP, Vol. 30 at 125–36.

- Due process—interrogation: On both direct appeal and in his postconviction application, Mr. Fontenot argued that the police violated his due process rights through improper interrogation tactics, leading to a false confession. *Fontenot II*, 881 P.2d at 75–77; Vol. 31 at 403–414. He makes the same argument in his second amended petition. *See* SAP, Vol. 30 at 137–49.

- Due process—false evidence: In his postconviction application, Mr. Fontenot argued that the prosecution violated his due process rights by knowingly admitting his false confession into evidence. *See* Vol. 31 at 414–17. He makes the same argument in his second amended petition. *See* SAP, Vol. 30 at 149–51.

- Sufficiency of evidence: On direct appeal, Mr. Fontenot argued that the evidence was insufficient to convict because the State failed to establish the corpus delicti of the crimes independent of his confession, and that his confession was unreliable and untrustworthy because the State failed to present independent corroborating evidence.

*See Fontenot II*, 881 P.2d at 77. He makes these same arguments in his second amended petition. *See* SAP, Vol. 30 at 151–65.

- Confrontation Clause: On direct appeal, Mr. Fontenot argued that various references to Mr. Ward's confession in the testimony of Detective Smith and Agent Rogers violated his Sixth Amendment right to confront his accusers. *See Fontenot II*, 881 P.2d at 81–82. Mr. Fontenot makes the same argument in his second amended petition based on the same trial testimony. *See* SAP, Vol. 30 at 165–74.

- Due process—investigation: In his postconviction application, Mr. Fontenot argued that his "due process rights were violated due to the police misconduct that permeated the [Haraway] investigation." Vol. 31 at 417. Mr. Fontenot makes the same argument in his second amended petition. *See* SAP, Vol. 30 at 174–88.

2. **Exhaustion of *Brady***

Mr. Fontenot brought a *Brady* claim in his state postconviction application, then supplemented that claim with additional allegations of material violations of the duty to disclose in his federal petition. This supplementation arguably rendered the claim "new," and thus unexhausted. *See Fairchild v. Workman*, 579 F.3d 1134, 1148–49 (10th Cir. 2009). We need not enter the thorny "new claim" thicket, however, because the State waived any argument that Mr. Fontenot's substantive *Brady* claim is unexhausted.

Under AEDPA, "[a] State shall not be deemed to have waived the exhaustion requirement or be estopped from reliance upon the requirement unless the State, through counsel, expressly waives the requirement." 28 U.S.C. § 2254(b)(3). The State did so here by expressly conceding at oral argument before this court, through counsel, that

58

Mr. Fontenot's substantive *Brady* claim is exhausted. *See* Oral Arg. at 40:00–41:00; *see also Eichwedel v. Chandler*, 696 F.3d 660, 671 (7th Cir. 2012) ("[A] State expressly waives exhaustion for purposes of § 2254(b)(3) where . . . it concedes clearly and expressly that the claim has been exhausted, regardless of whether that concession is correct."); *Sharrieff v. Cathel*, 574 F.3d 225, 229 (3d Cir. 2009) (holding that where a state "clearly, explicitly, and unambiguously relinquished and abandoned its right to assert the nonexhaustion defense" with respect to a claim, "[t]he fact that the State based its concession on a flawed legal conclusion is of no consequence").[16]

---

[16] We note that even had the State not waived exhaustion with respect to Mr. Fontenot's substantive *Brady* claim, it forfeited the argument by failing to raise it in its briefing before the district court or on appeal. *See* Vol. 31 at 254 (State's argument before the district court that the recently produced APD documents "do[] not substantially alter the *gravamen* of Petitioner's *Brady* claims."); *id.* at 310 (State's argument before the district court that Mr. Fontenot merely "added bits and pieces of argument to his *Brady* and actual innocence claims based upon the recently produced Ada police reports"); *cf. Jones v. Hess*, 681 F.2d 688, 694 (10th Cir. 1982) ("'[B]its of evidence' which were not before the state courts will not render a claim unexhausted." (quoting *Nelson v. Moore*, 470 F.2d 1192, 1197 (1st Cir. 1972))). In *Granberry v. Greer*, 481 U.S. 129, 133 (1987), the Supreme Court held that when a state respondent fails to argue exhaustion, a federal appellate court has discretion to raise the issue on its own. But "[t]he appellate court is not required to dismiss for nonexhaustion notwithstanding the State's failure to raise it." *Id.*; *see Odum v. Boone*, 62 F.3d 327, 332 n.2 (10th Cir. 1995) (after *Granberry*, if the state fails to assert a nonexhaustion defense, "a federal court may, but need not (in the sense of a jurisdictional issue) raise the defense *sua sponte*"). Rather, if the state "fails . . . to raise an arguably meritorious nonexhaustion defense," it is "appropriate for the court of appeals to take a fresh look at the issue." *Granberry*, 481 U.S. at 134. "The court should determine whether the interests of comity and federalism will be better served by addressing the merits forthwith or by requiring a series of additional state and district court proceedings . . . ." *Id.* In *Wood v. Milyard*, the Court clarified that a federal appeals court should exercise this discretion to consider an overlooked nonexhaustion argument only in "exceptional cases," bearing the interests of federal-state comity in mind. 566 U.S. 463, 471 (2012) (quoting *Granberry*, 481 U.S. at 132).

Although the State concedes Mr. Fontenot's underlying *Brady* claim is exhausted, it asserts that "the question of whether Petitioner ever properly exhausted *Brady* as his 'cause' to overcome the procedural bars in state court is problematic." Appellant Br. at 22. According to the State, the fact that Mr. Fontenot "relied on a different 'cause' to overcome procedural bars in federal court"—a *Brady* violation—than in state court—a conflict of interest with postconviction counsel—is a notable "exhaustion problem." Appellant Reply at 8–9; *see also* Vol. 31 at 302–09 (State's motion to dismiss).

This contention conflates federal gateways with substantive claims. "'Cause' . . . is not synonymous with 'a ground for relief.'" *Martinez v. Ryan*, 566 U.S. 1, 17 (2012) (quoting 28 U.S.C. § 2254(i)). That is, "[a] finding of cause and prejudice does not entitle the prisoner to habeas relief," but "merely allows a federal court to consider the merits of a claim that otherwise would have been procedurally defaulted." *Id.* Federal courts apply the doctrine of procedural default out of respect for state procedural rules. *See, e.g.*, *McCleskey v. Zant*, 499 U.S. 467, 493 (1991). And "[w]hether to apply procedural default doctrine out of respect for state rules is a *federal* question that state court decisions do not control." *Wood v. Milyard*, 721 F.3d 1190, 1194 (10th Cir. 2013). As a result, "[t]he question whether there is cause for a procedural default does not pose any occasion for applying the exhaustion doctrine when the federal habeas court can adjudicate the question of cause—a question of federal law—without deciding an independent and unexhausted constitutional claim on the merits." *Murray v. Carrier*, 477 U.S. 478, 489 (1986). Put another way, a petitioner's "cause" argument does not itself need to be exhausted before being presented to a federal habeas court, provided such argument does

60

not depend on an unexhausted constitutional claim for substantive relief. But if a petitioner's excuse for a procedural default is also a constitutional claim in its own right, *Murray v. Carrier* held that it "generally" must "be presented to the state courts as an independent claim before it may be used to establish cause." *Id.*

Here, Mr. Fontenot's "cause" argument (to the extent he makes one, *see infra* Part III.B.3) depends on his alleged substantive *Brady* violation. And, as established above, the State waived any argument that Mr. Fontenot's substantive *Brady* claim was not adequately presented to the Oklahoma courts in his postconviction application. Thus, no exhaustion problem is presented in connection with the issue of cause and prejudice.

### 3. Unexhausted Claims

In its motion to dismiss the second amended petition, the State argued that both Mr. Fontenot's attorney-client relationship and ineffective assistance of appellate counsel claims are unexhausted. Mr. Fontenot concedes that his petition is mixed.

The Sixth Amendment attorney-client claim, derived from the 2019 disclosure of several 1985 letters written by Mr. Fontenot to Mr. Butner and found in possession of the APD, is clearly unexhausted, having never been presented to the OCCA in any form.[17]

---

[17] While maintaining that "exhaustion in state court would be the most appropriate course" for Mr. Fontenot's attorney-client claim, the State acknowledged in briefing before the district court that, "given the procedural history of the case," "this is a situation where the circumstances might warrant a determination on the merits rather than dismissal pending exhaustion." Vol. 31 at 310; *id*. at 315 ("Respondent asserts that this claim, though unexhausted, might be more readily denied on the merits.").

Section 2254 contemplates denial on the merits as an alternative to exhaustion, but "it is the entire petition, rather than individual claims, that must be dismissed on the merits." *Moore v. Schoeman*, 288 F.3d 1231, 1234 (10th Cir. 2002); *see* 28 U.S.C. § 2254(b)(2) ("*An application* for a writ of habeas corpus may be denied on the merits,

The district court found that Mr. Fontenot's ineffective assistance of appellate counsel claim was fairly presented to the state courts in his postconviction application and is thus exhausted, a finding the State challenges. *See Fontenot III*, 402 F. Supp. 3d at 1149 n.11; Appellant Br. at 18. The sole reference to the ineffectiveness of appellate counsel in Mr. Fontenot's postconviction application is at the end of a discussion of trial counsel's failure to develop witness evidence from the McAnally's cash register tape. *See* Vol. 31 at 402 ("[A]ppellate counsel, likewise, should have pursued this evidence in building a defense for Mr. Fontenot."). This statement is found under a subheading referring solely to trial counsel's ineffectiveness, which is in turn nested under a section heading referring solely to trial counsel. Such a cursory reference, embedded within briefing that concerns only the failures of trial counsel, is insufficient to constitute "fair presentation" of the claim. *See Bland*, 459 F.3d at 1011; *cf. Cannon v. Gibson*, 259 F.3d 1253, 1262 n.8 (10th Cir. 2001) ("[Petitioner's] conclusory assertion that counsel was ineffective . . . is simply not sufficient to preserve this claim.").

Because Mr. Fontenot's petition contains two unexhausted claims, we must assess whether any exceptions to "[t]he rule in *Rose*" are applicable. *Harris*, 48 F.3d at 1131 n.3.

---

notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." (emphasis added)). Where a petition mixes unmeritorious, unexhausted claims with meritorious, exhausted ones, there is no authority for evading the rule in *Rose* by denying the unexhausted claims on the merits while granting relief on the exhausted ones.

4. **Anticipatory Procedural Bar**

Two state procedural bars are at play: Oklahoma's Uniform Post-Conviction Procedure Act, Okla. Stat. Ann. tit. 22, §§ 1080–89, and its state-law doctrine of laches. We analyze both to determine whether "the petitioner's unexhausted claims would now be procedurally barred in state court." *Harris*, 48 F.3d at 1131 n.3. Only if the state procedural rule is both independent of federal law and adequate to support the judgment—that is, "strictly or regularly followed and applied evenhandedly to all similar claims," *Smallwood v. Gibson*, 191 F.3d 1257, 1268 (10th Cir. 1999) (internal quotation marks omitted)—can it serve as the basis for an anticipatory procedural bar. *See Grant*, 886 F.3d at 892 ("[D]ismissal without prejudice for failure to exhaust state remedies is not appropriate if the state court would now find the claims procedurally barred on independent and adequate state procedural grounds." (quotation marks omitted)).

a. *Post-Conviction Procedure Act*

The OCCA has "repeatedly stated that Oklahoma's Post-Conviction Procedure Act is not an opportunity to raise new issues, resubmit claims already adjudicated, or assert claims that could have been raised on direct appeal." *Rojem v. State* [*Rojem IV*], 925 P.2d 70, 72–73 (Okla. Crim. App. 1996) (footnote omitted). In other words, the Post-Conviction Procedure Act "provides petitioners with very limited grounds upon which to base a collateral attack on their judgments." *Stevens v. State*, 422 P.3d 741, 745 (Okla. Crim. App. 2018).

"There are even fewer grounds available to a petitioner to assert in a subsequent application for post-conviction relief." *Id.* at 746. "Subsequent applications for post-

63

conviction relief can only be filed under certain, limited circumstances," *Rojem v. State*

[*Rojem III*], 888 P.2d 528, 530 n.6 (Okla. Crim. App. 1995), which are laid out in § 1086

of the Act:

> All grounds for relief available to an applicant under this act must be raised in his original, supplemental or amended application. Any ground finally adjudicated or not so raised, or knowingly, voluntarily and intelligently waived in the proceeding that resulted in the conviction or sentence or in any other proceeding the applicant has taken to secure relief may not be the basis for a subsequent application, unless the court finds a ground for relief asserted which for sufficient reason was not asserted or was inadequately raised in the prior application.

Okla. Stat. Ann. tit. 22, § 1086.

This rule is "rooted solely in Oklahoma state law," *Smallwood*, 191 F.3d at 1268,

and is "regularly and even-handedly applied by the state courts," *id.* at 1268 n.8; *see also*

*Moore v. Reynolds*, 153 F.3d 1086, 1097 (10th Cir. 1998), making it both independent

and adequate. And because the factual basis for Mr. Fontenot's ineffective assistance of

appellate counsel claim was available in 2013, when Mr. Fontenot filed his

postconviction application in state court, the OCCA would apply § 1086 and decline to

entertain that claim on the merits if brought in any subsequent application. *See Cummings*

*v. Sirmons*, 506 F.3d 1211, 1222–23 (10th Cir. 2007) ("Although the claim is technically

unexhausted, it is beyond dispute that, were [the petitioner] to attempt to now present the

claim to the Oklahoma state courts in a second application for post-conviction relief, it

would be deemed procedurally barred."). Mr. Fontenot's ineffective assistance of

appellate counsel claim is therefore subject to an anticipatory procedural bar and, as a

result, is procedurally defaulted (and exhausted) for purposes of federal habeas review.

64

His attorney-client claim is not necessarily subject to the same treatment. Because it is based on evidence newly disclosed after the filing of Mr. Fontenot's postconviction application—specifically, the jailhouse letters turned over for the first time in 2019—the exception in § 1086 allowing prisoners to bring a subsequent application when sufficient reason exists for not asserting the claim in the prior application could, in theory, be applied by the OCCA to entertain Mr. Fontenot's attorney-client claim on the merits.

The State seizes upon this statutory exception, arguing the district court, in deeming as futile a return to state court to pursue any unexhausted claims, "ignored the fact that the OCCA allows claims to be presented on a second post-conviction application when there is good cause shown." Appellant Br. at 19. In support, the State cites to one case, *Jones v. State*, 704 P.2d 1138, 1140 (Okla. Crim. App. 1985). While *Jones* notes the statutory possibility that for "sufficient reason" the OCCA could entertain a new claim in a second postconviction application, it does not apply that exception. Thus, the State has failed to highlight any occasion where the OCCA actually adjudicated a new constitutional claim on the merits in a subsequent application for postconviction relief.

At least one such occasion exists. In *Rojem IV*, 925 P.2d 70, the OCCA entertained a *Brady* claim based on newly discovered evidence in a subsequent postconviction application. The petitioner in *Rojem* was convicted of kidnapping, rape, and murder in 1988, and filed an initial application for postconviction relief that same year. *Id.* at 72. The state district court denied the application, and the OCCA affirmed in March 1992. *Rojem v. State* [*Rojem II*], 829 P.2d 683 (Okla. Crim. App. 1992). Less than two years later, the petitioner filed a second postconviction application, alleging the State

65

suppressed exculpatory evidence which he had only recently discovered. *Rojem III*, 888 P.2d at 529. The district court dismissed on timeliness grounds, but the OCCA reversed that decision, holding that § 1086 of the Post-Conviction Act does not impose a time limit for filing subsequent applications. *Id.* at 530. On remand, the district court denied the claims in petitioner's subsequent application on the merits. *Rojem IV*, 925 P.2d at 72. The OCCA affirmed, agreeing that two OSBI reports not disclosed before trial did not amount to material evidence. *Id.* at 74. *See also Van Woudenberg v. State*, 942 P.2d 224 (Okla. Crim. App. 1997) (adjudicating merits of successor petition based on withheld evidence).

Thus, because § 1086 of the Post-Conviction Act contains an exception that could allow for Mr. Fontenot's attorney-client claim to be heard on the merits in state court, and because that exception does not appear to be a complete dead letter, an anticipatory procedural bar cannot be applied to the attorney-client claim based on that statute. Nor is there a complete "absence of available State corrective process," 28 U.S.C. § 2254(b)(1)(B)(i), so as to remove Mr. Fontenot's obligation to return to state court.

b. *Laches*

However, the Post-Conviction Procedure Act is not the only state procedural bar at play. The state court applied laches to deny the claims in Mr. Fontenot's postconviction application from being adjudicated on the merits, finding that "[s]imply, too much time has elapsed due to Petitioner's own inaction," Vol. 31 at 675, a decision the OCCA affirmed. The State repeatedly refers to this application of laches as a procedural bar. *See, e.g.*, Appellant Br. at 7. Reasoning from the state court's summary dismissal of Mr. Fontenot's claims on this procedural ground—which dispensed with over 250 pages

66

of postconviction briefing from the parties in a two-page order—the district court found that "if Mr. Fontenot returned to state post conviction on a successor action to exhaust his claims, those claims would be procedurally barred based upon a consistent pattern and practice of the [OCCA]." *Fontenot III*, 402 F. Supp. 3d at 1150.

The OCCA does consistently apply laches to bar applications for postconviction relief brought after decades have elapsed since trial. *See, e.g.*, *Paxton v. State*, 903 P.2d 325, 326 (Okla. Crim. App. 1995) (thirty years between trial and application for relief); *Thomas v. State*, 903 P.2d 328, 330 (Okla. Crim. App. 1995) (fifteen years); *Berryhill v. Page*, 391 P.2d 909, 910 (Okla. Crim. App. 1964) (twenty-four years); *see also McLaurin v. State*, No. 2017–583, at *8 (Okla. Crim. App. Aug. 1, 2017) (unpublished) (twenty-one years). As the State asserted in its motion to dismiss, "for at least seventy years, the OCCA has applied the doctrine of laches to deny relief numerous times, even when the delay was shorter than in Petitioner's case, and continues to do so up to the present day." Vol. 31 at 237–38. Additionally, we have previously held (albeit in an unpublished opinion) that an OCCA decision denying postconviction relief based on laches rested on a ground both independent, because laches is an exclusively state-law doctrine, and adequate, because the doctrine of laches "is both firmly established and regularly followed by the OCCA." *Smith v. Addison*, 373 F. App'x 886, 888 (10th Cir. 2010);[18] *see*

---

[18] "Unpublished decisions are not precedential, but may be cited for their persuasive value." 10th Cir. R. 32.1(A); *see Noreja v. Comm'r, SSA*, 952 F.3d 1172, 1176 (10th Cir. 2020) ("[I]n appropriate circumstances [we look] to an unpublished opinion if its rationale is persuasive and apposite to the issue presented.").

*also Doe v. Jones*, 762 F.3d 1174, 1183 (10th Cir. 2014) (referencing "the possibility that a laches determination [by the OCCA] could be a procedural bar as an adequate and independent state ground for dismissal of the post-conviction application"). We thus accept the State's uncontested assertion that "Oklahoma has regularly and even-handedly followed this rule," Vol. 31 at 238, and determine Oklahoma's laches doctrine to be an independent and adequate state procedural bar that can be applied functionally to exhaust claims brought in federal habeas through an anticipatory procedural default.

The OCCA has explained in the following terms its rationale for applying laches to turn away petitioners who long delay presenting their claims:

> [I]t has repeatedly been held that where petition for release by habeas corpus is delayed for a period of time so long that minds of the trial judge and court attendants may have become clouded by time and uncertain as to what happened, and the possibility of dislocation of witnesses and loss of records and rights sought to be asserted have become mere matters of speculation, based upon faulty recollections or figments of imagination, justice may require the denial of the writ under the doctrine of laches.

*Berryhill*, 391 P.2d at 910; *see also Paxton*, 903 P.2d at 327 ("[T]he doctrine of laches has been and continues to be applicable, in appropriate cases, to collateral attacks upon convictions" "where a petitioner has forfeited that right through his own inaction."); Okla. *Brady* Br. at 12 ("[T]he OCCA has evenhandedly treated the same all petitioners who wait too long to litigate their stale claims.").

After denying Mr. Fontenot's first postconviction application on this ground, there is no indication the OCCA would deviate from these principles should Mr. Fontenot present his attorney-client claim in a subsequent application more than 30 years after his 1988 conviction, notwithstanding the existence of a theoretical vehicle for such a claim in

68

§ 1086 of the Post-Conviction Procedure Act. This is especially so because, as the State noted in its briefing below, the recent discovery of Mr. Fontenot's 1985 letters to Mr. Butner in the APD's files "is a symptom of the laches problem," Vol. 31 at 313—that is, a predictable result of the long delayed presentation of Mr. Fontenot's claims. "Ultimately," the State asserted, due to the passage of time, "it is impossible to tell how this letter came to be placed with the Ada Police reports, or when that even happened." *Id.* And "[t]here is likely nobody who can explain how this grouping of letters ever came to be stored by the Ada Police Department." *Id.*

We determine the Oklahoma courts would agree with this reasoning, given their use of laches in postconviction cases, and again apply the doctrine to bar Mr. Fontenot's attorney-client claim were it brought as part of any subsequent application. To be sure, Mr. Fontenot did not obtain these letters until 2019. But under the laches logic applied by Oklahoma courts, if he had initiated the postconviction process in, say, 1995 rather than 2013, the letters could have come to light at a time when the question of their provenance might still be answerable. *See, e.g.*, *Application of Smith*, 339 P.2d 796, 799 (Okla. Crim. App. 1959) ("One cannot sit by and wait until lapse of time handicaps or makes impossible the determination of the truth of a matter, before asserting his rights. This is in accordance with the uniform holding of this Court over a long period of years."); *Ex parte Motley*, 193 P.2d 613, 617 (Okla. Crim. App. 1948) ("The right to relief by habeas courts may be lost by laches, when . . . due to dislocation of witnesses . . . and the loss of records, the rights sought to be asserted have become mere matters of speculation."). Additionally, under the atypical formulation of Oklahoma's laches doctrine, the State

69

need not make any showing of prejudice from the delay. *See Thomas*, 903 P.2d at 332.

Thus, "we have no doubt the OCCA would apply its procedural bar to [Mr. Fontenot's

attorney-client claim] based on the same argument[]" it used to dispense with his claims

on state postconviction, *see Cannon v. Gibson*, 259 F.3d 1253, 1269 (10th Cir. 2001)—

that "too much time has elapsed due to Petitioner's own inaction," Vol. 31 at 675.

Further support is supplied by *Smith v. State*, No. 2006–707 (Okla. Crim. App.

Aug. 25, 2006) (unpublished), a case cited by the State in its briefing before the district

court. In *Smith*, a state prisoner convicted of murder in 1979 brought a postconviction

application eighteen years later, in 1997, claiming *Brady* violations. The state district

court rejected the application on laches grounds due to the petitioner's inaction. While the

petitioner "argue[d] that he was not afforded proper discovery and that he did not receive

exculpatory evidence," the court found that "his failure to timely raise these issues[] has

made it difficult, if not impossible, to determine exactly what he received at or prior to

trial." *Id.* at *2. The OCCA affirmed, stating in the process that "Petitioner's contention

that he was unable to discover evidence that allegedly had been suppressed until the year

1993 . . . is not sufficient reason to overcome the doctrine of laches." *Id.* at *3. Per this

logic, Mr. Fontenot's assertion that he was unable to discover evidence suppressed until

2019 would be insufficient to overcome laches, because his failure to timely raise these

issues has made it impossible to determine how his letters came into the APD's

possession.

To apply an anticipatory procedural bar, absolute certainty is not required

regarding "how another court will resolve an unexhausted claim under its own procedural

70

rules." *Williams v. Trammell*, 782 F.3d 1184, 1213 (10th Cir. 2015). Rather, "it is enough if, looking to the state's treatment of its procedural bar, the likelihood of default *in the petitioner's case* is beyond debate or dispute." *Id.* (emphasis added). "The OCCA has consistently and evenhandedly applied laches to petitioners, like this one, who come to court very late with their claims." Okla. *Brady* Br. at 13. Consequently, we determine it beyond debate or dispute that the Oklahoma courts would once more apply laches to bar adjudication of Mr. Fontenot's attorney-client claim on the merits, because thirty-five years have elapsed since Mr. Fontenot wrote the letters in question, making it virtually impossible to determine how they came to be in possession of the APD. We thus hold Mr. Fontenot's attorney-client claim to be anticipatorily barred on the procedural ground of laches, in addition to holding his appellate counsel claim anticipatorily barred by the Post-Conviction Procedure Act.

*** 

In summary, seven of Mr. Fontenot's nine claims are exhausted through either fair presentation or the State's waiver. His remaining two claims are subject to an anticipatory procedural bar based on the operation of state law, rendering them procedurally defaulted and effectively exhausted. Functionally, then, Mr. Fontenot presents a fully exhausted petition, rather than a mixed petition requiring procedural remand. We therefore proceed to evaluate the remaining threshold barriers to a merits adjudication of his constitutional claims.

## B. *Procedural Barriers*

There are two procedural barriers at issue—Mr. Fontenot's state court procedural default on laches grounds and AEDPA's statute of limitations for federal habeas claims.

### 1. Procedural Default

"[A]n important 'corollary' to the exhaustion requirement" is that "a federal court may not review federal claims that were procedurally defaulted in state court—that is, claims that the state court denied based on an adequate and independent state procedural rule." *Davila*, 137 S. Ct. at 2064 (quoting *Dretke v. Haley*, 541 U.S. 386, 392 (2004)). "A state procedural default is independent if it relies on state law, rather than federal law," and is "adequate if it is firmly established and regularly followed." *Smith v. Workman*, 550 F.3d 1258, 1274 (10th Cir. 2008) (internal quotation marks omitted).

The Oklahoma courts barred the claims presented in Mr. Fontenot's application for postconviction relief based on the state law doctrine of laches. Mr. Fontenot has contested neither the independence nor adequacy of this doctrine. And as discussed in connection with exhaustion, *supra* Part III.A.4, we determine Oklahoma's laches doctrine to be a state-law based procedural rule that is both firmly established in the postconviction setting and regularly followed by the OCCA. Thus, those claims Mr. Fontenot presented for the first time in state postconviction proceedings—including his *Brady* claim—are subject to a state court procedural default.

### 2. Statute of Limitations

AEDPA erects a one-year statute of limitations for a state prisoner to bring a writ of habeas corpus in federal court, running from the latest of, for these purposes, "the date

on which the [state-court] judgment became final." 28 U.S.C. § 2244(d)(1)(A).

Mr. Fontenot's second conviction became final prior to AEDPA's effective date. In such

case, "the one year limitation period for a federal habeas petition starts on AEDPA's

effective date, April 24, 1996." *Fisher v. Gibson*, 262 F.3d 1135, 1142 (10th Cir. 2001).

As Mr. Fontenot did not file on or before April 24, 1997, *see United States v. Hurst*, 322

F.3d 1256, 1261 (10th Cir. 2003), all his claims are time barred under federal law.

3. **Exceptions**

> In all cases in which a state prisoner has defaulted his federal claims in state
> court pursuant to an independent and adequate state procedural rule, federal
> habeas review of the claims is barred unless the prisoner can demonstrate
> cause for the default and actual prejudice as a result of the alleged violation
> of federal law, or demonstrate that failure to consider the claims will result
> in a fundamental miscarriage of justice.

*Coleman*, 501 U.S. at 750.

Mr. Fontenot defaulted his *Brady* claim pursuant to an independent and adequate

state procedural rule. He must therefore pass through one of these two procedural

gateways—cause and prejudice or the fundamental miscarriage of justice exception

(commonly known as a showing of actual innocence)—to facilitate federal habeas

review. And to have his *Brady* claim heard on the merits in federal court, Mr. Fontenot

must also find a way around the expiration of AEDPA's statute of limitations.

While a showing of "cause" can help excuse a procedural default, it is not the right

vehicle for a bid to overcome AEDPA's time bar. Rather, an assertion that extraordinary

circumstances prevented timely filing is properly brought as a claim for equitable tolling.

While analogous, these two doctrines remain analytically distinct. *Compare Amadeo v.*

*Zant*, 486 U.S. 214, 221 (1988) (noting the Supreme Court has "not attempted to establish conclusively the contours of the [cause] standard") *and Carrier*, 477 U.S. at 488 ("[T]he existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.") *with Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005) ("[A] litigant seeking equitable tolling bears the burden of establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way."). On the other hand, a credible showing of actual innocence lets a petitioner overcome both a procedural default and AEDPA's limitations period. *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013).

In *Dretke v. Haley*, the Supreme Court stated that when faced with an actual innocence allegation, a federal court "must first address all nondefaulted claims for comparable relief and other grounds for cause to excuse the procedural default." 541 U.S. at 393–94. But *Haley* concerned the proper protocol only with respect to state court procedural default. Here we are faced not just with that issue, but also with a failure to comply with the federal limitations period.

For multiple reasons, we invert the standard order of operations to address Mr. Fontenot's actual innocence plea at the outset. First, Mr. Fontenot dedicated the bulk of his habeas petition to establishing actual innocence, while making only a fleeting reference to the issue of cause.[19] Second, he made no equitable tolling argument. And

---

[19] The extent of the cause and prejudice argument Mr. Fontenot presented in his petition was to assert that "the elements of [a] substantive [*Brady*] claim itself mirror the

74

third, as mentioned, while actual innocence can excuse both a state court procedural default *and* the expiration of AEDPA's time bar, a showing of cause and prejudice, standing alone, addresses only the former issue. As a result, were we to reserve actual innocence, we would need to first analyze both an issue that received negligible briefing ("cause") and another that was forfeited (equitable tolling), an unpaved path we can avoid setting upon in the event of a meritorious showing of innocence. In these circumstances, *Haley*'s "avoidance principle" lacks its typical purchase. 541 U.S. at 394.

In the interests of both judicial economy and adequate presentation of the issues before us, "[w]e thus limit ourselves to answering whether the actual innocence exception applies." *McKay v. United States*, 657 F.3d 1190, 1196 (11th Cir. 2011).

## C. *Actual Innocence*

"[A] credible showing of actual innocence may allow a prisoner to pursue his constitutional claims . . . on the merits notwithstanding the existence of a procedural bar to relief." *Perkins*, 569 U.S. at 392. "This rule, or fundamental miscarriage of justice exception, is grounded in the 'equitable discretion' of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons." *Herrera v. Collins*, 506 U.S. 390, 404 (1993) (quoting *McCleskey*, 499 U.S. at 502). When used to overcome procedural issues, "a claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his

---

cause and prejudice inquiry and proof of one is necessarily proof of the other." SAP, Vol. 30 at 32. The district court credited this assertion without conducting any independent analysis. *See Fontenot III*, 402 F. Supp. 3d at 1129.

otherwise barred constitutional claim considered on the merits." *Id.* While Congress limited the operation of this gateway in the AEDPA provisions dealing with second-or-successive petitions, *see* § 2244(b)(2)(B), and the holding of evidentiary hearings in federal court, *see* § 2254(e)(2), "[n]either provision addresses the type of petition at issue here—a first federal habeas petition seeking consideration of defaulted claims based on a showing of actual innocence." *House v. Bell*, 547 U.S. 518, 539 (2006). And "[i]n a case not governed by those provisions, *i.e.*, a first petition for federal habeas relief, the miscarriage of justice exception survived AEDPA's passage intact and unrestricted." *Perkins*, 569 U.S. at 397.

The Supreme Court has "consistently reaffirmed the existence and importance of the exception for fundamental miscarriages of justice." *Schlup*, 513 U.S. at 321. It has been applied to overcome various procedural defaults, including those stemming from successive petitions, "abusive" petitions, failure to develop facts in state court, and failure to observe state procedural rules. *Perkins*, 569 U.S. at 393. Most recently, in *McQuiggin v. Perkins*, the Court recognized it as an available equitable exception to AEDPA's time bar for first petitions, holding that actual innocence "serves as a gateway through which a petitioner may pass whether the impediment is a procedural bar, as it was in *Schlup* and *House*, or, as in this case, expiration of the statute of limitations." *Id.* at 386. Accordingly, a credible showing of actual innocence will allow Mr. Fontenot to overcome both his state court procedural default and his failure to abide by the federal statute of limitations in order to have his *Brady* claim heard on the merits.

76

"[P]risoners asserting innocence as a gateway to defaulted claims must establish that, in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House*, 547 U.S. at 537–38 (quoting *Schlup*, 513 U.S. at 327).

> It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do. Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.

*Schlup*, 513 U.S. at 329.

Removing the double negative, a petitioner's burden at the gateway stage is to demonstrate "that more likely than not any reasonable juror would have reasonable doubt." *House*, 547 U.S. at 538. As this formulation makes clear, "actual innocence" is something of a misnomer, because "the *Schlup* standard does not require absolute certainty about the petitioner's guilt or innocence"—that is, a petitioner need not make "a case of conclusive exoneration." *Id.* at 538, 553; *see also Schlup*, 513 U.S. at 327 ("[T]he showing of 'more likely than not' imposes a lower burden of proof than the 'clear and convincing' standard."). Thus, a "petitioner's showing of innocence is not insufficient solely because the trial record contained sufficient evidence to support the jury's verdict." *Id.* at 331; *see House*, 547 U.S. at 553–54 (granting a gateway innocence claim despite acknowledging that "[s]ome aspects of the State's evidence . . . still support an inference of guilt"); *Cleveland v. Bradshaw*, 693 F.3d 626, 633 (6th Cir. 2012) (noting that the actual innocence standard "is less strict than the insufficient evidence standard").

77

At the same time, however, "it is by no means easy for a petitioner to meet the *Schlup* standard." *Case v. Hatch*, 731 F.3d 1015, 1036 (10th Cir. 2013). The Court has stressed that the standard is "demanding," *Perkins*, 569 U.S. at 401, and "that tenable actual-innocence gateway pleas are rare," *id.* at 386, arising only "in an extraordinary case," *Murray*, 477 U.S. at 496. "The gateway should open only when a petition presents 'evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error.'" *Perkins*, 569 U.S. at 401 (quoting *Schlup*, 513 U.S. at 316). The actual innocence standard is designed to "ensure[] that petitioner's case is truly 'extraordinary' while still providing [a] petitioner a meaningful avenue by which to avoid a manifest injustice." *Schlup*, 513 U.S. at 327 (quoting *McCleskey*, 499 U.S. at 494).[20]

---

[20] The dissent agrees with our articulation of the relevant actual-innocence standard but asserts we fail to faithfully apply it to the facts of this case. But in our view, it is the dissent that misstates and misapplies the relevant standard. The dissent suggests Mr. Fontenot must show he could not have committed the charged crimes. Dissent at 3–4 (criticizing the majority opinion for purportedly failing to consider "that a reasonable juror could conclude that [Mr.] Fontenot could have . . . committed the crimes," notwithstanding his alibi). That is not a proper recitation of the standard. Rather, Mr. Fontenot's burden under the actual-innocence standard is to demonstrate "that *more likely than not* any reasonable juror would have *reasonable doubt*." *House v. Bell*, 547 U.S. 518, 538 (2006) (emphasis added). He need not make "a case of conclusive exoneration." *Id.* at 553.

Next, when applying the actual-innocence standard, the dissent cherry-picks one piece of inculpatory evidence—Mr. Fontenot's confession—while dismissing six important categories of new exculpatory evidence as "peripheral, cumulative, or remote in time." Dissent at 5. The dissent does not seriously contest that Mr. Fontenot's confession was highly problematic. *See id.* (acknowledging our description that Mr. Fontenot's "'confession was [(1)] shot through with clear falsehoods and inconsistencies, [(2)] produced no independently verifiable information, . . . [(3)] provided the police no new facts about the crime[,] . . . [and (4)] Mr. Fontenot fully recanted just two days later,'" and then stating "[a] reasonable juror would take these

78

## 1. New Evidence

To be credible, a claim of actual innocence requires a petitioner to present "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup*, 513 U.S. at 324. In assessing the adequacy of a petitioner's showing, "the habeas court must consider 'all the evidence,' old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under 'rules of admissibility that would govern at trial,'" *House*, 547 U.S. at 538 (quoting *Schlup*, 513 U.S. at 327–28). Put another way, the innocence inquiry "requires a holistic judgment about 'all the evidence,' and its likely effect on reasonable jurors applying the reasonable-doubt standard." *Id.* at 539 (quoting *Schlup*, 513 U.S. at 328).

The *Schlup* Court did not precisely define what it meant by "new reliable evidence . . . that was not presented at trial." 513 U.S. at 324. As a result, "[t]here is a circuit split about whether the 'new' evidence required under *Schlup* includes only newly discovered evidence that was *not available* at the time of trial, or broadly encompasses all evidence that was *not presented* to the fact-finder during the trial, i.e., newly presented evidence."

---

factors . . . into account when considering the confession" (quoting Maj. Op. at 120)). The dissent nonetheless asserts a reasonable jury would "give substantial weight to" it. *Id.* Even if we assume a reasonable jury would give substantial weight to Mr. Fontenot's problematic confession, however, that merely shows that "[s]ome aspects of the State's evidence . . . still support an inference of guilt." *House*, 547 U.S. at 553–54. As discussed, such evidence does not block a defendant's passage through the actual-innocence gateway. *Id.*; *see also Schlup v. Delo*, 513 U.S. 298, 331 (1995) ("[A] petitioner's showing of innocence is not insufficient solely because the trial record contained sufficient evidence to support the jury's verdict.").

*Cleveland*, 693 F.3d at 633 (emphasis added); *see also Reeves v. Fayette SCI*, 897 F.3d 154, 161 (3d Cir. 2018) ("[C]ircuit courts are split on whether the evidence must be newly discovered or whether it is sufficient that the evidence was not presented to the fact-finder at trial.").

"The Seventh and Ninth Circuits have interpreted this phrase to mean evidence is 'new' for purposes of a *Schlup* analysis so long as it was 'not presented' at trial." *Kidd v. Norman*, 651 F.3d 947, 952 (8th Cir. 2011) (citing *Gomez v. Jaimet*, 350 F.3d 673, 679–80 (7th Cir. 2003), and *Griffin v. Johnson*, 350 F.3d 956, 962–63 (9th Cir. 2003)). The Second and Sixth Circuits also agree with this "newly presented" view. *See Rivas v. Fischer*, 687 F.3d 514, 543 (2d Cir. 2012) (defining "new evidence" as "evidence not heard by the jury"); *Souter v. Jones*, 395 F.3d 577, 595 n.9 (6th Cir. 2005) ("[E]ven if the photographs of the bloody clothes were available in 1992, there is no evidence in the record that they were ever presented to the jury and therefore, are new evidence in support of [petitioner's] actual innocence claim under *Schlup*.").

On the other hand, the Third and Eighth Circuits have held "that evidence is 'new' only if it was not available at the time of trial through the exercise of due diligence." *Kidd*, 651 F.3d at 952 (citing *Hubbard v. Pinchak*, 378 F.3d 333, 341 (3d Cir. 2004)). While nominally declining to weigh in, the Fifth Circuit also appears to endorse this "newly discovered" view, having held that "[e]vidence does not qualify as 'new' under the *Schlup* actual-innocence standard if 'it was always within the reach of [a petitioner's] personal knowledge or reasonable investigation.'" *Hancock v. Davis*, 906 F.3d 387, 389–90 (5th Cir. 2018) (quoting *Moore v. Quarterman*, 534 F.3d 454, 465 (5th Cir. 2008)).

This case requires us to pick a side. We adopt the "newly presented" view of *Schlup* evidence over the "newly discovered through diligence" view for two reasons.

First, actual innocence works to remove procedural obstacles to habeas relief in a manner that does not depend on satisfying requirements for standard equitable exceptions to those obstacles, which typically involve some excuse for the delayed presentation of a claim. In particular, as confirmed by *Perkins*, a petitioner who establishes actual innocence need not make a showing of diligence in order to get his otherwise time-barred substantive claims heard. *See* 569 U.S. at 399. Those courts that categorically reject actual-innocence claims unless the petitioner shows he could not have discovered the new evidence through the exercise of diligence prior to trial seem to be in conflict with *Perkins*, at least in the time-bar context—and there does not appear to be any reason to treat the procedural-bar context differently in this regard.

Support for this conclusion is also found in the Supreme Court's various pronouncements that the actual innocence exception operates independently from the "cause" requirement. The miscarriage of justice principle is an "exception" to the "general rule" that "claims forfeited under state law may support federal habeas relief only if the prisoner demonstrates cause for the default and prejudice from the asserted error." *House*, 547 U.S. at 536. That is, "'[i]n appropriate cases' the principles of comity and finality that inform the concepts of cause and prejudice 'must yield to the imperative of correcting a fundamentally unjust incarceration.'" *Carrier*, 477 U.S. at 495 (alteration in original) (quoting *Engle v. Isaac*, 456 U.S. 107, 135 (1982)). The actual innocence exception thus serves as an unconditional safety net to ensure that constitutional claims

81

receive consideration in the "extraordinary" case. Disallowing new evidence from being used in support of a *Schlup* claim if that evidence could have been discovered before trial "through the exercise of due diligence," *Kidd*, 651 F.3d at 952, or if it was "always within the reach of [a petitioner's] personal knowledge or reasonable investigation," *Hancock*, 906 F.3d at 390, would hinder "the 'equitable discretion' of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons," *Herrera*, 506 U.S. at 404, by erecting a "cause" barrier where the Court has made clear that one does not belong.

Second, adding diligence to the new evidence requirement does nothing to further its purpose. The aim is to lend "credibility" to the claim of innocence by showing it is not based solely on evidence a jury has already found sufficient to convict the petitioner. *See Schlup*, 513 U.S. at 324 ("To be credible," an actual innocence claim "requires petitioner to support his allegations of constitutional error with new reliable evidence . . . that was not presented at trial."). Whether the petitioner's jury could have heard the new evidence if he (or, as it were, his counsel) had been diligent in developing and presenting it is beside the principal point of avoiding a manifest injustice. Further, the fact that new reliable evidence of innocence "is obviously unavailable in the vast majority of cases," such that "claims of actual innocence are rarely successful," *id.*, mitigates any concern that the "newly presented" view will lead to a multiplication of unmeritorious claims.

We thus hold that any reliable evidence not presented to the jury at Mr. Fontenot's 1988 new trial can be factored into our assessment of his actual innocence gateway claim.

Although a lack of diligence in developing evidence does not disqualify the use of that evidence in support of a *Schlup* showing, the assessment of diligence does still factor into the holistic innocence inquiry, at least with regard to overcoming AEDPA's time bar. In *Perkins*, the Court clarified that while not "an absolute barrier to relief" or "an unyielding ground for dismissal," a habeas petitioner's unjustifiable delay in presenting new evidence is "a factor in determining whether actual innocence has been reliably shown." 569 U.S. at 387, 401. That is, untimeliness "does bear on the credibility of evidence proffered to show actual innocence." *Id.* at 401. "Considering a petitioner's diligence, not discretely, but as part of the assessment whether actual innocence has been convincingly shown, attends to the State's concern that it will be prejudiced by a prisoner's untoward delay in proffering new evidence." *Id.* at 399.

2. **Standard of Review**

The district court determined that "Mr. Fontenot's actual innocence can equitably toll the AEDPA's statute of limitations," *Fontenot III*, 402 F. Supp. 3d at 1129, and the State likewise described the district court as having "applied equitable tolling to reach the merits" of Mr. Fontenot's claims, Appellant Br. at 55. Equitable tolling, however, does not provide the proper framework for a claim that actual innocence overrides a time bar. In *Perkins*, the Court specified that a petitioner who "maintains that a plea of actual innocence can overcome AEDPA's one-year statute of limitations" "seeks an equitable *exception* to § 2244(d)(1), not an extension of the time statutorily prescribed." 569 U.S. at 392. In support, it cited a Second Circuit opinion that distinguished "a plea to override the statute of limitations when actual innocence is shown" from equitable tolling. *Id.*

83

(citing *Rivas*, 687 F.3d at 547 n.42). Thus, the abuse of discretion standard applicable to tolling does not apply to our review of the district court's actual innocence finding.

We have not directly addressed what standard of review applies to claims of actual innocence, but our sister circuits generally agree that the determination is a mixed question of fact and law. *See Doe v. Menefee*, 391 F.3d 147, 163 (2d Cir. 2004); *U.S. ex rel. Bell v. Pierson*, 267 F.3d 544, 551–52 (7th Cir. 2001). "A determination of a mixed question of fact and law carries no presumption of correctness and is to be reviewed de novo on federal habeas review." *Maes v. Thomas*, 46 F.3d 979, 988 (10th Cir. 1995).

That de novo review is the appropriate standard under which to assess the district court's fundamental miscarriage of justice determination is reinforced by the reasoning of *House v. Bell*. There, the Court rejected a requirement to show "clear error as to . . . specific determinations" in order to upset a district court's finding, as that standard would "overstate" the effect of the habeas court's ruling on actual innocence. 547 U.S. at 539.

> Deference is given to a trial court's assessment of evidence presented to it in the first instance. Yet the *Schlup* inquiry, we repeat, requires a holistic judgment about "all the evidence," and its likely effect on reasonable jurors applying the reasonable-doubt standard. As a general rule, the inquiry does not turn on discrete findings regarding disputed points of fact, and "[i]t is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses."

*Id.* at 539–40 (quoting *Schlup*, 513 U.S. at 328, 329). This reasoning indicates that little to no deference should be given to the application by federal habeas courts of "*Schlup*'s predictive standard regarding whether reasonable jurors would have reasonable doubt." *Id.* at 540.

84

Nor do we defer to state court adjudications in this sphere: AEDPA's deferential standard of review for claims decided on the merits by a state court, found in § 2254(d), has no application to a gateway innocence assertion, which is an exception to federal procedural obstacles to relief rather than a substantive claim. *See Blackmon v. Williams*, 823 F.3d 1088, 1101 n.2 (7th Cir. 2016); *Sharpe v. Bell*, 593 F.3d 372, 378 (4th Cir. 2010). But the presumption of correctness applied to state court factfinding under § 2254(e)(1) does still apply. Therefore, "when a state court has made a factual determination bearing on the resolution of a *Schlup* issue, the petitioner bears the burden of rebutting this presumption by 'clear and convincing evidence.'" *Teleguz v. Pearson*, 689 F.3d 322, 331 (4th Cir. 2012) (quoting *Sharpe*, 593 F.3d at 378); *cf. Klein v. Neal*, 45 F.3d 1395, 1400 (10th Cir. 1995) (state court factfinding entitled to presumption of correctness in fundamental miscarriage of justice inquiry).

3. **Analysis**

Adopting the "newly presented" view of *Schlup* evidence instead of the "newly discovered" view means that even if some evidence not presented at trial was, as the State claims, "available to the defense since the 1980s," Appellant Br. at 30, such evidence is factored into the holistic evaluation of Mr. Fontenot's actual innocence plea nonetheless. Additionally, the State's contention that Mr. Fontenot's petitions "lacked a unifying theory for why this [c]ourt or anyone should believe that some other individual committed the crime" is not dispositive. Appellant Br. at 41; *see also id.* at 46 (referencing Mr. Fontenot's "contradictory" theories of the case). As discussed, the *Schlup* standard does not demand conclusive proof of exoneration; rather, it involves a

probabilistic determination that, in light of all the evidence—"old and new; admissible and inadmissible," *Case*, 731 F.3d at 1036—"more likely than not any reasonable juror would have reasonable doubt," *House*, 547 U.S. at 538. Of course, reasonable doubt "does not require [the defense] to prove to [the jury] who did these things." N/T, Vol. 37 at 306 (Mr. Butner's closing argument). And neither is it our "function . . . to make an independent factual determination about what likely occurred." *House*, 547 U.S. at 538.

Mr. Fontenot presents six categories of new evidence in support of his actual innocence gateway assertion, all of which the district court credited. SAP, Vol. 30 at 32–62; *Fontenot III*, 402 F. Supp. 3d at 1129–49. We analyze each category in turn, contrasting the evidence put on at the 1988 new trial with that which is newly presented.

a. *Alibi evidence*

At Mr. Fontenot's new trial, Gordon Calhoun testified for the State that he threw a keg party at his apartment on April 28, 1984, but that neither Mr. Fontenot nor Mr. Ward attended. Mr. Butner failed to impeach him on this point, and put on no defense regarding Mr. Fontenot's presence at the party.

During his pre-polygraph interview on October 21, Mr. Fontenot recalled several people at the Calhoun keg party on April 28, including Mr. Calhoun, "Bruce" from Konawa, Janette Roberts, Mr. Ward, and Michael Shane Lindsay. He also recalled that someone at the party was playing the drums. In a letter written to Mr. Butner in June 1985, which Mr. Butner never received, Mr. Fontenot again stated that "Bruce" from Konawa "was at the keg party Gordon Calhoun was throwing," while listing Ms. Roberts as another alibi witness. Ex. 95, Vol. 30 at 523, 529.

86

The police interviewed Ms. Roberts on October 19, 1984, the day Mr. Fontenot confessed. She stated that on a Saturday night the previous spring, Mr. Calhoun threw a keg party at his apartment next door to hers on South Townsend. Mr. Calhoun had gone to Texas to buy the kegs, according to Ms. Roberts, which she knew because she had split the cost with him.[21] Ms. Roberts said the party started sometime between 7 and 9 p.m., that she "was in and out most of the time the party was going on," that both Mr. Fontenot and Mr. Ward were there, and that she never saw either leave after the party started. Ex. 44, Vol. 6 at 37. Ms. Roberts also identified several individuals from Konawa as being in attendance, including someone named "Bruce." She stated that neither Mr. Fontenot nor Mr. Ward had transportation at that time and that they both lived in her apartment.[22]

The "Bruce" from Konawa referenced by both Mr. Fontenot and Ms. Roberts in their October 1984 statements is Bruce DePrater, who was good friends with Mr. Calhoun. In a 2013 affidavit provided in support of Mr. Fontenot's petition,

---

[21] At the time, Texas beer had a higher alcoholic content than beer sold in Oklahoma, making it more desirable.

[22] Ms. Roberts also told police that Mr. Ward was at her apartment earlier that Saturday, but left to put plumbing in for his mother, before returning for the party at around 9 p.m. This confirmed a key detail of the story Mr. Ward gave police a week earlier, on October 12. *See* P/H, Vol. 32 at 512 (Detective Baskin's testimony that "[Mr. Ward] said they got back and started around 10:30 or 11:00 Saturday morning and worked all day on the plumbing. He said he got through somewhere around 9:00 p.m. He said he then took a shower and walked over to Janette Roberts' house at 509 ½ South Townsend. He said that Gordon Calhoun was having a keg party there. And [he] said that he spent the night at Gordon's and never left the party.").

Mr. DePrater stated that he remembered a keg party at Mr. Calhoun's apartment sometime in the spring of 1984. He and Mr. Calhoun had gone to Texas to purchase the kegs for this party, confirming what Ms. Roberts told police in 1984. Mr. DePrater played the guitar at this party while Mr. Calhoun played the drums, corroborating a detail from Mr. Fontenot's October 21 statement. Mr. DePrater recalled seeing Mr. Fontenot three times throughout the night, the last being when he followed Mr. Fontenot into a passageway between the Calhoun and Roberts apartments to hide from police responding to a noise complaint about the party late that night.

In his affidavit, Mr. DePrater identified a man named Eric Thompson as also being at the party. Mr. Thompson confirmed via his own 2013 affidavit that he traveled from Konawa to Ada with his brother Chris for Mr. Calhoun's keg party on April 28, 1984, and that he saw Mr. Fontenot there. Mr. Thompson specifically remembered Mr. Fontenot joking about repeatedly filling the same beer can at the keg.

Stacy Shelton, Mr. DePrater's sister, provided another affidavit in support of Mr. Fontenot's petition. She confirmed various details about the Calhoun keg party: that it was on April 28, 1984; that Mr. DePrater, the Thompson brothers, and Ms. Roberts all attended; that Mr. Calhoun was playing the drums; and that the APD was called out to the party on a noise complaint.[23] In her affidavit, Ms. Shelton recounted that the police

---

[23] Additionally, Ms. Shelton testified at Mr. Ward's new trial in 1989 that there were 20 to 25 people at the Calhoun party when she arrived around midnight. This corroborates Mr. Fontenot's statement from October 21, 1984: "He does recall there were approximately twenty-five people at the party." Ex. 43, Vol. 4 at 324.

ignored her when she tried to tell them neither Mr. Fontenot nor Mr. Ward could have committed the murder because both were at the party, and that when she testified for the defense about this party at Mr. Ward's 1989 new trial, District Attorney Bill Peterson pressured her (unsuccessfully) to get back on the stand and recant.

These affidavits are corroborated by Mr. Ward's 1984 statements to police. The prosecutorial contains a summary of the APD's initial encounter with Mr. Ward, on May 1, 1984, when Mr. Ward told Detective Smith he went to a party on the night of April 28 next door to Mr. Fontenot's apartment, at which the police showed up later that night. During Mr. Ward's interrogation in Norman on October 12, 1984, a recording of which was played at the joint trial, he stated that Mr. Calhoun threw a keg party on that Saturday night, and that the police showed up at the party because Mr. Calhoun was playing the drums and "[t]he other guy from Konawa was playing the guitar, and it was kind of loud, so they came out and told us to quiet it down." J/T, Vol. 41 at 49. Mr. Ward identified Ms. Roberts, Mr. Calhoun, Mr. Fontenot, and the "[g]uys from Konawa" as being in attendance. *Id.* at 50.

Contemporaneous police documents also corroborate key details of Mr. Fontenot's alibi. The APD radio log from the early morning hours of April 29, 1984, contains an entry at 12:40 a.m. stating: "rep loud drummer at 515 S. Townsend," Ex. 42, Vol. 4 at 168, which was Mr. Calhoun's address. The report of a "loud drummer" confirms the statements of Mr. Fontenot, Mr. DePrater, Ms. Shelton, and Mr. Ward that someone was playing the drums. A police report regarding this noise complaint noted that on April 29 at 12:40 a.m., "[a]n upstairs apt on the north side of the alley at 519 S. Townsend rented

89

by Gordon Calhoun was having a party. They advised they would quieten down." Ex. 89, Vol. 28 at 332. The timing of this complaint meshes with the recollections of both Mr. DePrater and Mr. Ward that the police came later that night in response to loud music being played by Mr. DePrater and Mr. Calhoun, and also meshes with Mr. DePrater's statement that he and Mr. Fontenot ran off to hide in a passageway between the neighboring apartments until the police departed.

If all of this information had been presented at Mr. Fontenot's trial, "[his] alibi [defense] would have been viewed in a different light." *Bowen v. Maynard*, 799 F.2d 593, 612–13 (10th Cir. 1986). In his October 21 statement, Mr. Fontenot gave information about the Calhoun keg party that was corroborated by various other sources—including the key detail of the drummer, which precipitated the late-night noise complaint. Given that Mr. Fontenot was seen by multiple people at the party at multiple points on the night of April 28, 1984, that the party began between 7 and 9 p.m., and that Ms. Haraway was abducted at around 8:45 p.m., a reasonable juror would have questioned whether Mr. Fontenot could have participated in her murder—particularly since Ms. Haraway's body was found in rough hilly brushland some 30 miles from Ada. *See* N/T, Vol. 37 at 345 (prosecution's argument in closing that "the only reasonable interpretation" of the confessions was that Mr. Ward and Mr. Fontenot drove Ms. Haraway's body to Hughes County and dumped it near Gerty on the night of April 28 after murdering her at the Ada power plant).

However, the reliability of at least one of the affidavits that support Mr. Fontenot's alibi defense is weakened by several documents in the record. First, Mr. DePrater's

90

statement that he traveled with Mr. Calhoun to buy the beer in Texas is contradicted by Mr. Calhoun's December 11, 1984, statement that he made this trip with a friend named Brad from East Central University. Second, and more damaging, is a summary of an interview with Mr. DePrater conducted by the OSBI on October 25, 1984, in which he said that he did not know Mr. Fontenot. In light of this contemporaneous contradictory information, we must discount to some degree the credibility of the information in Mr. DePrater's alibi affidavit, which Mr. Fontenot presented more than two decades after his new trial.[24]

### b. *Obscene phone calls*

At Mr. Fontenot's new trial, no mention was made of the obscene phone calls Ms. Haraway received while working at McAnally's shortly before her abduction. *See supra* Part I.A.4. This can be primarily attributed to the State's failure to disclose the police reports documenting such calls.

---

[24] The dissent notes that, notwithstanding all of this new alibi evidence, "[Mr.] Fontenot could have attended the party *and* committed the crimes," and it criticizes our analysis for purportedly ignoring this possibility. Dissent at 3–4 (emphasis in original). The dissent misunderstands our analysis and the relevant standard. We do not fail to consider that it would have been possible for Mr. Fontenot to attend the party and commit the charged crimes. In fact, we agree with the dissent that the new alibi evidence does not completely negate that possibility. But the reasonable-doubt standard does not, as the dissent suggests, dictate that a jury must convict if there is a possibility that Mr. Fontenot *could* be guilty; rather, a jury must acquit if there is "a real possibility" he is *not*. *See United States v. Petty*, 856 F.3d 1306, 1310 (10th Cir. 2017). Because the new alibi evidence helps show there is "a real possibility that he is not guilty," *id.*, it properly informs our conclusion, under the appropriate actual-innocence standard, "that more likely than not any reasonable juror would have reasonable doubt" as to his guilt, *House*, 547 U.S. at 538.

Most prominent among these reports was the summary of information provided by Ms. Haraway's sister, Janet Weldon. But the State also had several other reports referencing the troubling calls: from the McAnally's manager, Monroe Atkeson; from Ms. Haraway's husband, Steve; and from her coworker James David Watts, who told a D.A. investigator in 1985 that Ms. Haraway had specifically described these phone calls to him as "obscene." Ex. 62, Vol. 26 at 207; Ex. 15, Vol. 2 at 72. Additionally, a defense investigator uncovered a McAnally's customer, Anthony Johnson, who said that Ms. Haraway told him about these disturbing calls when he was in the store a week prior to her abduction, and was concerned enough about them to ask Mr. Johnson where she could buy a gun.

"From beginning to end th[is] case is about who committed the crime. When identity is in question, motive is key." *House*, 547 U.S. at 540. The evidence of these obscene phone calls, had it been presented to the jury, would have revealed a viable alternate suspect—the unknown man (or men) who made these harassing calls. This unidentified caller obviously knew that Ms. Haraway worked at McAnally's and knew when she worked. *See* Ex. 15, Vol. 2 at 72 (Mr. Watts's statement that Ms. Haraway only got the calls when working at the store, and not at home). This indicates that he may have been a regular customer.[25] *See* Ex. 15, Vol. 2 at 72 (Mr. Watts's speculation that the

---

[25] In what may only be a disturbing coincidence, Karen Wise, the J.P.'s clerk, testified at the preliminary hearing that she had "gotten several phone calls since this whole mess started," which she described as "[h]ang-up calls." P/H, Vol. 32 at 1085. She further stated that "I've gotten some breathers, of course, and then some that I've had two whisperers, and then one day a girl called me at work. That was like a threat in a sense, because of the way it was worded. . . . It was more like a warning." *Id.* at 1086. Ms. Wise

caller was probably a regular McAnally's customer); *see also* Ex. 22, Vol. 2 at 260

(Mr. Johnson's speculation "that she knew who was making the calls but did not seem to

want to indicate who it was"). These calls at least hint at a motive for the abduction,

which is entirely lacking with respect to the potential involvement of Mr. Fontenot, given

that no evidence was presented that he had ever been in McAnally's or had ever even

seen Ms. Haraway before the evening of the crime.

Additionally, the timing of these calls should have implicated whoever made them

as a prime suspect in Ms. Haraway's murder. Mr. Watts stated that the last of the obscene

calls occurred about a month before her disappearance. Steve Haraway moved the

timeline forward, telling police the last call his wife received was around two or three

weeks before she disappeared. The statement of Mr. Johnson, meanwhile, indicates that

Ms. Haraway expressed significant concern about these calls just one week prior to her

disappearance. And in a conversation with her sister that likely occurred only a day or

two before the abduction, Ms. Haraway said that "the phone calls had started again," and

indicated that she was particularly upset about having to go in to work on the very

_____

relayed this information in the context of her testimony about calling the police several weeks prior because a man was watching her apartment late at night from a nearby alley, who resembled the taller man she saw in J.P.'s on April 28, 1984. Specifically, she relayed this information about the phone calls when asked what made her think the man watching her apartment "was causing [her] some possible harm." *Id.* at 1085. If Janet Weldon's report about the phone calls Ms. Haraway received prior to her disappearance had been disclosed to the defense, this additional set of strange phone calls received by Ms. Wise—who, like Ms. Haraway, was a female convenience store clerk working night shifts alone in Ada, at a store just a quarter mile down the road from McAnally's—might have proven ripe for follow-up inquiry. But no such follow-up was made.

Saturday night she went missing. Ex. 43, Vol. 4 at 294. It thus appears that Ms. Haraway was being harassed by the unknown caller while at McAnally's in the period just before she was abducted from the store, harassment that caused her to feel "uneasy" while working the night shift alone. *See* Ex. 1, Vol. 2 at 25 (affidavit of Darlene Adams); Ex. 43, Vol. 4 at 294 (statement of Janet Weldon).

The evidence of these calls, combined with other circumstantial evidence derived from customers at McAnally's shortly before Ms. Haraway disappeared, would have led a reasonable juror to question whether this unknown male caller participated in Ms. Haraway's abduction. Specifically, Ms. Weldon's statement that the caller told Ms. Haraway "he was going to come out to the store some night and wait outside while she was working," Ex. 43, Vol. 4 at 294, fits with the observation of several witnesses that the gray-primered pickup was parked outside McAnally's for an hour or so before she disappeared. *See* Ex. 102, Vol. 30 at 551–52 (James Moyer's statements that a rough-looking gray Chevy pickup pulled into McAnally's shortly after he arrived at 7:30); Ex. 6, Vol. 2 at 39 (Richard Holkum's statement that he saw a gray Chevy or GMC pickup in the parking lot when he stopped at McAnally's between 7:30 and 7:45); Ex. 5, Vol. 2 at 35 (John McKinnis's statement that he saw a light-colored Chevy pickup with primer spots in the parking lot when he arrived shortly before 8 p.m.).

In sum, "[t]his is not a situation where only one person made a comment about a few suspicious telephone calls. Instead, numerous people including [Ms. Haraway's] husband, manager, co-worker, customers, and [sister] were aware of this conduct and recognized its obvious relevance to the case." *Fontenot III*, 402 F. Supp. 3d at 1139. This

94

evidence of an alternate suspect who was targeting Ms. Haraway while she worked the night shift at McAnally's in the weeks leading up to her disappearance, if presented at trial, would most likely have planted seeds of reasonable doubt in the mind of a reasonable juror regarding whether Mr. Fontenot was involved in her murder.[26]

c. *James Moyer's affidavit*

At the 1988 new trial, James Moyer testified that he saw two men walk into McAnally's seconds apart at around 7:30 p.m. on the night of April 28, 1984: "[a] dark haired person first and then a blond haired person." N/T, Vol. 36 at 25–26. The dark-haired man immediately walked toward the back aisles. He was wearing jeans and "hard soled boots, you could hear them when he walked." *Id.* at 37. Whenever Mr. Moyer glanced behind him toward the back of the store, he saw this man staring at him. The

---

[26] The dissent states a reasonable juror "would most likely deem the calls irrelevant" or "infer that [Mr. Fontenot] was the caller." Dissent at 4. We remain convinced it is more likely that a reasonable juror would find that harassing phone calls made to Ms. Haraway in the period immediately before her abduction—calls from a man who said he was going to come to the store some night and wait outside while she was working, calls that concerned her enough that she asked Mr. Johnson about obtaining a gun, and calls that made her particularly upset about having to go to work on the very night she went missing—were highly relevant. Indeed, the district court described these calls as having "*obvious relevance* to the case," *Fontenot III*, 402 F. Supp. 3d at 1139 (emphasis added).

As for the possibility that Mr. Fontenot made the calls himself, the dissent does not explain why a reasonable juror would reach this conclusion in the absence of any evidence supporting it. The more reasonable inference to be drawn from the evidence is that Mr. Fontenot did *not* make the calls, given that the caller clearly knew Ms. Haraway worked at McAnally's and knew when she worked, and no evidence shows Mr. Fontenot had ever been in McAnally's or had ever even seen Ms. Haraway before the evening of the crime. In any event, the absence of conclusive evidence that Mr. Fontenot did not make the phone calls does not mean the calls do not contribute to reasonable doubt.

blond-haired man, meanwhile, stayed up near the counter, where Mr. Moyer was talking to Ms. Haraway. Mr. Moyer identified the blond-haired man as Mr. Ward.

Mr. Moyer's identification of the dark-haired man, whom he observed only in "glances," *id.* at 39, was far more equivocal. On direct examination, he testified that Mr. Fontenot was the person he "first identified": "At the time that was my perception, it has been a while and I get confused on it." *Id.* at 32–33. He stated that he grew confused about this identification after testifying at the preliminary hearing, when he saw a man sitting in the back of the courtroom—Steve Bevel—who was staring at him the same way the dark-haired man in the back of the store stared at him on the night of April 28.

On cross-examination, Mr. Moyer stated that the dark-haired man he saw in McAnally's was taller than his own height of 5′10". And Mr. Moyer agreed that Mr. Fontenot was "two to three inches shorter than" his own height, based on his observation from standing next to him at the preliminary hearing. *Id.* at 41. Mr. Moyer therefore conceded that for Mr. Fontenot to appear taller than him, "he would have to have heels on his boots about three to four inches tall." *Id.* at 41–42. Mr. Moyer again stated that he became "confused" about his identification of Mr. Fontenot after the preliminary hearing—confused enough to repeatedly attempt to contact the Pontotoc County District Attorney's office during the summer of 1985 to inform the prosecution that Mr. Fontenot was not the dark-haired man he saw in McAnally's. *Id.* at 42.

Mr. Moyer revealed on cross-examination that he contacted the D.A.'s office because he believed there was someone sitting in the back of the courtroom during the preliminary hearing who looked more like the dark-haired man he saw in McAnally's on

96

April 28. This man was wearing boots at the preliminary hearing, like the man he saw in McAnally's that night. He also had longer hair and was "much taller" than Mr. Fontenot. *Id.* at 43. At the hearing, Mr. Moyer saw this taller man, Mr. Bevel, say something to Mr. Ward as he was taken to the restroom. Mr. Moyer stated that during a break at the hearing, he asked Karen Wise whether there was someone in the courtroom who "looked more familiar" than Mr. Fontenot, to which she replied, "yes." *Id.* at 45. Mr. Moyer closed his cross-examination testimony by admitting he was "not sure" whether Mr. Fontenot was in McAnally's on April 28, 1984. *Id.* at 47.

On redirect, the State elicited the fact that Mr. Moyer did previously identify Mr. Fontenot as being the dark-haired man he saw in McAnally's at both a live lineup in December 1984 and at the preliminary hearing in January 1985.

Mr. Fontenot points to two items of new evidence not presented at trial regarding Mr. Moyer's identification. First, the police failed to turn over summaries of two 1984 interviews with Mr. Moyer, from April 30 and November 6. In the November 6 interview, Mr. Moyer stated that he did not get a very good look at the dark-haired man in the store. Second, Mr. Fontenot presents Mr. Moyer's 2012 affidavit, in which Mr. Moyer asserts he is "confid[e]nt that Karl Fontenot was not the man I saw at McAnally's," who "was definitely taller than Karl Fontenot and had a much more intimidating look about him." Ex. 14, Vol. 2 at 69. Mr. Moyer swears that he is now "about 95% sure that it was Steve Bevel, not Karl Fontenot, that I saw in McAnally's on April 28, 1984." *Id.* at 69. Mr. Moyer's affidavit also states that when he called the

97

D.A.'s office in the summer of 1985 to express concern regarding his identification of Mr. Fontenot, he was told that "[i]t was not him (Bevel)." *Id.* at 68.

The State argues that Mr. Moyer's recantation is not new evidence because the "'uncertainty' in his identification of Petitioner was on full display at the 1988 trial," given that Mr. Moyer admitted to being "confused" about the second man. Appellant Br. at 32. But the uncertainty and confusion Mr. Moyer exhibited at trial has now turned to confidence that Mr. Fontenot was *not* the dark-haired man in McAnally's that night. The affidavit thus qualifies as new evidence for *Schlup* purposes because the new trial jury did not hear Mr. Moyer definitively recant his uncertain identification of Mr. Fontenot in favor of a near-certain identification of Mr. Bevel. *See, e.g.*, N/T, Vol. 36 at 43 ("Q [Mr. Butner]: And, in fact, you became convinced that [Mr. Bevel] was, in fact, the second man, didn't you? A [Mr. Moyer]: Well, I don't know if I was convinced about it.").

Additionally, Mr. Moyer's recantation counts as new evidence because it serves to refute, via clear and convincing evidence, that "he had seen two men generally matching Fontenot's and Ward's descriptions inside the store," *Fontenot II*, 881 P.2d at 78, one of nine facts the OCCA found to be corroborative of Mr. Fontenot's confession in upholding his second conviction. The State advances this finding as a key OCCA-determined fact entitled to a presumption of correctness under § 2254(e)(1). *See* Appellant Br. at 34–35. It cannot then simultaneously argue that a recantation of Mr. Moyer's shaky trial identification is cumulative. If Mr. Moyer's assertion that he is now convinced he did not see Mr. Fontenot in the store does not meaningfully differ from his trial testimony, then the corroborative value of the OCCA's finding of "general resemblance" between the

man Mr. Moyer saw in McAnally's and Mr. Fontenot would be essentially nil, a dead-letter from the start. *Cf.* Ex. 14, Vol. 2 at 69 ("The man I saw at McAnally's was definitely taller than Karl Fontenot and had a much more intimidating look about him.").

The State also cites *Case v. Hatch*, 731 F.3d at 1044, for the proposition that "recanted testimony is notoriously unreliable." *See* Appellant Br. at 32. This is doubtless true in the mine-run case. Here, however, the reliability of Mr. Moyer's recantation is greatly enhanced by the fact that it matches a statement he gave to a defense investigator in 1985, prior to both trials—a statement Mr. Fontenot's new trial jury never heard.[27]

During the September 1985 joint trial, the defense introduced the tape of a conversation between Mr. Moyer and private investigator Richard Kerner that occurred on August 28, 1985. On the tape, Mr. Moyer states that Mr. Bevel, not Mr. Fontenot, was the man he saw in McAnally's with Mr. Ward:

> Mr. Kerner: And the tall one that was in the convenience store, then, is not the one that's in jail at the present time—not Fontenot?
> Mr. Moyer: Not the one I saw. I was about—Bill Peterson is hard to get a hold of. I was going to let him know that I was changing my mind on this.
> . . .
> Mr. Kerner: So, at least at the upcoming trial, you're going to—you're going to be saying, then, that the tall guy which is Karl Fontenot, is not the one you saw in the store that night the girl disappeared?
> Mr. Moyer: Right.

J/T, Vol. 40 at 1074–75.

---

[27] The dissent cites *Case v. Hatch* for the same proposition as the State cites it—i.e., recanted testimony is unreliable. In this section we explain why, although true as a general matter, this proposition does not carry the same force with respect to Mr. Moyer's testimony.

Mr. Kerner: And the guy at the Preliminary Hearing, you're pretty reasonably sure that the guy at the Preliminary Hearing with the Bevel on his belt[28] was the second man, and he knows Tommy [Ward] and spoke to him at the Preliminary Hearing?
Mr. Moyer: Right.

*Id.* at 1079.

Mr. Kerner: But you're going to say the same things that you told me; you're going to say the same things at the trial?
Mr. Moyer: Yeah, that's why I've been trying to get a hold of Bill Peterson, let him know I changed my mind.
. . .
Mr. Kerner: He won't be too happy one of his witnesses backed out on one of the two guys in jail, but I mean, you've got to tell the truth. Hell, whoever it helps or hurts, you couldn't—
Mr. Moyer: Well, I don't want the wrong person being convicted.

*Id.* at 1080–81. This tape was played for the jury at the 1985 joint trial (but not the 1988 new trial) to impeach statements made by Mr. Moyer. And when cross-examined by Mr. Butner at the joint trial, Mr. Moyer agreed that Mr. Bevel, the man he saw at the preliminary hearing, looked more familiar to him as being in McAnally's on the night of April 28 than Mr. Fontenot, because Mr. Bevel was taller and had longer hair.

Thus, this is not a situation where an eyewitness who was sure of his identification thirty years ago now suddenly reverses course to claim he saw someone else entirely. Not only was Mr. Moyer uncertain of his identification at trial, but his current affidavit aligns

---

[28] Mr. Bevel wore a wide leather cowboy belt at the preliminary hearing with the letters B-E-V-E-L engraved on the back. He also wore boots and "a long-sleeved shirt, like snaps on the shirt like cowboys wear, western style." J/T, Vol. 40 at 1080. He was, in short, dressed "[l]ike a cowboy." N/T, Vol. 40 at 990.

with candid statements he made *prior to both trials*.[29] Furthermore, there was no reason for Mr. Moyer to lie to the defense investigator. In fact, he said during the taped interview with Mr. Kerner that by speaking to him, he "might be helping the wrong people"—that is, the defense instead of the prosecution—but that he was doing so because he "d[idn't] want the wrong person being convicted." J/T, Vol. 40 at 1080–81.

Additionally, Mr. Moyer offers plausible explanations for his failure to recant his identification at trial. He felt betrayed by the fact Mr. Kerner taped their conversation without his consent, which led him to feel conflicted about his testimony. And when he spoke with someone at the D.A.'s office in the summer of 1985, he was told that "it was not [Mr. Bevel]," which made him afraid to change his story. Ex. 14, Vol. 2 at 68. Mr. Moyer's allegation of inappropriate prosecutorial influence is bolstered by sworn statements from other witnesses recounting pressure from the D.A.'s office to conform their recollection to an official narrative of Mr. Fontenot's and Mr. Ward's guilt. *See* Ex. 12, Vol. 2 at 57 (Stacey Shelton affidavit); Ex. 13, Vol. 2 at 62 (Karen Wise affidavit).

---

[29] That Mr. Bevel was much taller than Mr. Fontenot, had longer, shoulder-length hair, and was wearing boots at the preliminary hearing provide discrete details that better align with the description given by Mr. Moyer at both trials of the man he saw in McAnally's (tall with shoulder-length hair and wearing boots) and the description of Composite Suspect #1. *See* N/T, Vol. 36 at 43; J/T, Vol. 40 at 1098; *see also* Vol. 11 at 27 (describing Suspect #1 as 6′0″ to 6′2″ with shoulder-length hair). Additionally, when police interviewed Mr. Bevel on September 19, 1985, during the joint trial, he admitted to knowing Mr. Ward "for about ten years." Ex. 44, Vol. 7 at 19. This association, combined with circumstantial evidence derived from Mr. Bevel's presence at the preliminary hearing and Ms. Wise's midnight sighting of the tall, slim, cowboy-like man in the alley, further increase the reliability of Mr. Moyer's recantation. *Cf. House*, 547 U.S. at 551 (the reliability of a statement made well after the crime is enhanced when "the record includes at least some independent support for th[at] statement[]").

The importance of Mr. Moyer's testimony to Mr. Fontenot's prosecution also counsels in favor of factoring this evidence into the *Schlup* inquiry. As the district court stated, Mr. Moyer was the only witness who placed Mr. Fontenot in McAnally's the night of Ms. Haraway's disappearance. *See Fontenot III*, 402 F. Supp. 3d at 1139. And while Mr. Moyer's testimony at the new trial was equivocal, the jury did hear he had twice before identified Mr. Fontenot as the dark-haired man in McAnally's: at a live lineup and at the preliminary hearing. Furthermore, in closing argument, the prosecution repeatedly emphasized the fact that Mr. Moyer identified Mr. Fontenot at the preliminary hearing. *See* N/T, Vol. 37 at 270; *id* at 319 (arguing in closing that Mr. Moyer previously identified Mr. Fontenot "in Court, under oath"). The assertion by Mr. Moyer that he is now confident his original identification of Mr. Fontenot was wrong would undermine the residual power of those prior statements of identification and serve to cast additional doubt in the mind of a reasonable juror regarding whether Mr. Fontenot was ever at McAnally's on the night of April 28.[30]

Lastly, the State argues that before crediting Mr. Moyer's recantation, the district court "should have at least subjected Moyer's claims to the rigors of cross-examination rather than relying on affidavits produced by defense investigators," and that "[w]ithout taking that step, the OCCA's finding that Moyer's testimony represented one of nine

---

[30] We disagree with the dissent's assessment that Mr. Moyer's affidavit "barely state[s] anything of value." *See* Dissent at 3. For the reasons discussed above, Mr. Moyers's affidavit—in which he avers he is confident he misidentified Mr. Fontenot as the man he saw in McAnally's on the night Ms. Haraway disappeared—is of significant evidentiary value.

points of corroboration was not overcome by clear and convincing evidence." Appellant Br. at 35 (citing, *inter alia*, 28 U.S.C. § 2254(e)(1)). Affidavits, however, are a common source of new evidence presented in support of *Schlup* showings: in *Schlup* itself, "[t]he petition was supported by numerous affidavits from inmates attesting to Schlup's innocence," 513 U.S. at 307, two of which were described by the Court as "particularly relevant" new evidence, *id.* at 316–17. Furthermore, although an evidentiary hearing may be an advisable method for testing actual innocence assertions,[31] here the interlocking nature of the statements in Mr. Moyer's affidavit and his statements to Mr. Kerner in the summer of 1985, combined with Mr. Moyer's uncertainty at trial regarding the identity of the dark-haired man, provides the clear and convincing evidence needed under § 2254(e)(1) to overcome the OCCA's finding that Mr. Moyer's trial testimony corroborated Mr. Fontenot's confession to any meaningful extent.

d. *Karen Wise's affidavit*

Karen Wise, the J.P.'s clerk, was a key witness at Mr. Fontenot's new trial. She testified that two suspicious men were first in her store at around 4 p.m. on April 28, 1984, then later returned at around 7 p.m. One of them wore boots[32] and one wore tennis

---

[31] "In cases where an applicant for federal habeas relief is not barred from obtaining an evidentiary hearing by 28 U.S.C. § 2254(e)(2), the decision to grant such a hearing rests in the discretion of the district court." *Schriro v. Landrigan*, 550 U.S. 465, 468 (2007).

[32] At the preliminary hearing, Ms. Wise testified that one of the men "had on shoes I could hear . . . heavier shoes, [that] walked heavier." P/H, Vol. 32 at 183. *Cf.* N/T, Vol. 36 at 37 (Mr. Moyer's trial testimony that the taller, dark-haired man in McAnally's had on "hard soled boots, you could hear them when he walked").

103

shoes, but Ms. Wise could not recall who had on what. One of these men was watching Ms. Wise, which made her nervous. *See* N/T, Vol. 35 at 547 ("It was a look in his eyes, I don't know how to describe it."[33]). Every time she looked up, he would be staring at her.[34]

Ms. Wise identified one of these men—blond and around 5'8—as Mr. Ward. She indicated that the other man—taller and with darker hair—looked similar to Mr. Fontenot. She also testified that Mr. Fontenot looked familiar to her, as perhaps someone she had seen in the store before. But she could not recall when she had seen Mr. Fontenot and could not identify him as one of the men in J.P.'s on April 28, 1984. *See id.* at 579 ("I cannot say for sure he was in that night."). And she admitted that she also failed to identify Mr. Fontenot at a live lineup conducted in December 1984.

On cross-examination, Mr. Butner brought out the night in January 1985, following her initial preliminary hearing testimony, when Ms. Wise called the police because a man resembling the tall, slim man she saw in J.P.'s on April 28 was staring up at her apartment from an alley.[35] Mr. Butner also elicited testimony that Ms. Wise

---

[33] *Cf.* Moyer affidavit, Ex. 14, Vol. 2 at 69 ("The man I saw at McAnally's was definitely taller than Karl Fontenot and had a much more intimidating look about him.").

[34] *Cf.* Moyer testimony, N/T, Vol. 36 at 33–34 ("While I was standing up at the counter, this person was walking the back aisles, I would look in back of me and he would be staring at me. . . . I glanced up again and this person was staring at me again, directly in back of me, on the back aisle."); Wise testimony, P/H, Vol. 32 at 1098 ("But when I looked out—went to another window [of my apartment] and looked out again, there he was, you know, looking right back up again.").

[35] This man "was dressed cowboy-like." J/T, Vol. 40 at 1006; *see id.* at 1015 (Mr. Butner's cross-examination of Ms. Wise: "[Y]ou heard some boots [in J.P.'s]; you

recognized someone in the back of the courtroom at the preliminary hearing who resembled the person in J.P.'s that night—Mr. Bevel—and that Mr. Bevel stared at Ms. Wise in the hallway outside the preliminary hearing, which concerned her and caused her to step back out of view. Ms. Wise stated she knew Mr. Bevel and had seen him in J.P.'s several times. But on redirect, she denied that Mr. Bevel was the second man in J.P.'s on April 28.

Ms. Wise also testified that the "two boys that are in question here, they were not the only boys in the game room during that whole time." *Id.* at 579. And in response to a question from Mr. Butner as to whether she was "sure that the State of Oklahoma has the second man in this case," she replied, "I'm not sure that two is all there were." *Id.* at 585.

Mr. Butner did not follow up on this comment, as he had no information regarding any other individuals in J.P.'s that night. But in a 2009 affidavit, Ms. Wise asserted that when the police interviewed her on the night of April 28, she told them there were two other men in J.P.'s earlier that evening—that is, there were four men total—but that the police insisted there were only two. She said the two men who ended up in the composite drawings, later identified as Mr. Fontenot (Suspect #1) and Mr. Ward (Suspect #2), "were not aggressive in any way," and that she "was particularly nervous because of two *other* men in the store that evening" who were there "during approximately the same time as

saw someone with a cowboy belt in this courtroom at [the] Preliminary Hearing sitting on the back row; and you identified a cowboy outside your apartment. Cowboy boots, cowboy belt, cowboy hat . . . .").

105

the men who were later reported to be Tommy Ward and Karl Fontenot." Ex. 13, Vol. 2 at 61 (emphasis added).

Ms. Wise knew these two other men. She identified them in her affidavit as Jim Bob Howard and Bubba Daggs. Prior to her joint trial testimony, Ms. Wise claims she told Mr. Peterson that Mr. Howard and Mr. Daggs were in J.P.'s at the same time as the men in the composites, and that they made her afraid because of how they were behaving in the store. According to Ms. Wise, Mr. Peterson responded that he already had the "ones who did it," and further stated that Mr. Howard "couldn't have committed the murder because he 'didn't have the I.Q. of a grub worm.'" *Id*. Mr. Peterson also allegedly told Ms. Wise that she couldn't mention in court that Mr. Howard and Mr. Daggs were with the other two men in J.P.'s because it wasn't relevant. Due to Mr. Peterson's instructions—which allegedly included characterizing the defense as "the enemy"—Ms. Wise "testified at times as though there were only two young men hanging around JP's together when in fact there were four who were together at the store and [] stayed for a long time."[36] *Id.* at 62.

Ms. Wise's affidavit presents new reliable evidence of innocence. Her assertion that there were actually four young men at J.P.'s throughout the evening of April 28— and that the two previously unknown men, not the two alleged to be Mr. Ward and Mr. Fontenot, were the ones who made Ms. Wise nervous—leads to the inference that

---

[36] In her affidavit, Ms. Wise also stated that she "cannot be certain now that the young man I previously identified as Tommy Ward" was not actually a different man. Ex. 13, Vol. 2 at 62.

106

these two other men may have been involved in the crime. This information, and Ms. Wise's frustration in failing to get the police and prosecution to credit it, would lead a reasonable juror to question both Mr. Fontenot's involvement in the crime and the State's motivation for ignoring the other two men in J.P.'s that night.

***

As we now explain, the support Ms. Wise's affidavit provides for Mr. Fontenot's actual innocence claim is significantly enhanced by her identification of Jim Bob Howard as one of the four young men who were hanging out together at J.P.'s that night.

During their investigation, the police identified a pickup owned by an Ada man named Brian Cox that matched the description of the truck seen at McAnally's. Mr. Cox's pickup was a 1969 Chevy or GMC with a coat of gray primer and rough spots under the doors. In a November 14, 1984 interview, David Yockey—an associate of Mr. Ward, Mr. Cox, and Mr. Howard—told police that Mr. Cox painted his pickup red after Ms. Haraway's abduction to keep from getting pulled over. On December 14, 1984, the police gave a polygraph to Mr. Cox, who knew both Mr. Ward and Mr. Fontenot. While he denied loaning out his pickup, police records showed that just four or five days before the abduction, three men—Billy Shelton, Joe Lyda, and Mr. Howard—were arrested while riding in Mr. Cox's truck.

The APD interviewed Mr. Howard on November 16, 1984, a month prior to Mr. Cox's polygraph. He stated he had known Mr. Ward for around a year and a half and had "gone riding around with" him before, and that he (Mr. Howard) and Mr. Cox were good friends. Ex. 43, Vol. 4 at 247. Mr. Howard told the police he had ridden in

107

Mr. Cox's gray pickup several times, and admitted that he, Mr. Shelton, Mr. Lyda, and Mr. Cox were stopped by police in that truck the previous spring. Mr. Howard provided no alibi for April 28, 1984. He also said he had been in McAnally's several times before, mainly at night, as well as in J.P.'s. Detective Smith's handwritten notes from this interview state that Mr. Howard "appeared to withhold certain details in his statement but was fairly cooperative." Vol. 30 at 435. Mr. Howard was 20 years old at the time of the crime, and according to police reports was a skinny 6′0″ to 6′2″ and 145 to 155 pounds, with brown hair and blue eyes.[37]

Mr. Howard was a State's witness at the preliminary hearing, testifying to the fact that he had previously seen Mr. Ward with a knife. He identified Mr. Ward, but said he did not know Mr. Fontenot. Mr. Howard testified that he "didn't even know who [Mr. Fontenot] was until I just seen him." P/H, Vol. 32 at 119. When asked to point out Mr. Ward and Mr. Fontenot in court, he said, "Tom Ward's in white. I think that guy right there's Karl Fontenot, I guess. I don't know." *Id*. On cross-examination, Mr. Howard stated that he had seen Mr. Fontenot at several Ada house parties, but had never seen him anywhere else, and had never even spoken to him, because "I don't talk to people I don't know." *Id.* at 144. Mr. Howard further stated that he "never had known

---

[37] *Cf.* Ex. 44, Vol. 5 at 110 (Suspect #1 described as in his early twenties, 6′0″ to 6′2″, slender build, sandy brown hair, blue or green eyes).

[Mr. Fontenot's] name" until the preliminary hearing and admitted to having no independent knowledge of who he was.[38] *Id.* at 145–46.

In light of the 1984 police interviews of Mr. Yockey, Mr. Cox, and Mr. Howard—which were not disclosed to the defense—and Mr. Howard's hearing testimony, Ms. Wise's 2009 identification of Mr. Howard as one of the four men in J.P.'s on April 28, 1984, is strong new evidence of Mr. Fontenot's innocence, for two reasons. The first is that Ms. Wise's identification places a man in J.P.'s on the night of the abduction who had previously been seen in a pickup—Mr. Cox's truck—similar to the pickup seen at McAnally's on April 28, 1984. The fact that Mr. Howard was a passenger in Mr. Cox's late '60s gray-primered pickup less than a week prior to Ms. Haraway's disappearance, and was also seen in J.P.'s on the night of the crime, is evidence that would lead a reasonable juror to question whether a different man than Mr. Fontenot was in the gray-primered pickup at McAnally's.

The second, more significant reason relates to Mr. Howard's unfamiliarity with Mr. Fontenot. Ms. Wise's affidavit is clear that the four men she saw in J.P.'s throughout the night of April 28 were there at the same time. And importantly, these four men were *hanging out together*. *See* Ex. 13, Vol. 2 at 61 ("[T]here were four men hanging out around the store for an extended period of time, instead of two."); *id.* at 62 ("[I]n fact there were four who were together at the store and [who] stayed for a long time."); *id.*

---

[38] None of Mr. Howard's testimony at the 1985 joint trial referenced Mr. Fontenot. *See* J/T, Vol. 40 at 797–815. Mr. Howard did not testify at Mr. Fontenot's new trial.

(referencing "the additional persons who were with the two suspects"). It follows that these four men hanging out at J.P.'s for an extended period that Saturday afternoon and evening were friends, or at least acquaintances—or, at the very least, that they knew each other's names. But as detailed above, Mr. Howard testified he did not know Mr. Fontenot and had never talked to him; indeed, Mr. Howard did not even know Mr. Fontenot's name before the preliminary hearing. Taking this testimony as true (and, given that Mr. Howard was a State's witness who identified Mr. Ward, there seems no good reason why he would lie about his knowledge of Mr. Fontenot), Ms. Wise's sworn statement that Mr. Howard was one of the four men hanging out at J.P.'s on the night of April 28, 1984, leads to the conclusion that Mr. Fontenot was not one of the remaining three.

***

The State objects to Ms. Wise's affidavit being treated as new evidence, because the affidavit presents evidence "substantially the same" as her trial testimony that "she was not sure whom she saw while working at J.P.'s, and could not make any positive identification." Appellant Br. at 37. But the evidentiary value of Ms. Wise's affidavit flows not from any recantation of her highly equivocal trial testimony that Mr. Fontenot may have resembled the second man in J.P.'s—in fact, her affidavit makes no reference to Suspect #1, the taller, dark-haired man. Rather, it derives from her definitive statement that there were four men hanging out together in J.P.'s during the relevant timeframe, not two. And it is important that it was the other two, previously unknown men who made her nervous, one of whom was Jim Bob Howard. This information would have led a reasonable juror to harbor a reasonable doubt regarding Mr. Fontenot's involvement,

110

particularly since it would have allowed the defense to establish, by cross-reference to

Mr. Howard's prior testimony, that Mr. Fontenot could not logically have been one of the

four men present in J.P.'s that night because Mr. Howard did not know him.

Further, the evidentiary value of the affidavit derives from Ms. Wise's statement

that the police ignored her description of the four men, instead zeroing in on just two of

them, and from her allegation that Mr. Peterson pressured her to avoid bringing up the

other two men because it was not relevant and because the State already had the "ones

who did it." Ex. 13, Vol. 2 at 61. This would lead a reasonable juror to question whether

police and prosecutorial misconduct led to the conviction of an innocent man.[39]

The State also attacks the reliability of Ms. Wise's affidavit, which came over

twenty years after her 1988 testimony. The timing of her affidavit does impact its

evidentiary value under *Perkins*, but its credibility is enhanced by four factors. One,

Ms. Wise made several allusions at trial to there being more than two men in J.P.'s that

night, *see* N/T, Vol. 35 at 579, 585, and also alluded to a third man at several points of

her preliminary hearing testimony, *see* P/H, Vol. 32 at 1087–88 ("Someone else came in

when they were playing pool."); *id.* at 1094 ("He could have been one of the boys that

came in while they were playing pool."); *id.* at 1095 ("There was someone else."). Two,

Ms. Wise asserts that these facts are not being revealed for the first time some twenty-

---

[39] The dissent echoes the State's assertion that Ms. Wise's affidavit has little evidentiary value because it "does not directly recant anything about [Mr.] Fontenot." Dissent at 3. We agree that the evidentiary value of Ms. Wise's affidavit is not that it recants her previous testimony; rather, it provides support for Mr. Fontenot's actual innocence claim for the reasons discussed above.

five years after the crime, but that she informed the police and prosecution in 1984, who proceeded to ignore the details that did not match their theory. Three, Ms. Wise offers a plausible explanation for failing to testify to these facts at trial: that Mr. Peterson told her they were irrelevant, that she could not mention them in court, and that the defense was the enemy, allegations of prosecutorial misconduct that are echoed by other witnesses. And four, the description of Ms. Wise's fear of being intimately involved in the case, which led to her reluctance to sign an affidavit naming Mr. Howard and Mr. Daggs, seems genuine, especially in light of her experience with the unknown man staring up at her apartment in January 1985 and her receipt of ominous phone calls following Ms. Haraway's abduction. *See* J/T, Vol. 40 at 972 ("Q: [S]ince the arrest of Mr. Ward and Mr. Fontenot, you've had some rather frightening experiences; have you not? A: Some.").

That is, Ms. Wise "did attempt to explain [her] delay coming forward." *House*, 547 U.S. at 551. While Ms. Wise's delay affects the assessment of her credibility, her affidavit counts as newly discovered evidence that we include in our "holistic judgment." *Id.* at 539.

e. *Pickup descriptions*

Mr. Fontenot highlights inconsistencies in descriptions of the primered pickup seen at McAnally's and J.P.'s on April 28, and argues that undisclosed police interviews constitute new evidence of innocence because they would have allowed the defense to probe whether the pickup seen at the two stores was in fact two different vehicles.

Mr. Fontenot is correct that there were notable discrepancies in the descriptions of the pickup seen at J.P.'s and at McAnally's. The former was reported to have spots of red

112

and gray primer paint and an abnormal tailgate, while the latter was reported to have solid gray primer and a normal tailgate. *Compare* N/T, Vol. 35 at 545 (Ms. Wise's testimony that the pickup at J.P.'s was spotted with both red and gray primer) *and id.* at 598 (Mr. Paschal's testimony that something caught his attention about the tailgate of the pickup at J.P.'s, which may have been missing) *with* N/T, Vol. 36 at 33, 44–45 (Mr. Moyer's testimony that the pickup that pulled into McAnally's at 7:30 p.m. was a solid gray primer, and that nothing stood out about its tailgate),[40] *id.* at 57–58, 60 (Lenny Timmons's testimony that the pickup Ms. Haraway entered was a greenish gray primer color, and that he could not recall anything unusual about the tailgate), *and id.* at 64, 70 (David Timmons's testimony that this pickup was light gray or blue, and that he remembered nothing about its tailgate). These conflicting accounts opened a line of attack for the defense, as the State's timeline depended on the pickups at McAnally's and J.P.'s being the same. *See, e.g.*, N/T, Vol. 37 at 342 (prosecution's closing argument that "[Mr.] Ward and a man closely resembling Mr. Fontenot were in J.P.'s on April the 28th . . . in a primer colored pickup . . . [which] left and within moments thereof arrived at McAnally's where Mr. Moyer was"). But because Mr. Fontenot's new trial jury heard these differing descriptions, they do not count as new evidence under *Schlup*.

Several police reports mentioning the pickup were not disclosed to the defense and thus do amount to new evidence. In an interview on April 30, 1984, Ms. Wise told the

---

[40] At the preliminary hearing, Mr. Moyer testified that the tailgate on the pickup he saw was not missing, nor was it painted a different color. P/H, Vol. 32 at 246.

113

OSBI that the red and gray-primered pickup she saw at J.P.'s between 7 and 8:30 p.m. on April 28 was possibly a "step-side" truck with a "short bed." Vol. 8 at 29. Meanwhile, in an interview also conducted April 30, Mr. Whelchel told police that the "light colored" pickup in the McAnally's parking lot which Ms. Haraway entered was "full size," and, he thought, "not the narrow bed type," *id.* at 20, while David Timmons said in an interview the following day that this pickup had a "conventional side type bed," *id.* at 23. These descriptions were given just days after the crime, making them more reliable than those provided at a trial more than four years later.

A "step-side" pickup bed style differs from a "conventional side type bed" that is "not the narrow bed type," and a "short bed" pickup differs from one that is "full size." *See* J/T, Vol. 40 at 1006 ("Basically, you've got two styles of beds."); *id.* at 1030 (cross-examination contrasting a "wide-type bed truck, straight line" with a "narrow bed [truck] with the extended bumpers"). The holistic judgment of all the evidence required by *Schlup* thus reveals a more significant contrast in the trucks seen at the two stores than was presented at the new trial: one, a step-side, short-bed pickup with red and gray primer and an irregular tailgate (at J.P.'s); the other, a conventional-side, full-size pickup with solid gray primer and a normal tailgate (at McAnally's).

It is possible that the pickup descriptions in these April 30 and May 1 reports would have created additional doubt in a reasonable juror's mind about whether the witnesses at J.P.'s and those at McAnally's were describing the same truck, thereby further damaging the State's timeline of the two suspects' movements leading up to the abduction. But since they add only marginal value to the discrepancies aired at trial, we

114

assign this category of newly presented evidence minimal weight in the overall *Schlup* assessment.

### f. *Medical Examiner report*

Lastly, Mr. Fontenot points to two pieces of evidence from the medical examiner's report on Ms. Haraway's skeletal remains that were not presented to Mr. Fontenot's jury.

The first is a supplemental report from OCME's Board of Medicolegal Investigations detailing problems with the recovery and documentation efforts at the Gerty crime scene site. In this report, an unidentified OCME official expressed frustration with law enforcement's handling of Ms. Haraway's remains after speaking with Mr. Peterson on January 21, a day after the discovery:

> No [Medical Examiner] was notified. . . . OSBI lab people out of OKC did photo[] the scene & they just had a field day picking up bones, no diagrams. . . . Mr. Peterson believes that the bones are enroute to OKC but didn't know for sure. The sheriff didn't know where the bones were but thought that the OSBI had them. Notified the OSBI in OKC and spoke with Rick Spense—he didn't have the bones but thought that the lab man David Dixon had them. . . . Finally the OSBI found them in their lab . . . .

Ex. 46, Vol. 23 at 46. This official then documented "several problems with this case," including that "no one notified a county medical examiner," and that "no one seems to give a 'shit' & provide OCME with any information on Ms. Harriway [sic]." *Id.*

The district court found the "[i]ncompetence in processing and handling the Gerty crime scene" documented by this report to be "a critical failure by law enforcement given that very little physical evidence was found besides the skeletal remains." *Fontenot III*, 402 F. Supp. 3d at 1147. Due to this improper processing, "it cannot be determined if Mrs. Haraway was murdered at this location, or her body was taken there." *Id.*

115

After seeing this report, a reasonable juror's confidence in the competence of the investigation into Ms. Haraway's murder would decrease, which would in turn decrease confidence that law enforcement identified the right culprits. But the value of this new evidence is minimal, given that the jury was presented with the major details from the scene of Ms. Haraway's remains that differed completely from Mr. Fontenot's confession—that her body was found in a different county; that she died from a gunshot wound, not from stabbing; that there was no evidence she was either stabbed or burned; and that there was no evidence of a floral blouse with a lace collar.[41]

The second piece of evidence from the medical examiner's report is a letter, dated January 23, 1986, from Dr. Richard McWilliams, a forensic anthropologist and OCME consultant, to Dr. Larry Balding, a forensic pathologist with the office's Board of Medicolegal Investigations. In the letter, Dr. McWilliams informs Dr. Balding that he has examined Ms. Haraway's remains, and that "[m]arks on the pelvis indicated she had given birth to at least one child." Ex. 46, Vol. 23 at 48.

The district court determined this report to be newly discovered evidence of innocence. *Fontenot III*, 402 F. Supp. 3d at 1148. If Ms. Haraway gave birth to a child before her death, then she must have been killed some months after April 28, given that

---

[41] The dissent claims we "[o]veremphasiz[e] peripheral evidence" by assuming this supplemental report "would undermine a juror's confidence in the *entire* police investigation." Dissent at 3 (emphasis in original). Far from "overemphasizing" this supplemental report, we agree that "the value of this new evidence is minimal." The letter from Dr. McWilliams, discussed *infra*, is the more significant piece of new evidence from the medical examiner's report.

116

there was no indication she was pregnant at that time.[42] *Id.* Due to his incarceration from late October 1984 onward, this would make Mr. Fontenot's involvement in the crime highly improbable, and "undermine[] the state's entire theory as to the motive of Mrs. Haraway's kidnapping and what happened to her in the months leading up to her death." *Id.*

The State argues that without any corroboration, the conclusion in Dr. McWilliams's report amounts to highly unreliable support for a "particularly outlandish" actual innocence rationale. Appellant Br. at 27–28. Yet, Dr. McWilliams's report—which bore the indicia of expert opinion—would nonetheless raise the level of reasonable doubt in the mind of a reasonable juror regarding the State's theory of the case and Mr. Fontenot's guilt.

### 4. **Total Record**

In comparison to the evidence presented at trial, the strongest new evidence of innocence brought forth by Mr. Fontenot is laid out below:

Alibi:
- **Trial evidence**:
  - No alibi defense mounted; Mr. Calhoun testified that neither Mr. Fontenot nor Mr. Ward was at the keg party thrown at his apartment on April 28, 1984.

---

[42] Mr. Fontenot presents a 2013 affidavit from a woman named Vickey Jenkins, in which Ms. Jenkins asserts that Karen Wise told her in 1984 that Ms. Haraway "had told [Ms. Wise] right before [Ms.] Haraway disappeared[] that [Ms. Haraway] was 3 months pregnant." Ex. 2, Vol. 2 at 28. While this account would be compelling evidence if true, we give no credence to a hearsay-within-hearsay statement recounting a 29-year-old conversation.

- **New evidence**:
  - Statements from three people at the April 28 Calhoun keg party who remember seeing Mr. Fontenot there at different points throughout the night.

  - Corroboration by other attendees of Mr. Fontenot's own statement, given two days after his confession, listing details of the Calhoun keg party, including the number and identity of those in attendance and the fact someone was playing the drums.

  - Mr. Ward's 1984 statements, which corroborate accounts that the police were called out to the Calhoun keg party because of loud guitar and drum music.

  - Police reports that establish the Calhoun keg party as occurring the night of April 28, confirm the APD was called out to the party on a noise complaint, and verify Mr. Fontenot's recollection of someone playing the drums.

Alternate Suspect:
- **Trial evidence**:
  - The jury heard nothing about the obscene phone calls received by Ms. Haraway while on duty at McAnally's shortly before her disappearance.

  - The jury did not see the complete medical report about Ms. Haraway's remains.

- **New evidence**:
  - Reports from five people—Ms. Haraway's sister and husband, as well as a McAnally's manager, coworker, and customer—documenting that Ms. Haraway was receiving obscene, harassing calls at the store, which had resumed shortly before she disappeared and which reportedly made her feel uneasy while working the night shift.

  - The conclusion of a forensic anthropologist who analyzed Ms. Haraway's remains that she may have given birth to a child.

Eyewitness statements:
- **Trial evidence**:
  - Mr. Moyer testified he saw someone who generally resembled Mr. Fontenot in McAnally's at around 7:30 p.m. but could not be sure who it was.

  - Ms. Wise testified she saw two men in J.P.'s between 7 and 8:30 p.m. who made her nervous, one of whom looked similar to Mr. Fontenot.

118

- **New evidence**:
  - An affidavit from Mr. Moyer stating he is confident Mr. Fontenot was not the man he saw in McAnally's and is "95% sure" it was instead Mr. Bevel, which coincides with a statement he gave to a defense investigator in 1985.

  - An affidavit from Ms. Wise stating there were actually four young men hanging out together in J.P.'s that night, not two; that it was these additional two men who made her nervous; and that one of them was Mr. Howard—a man who testified to never having spoken to or associated with Mr. Fontenot, and who was seen in a gray-primered pickup several days before the crime.

***

While a gateway innocence claim requires "new reliable evidence" to be credible, "the habeas court's analysis is not limited to such evidence." *House*, 547 U.S. at 537. Rather, "the habeas court must consider 'all the evidence,' old and new, incriminating and exculpatory," and thereby base its "'probabilistic determination about what reasonable, properly instructed jurors would do'" on the "total record." *Id.* at 538 (quoting *Schlup*, 513 U.S. at 328, 329).

Here, the total record—even before its augmentation with this newly presented evidence—reveals an extremely weak case against Mr. Fontenot. The State lacked a plausible motive and had no physical evidence linking Mr. Fontenot to the crime. Its two key eyewitnesses testified only that they saw a man in and around McAnally's on the night of April 28 who "generally match[ed]" Mr. Fontenot's description or who "resembled" him. *Fontenot II*, 881 P.2d at 78. In Mr. Fontenot's first appeal, the OCCA went so far as to find that "[o]ther than the statements given by Ward and Fontenot, there was no other evidence linking appellant to the crimes." *Fontenot I*, 742 P.2d at 32.

119

The State, of course, did have the statement given by Mr. Fontenot.[43] But Mr. Fontenot's confession was shot through with clear falsehoods and inconsistencies, produced no independently verifiable information, and provided the police no new facts about the crime. *See supra* Part I.C; *cf. Pavatt v. State*, 159 P.3d 272, 289 (Okla. Crim. App. 2007) ("A confession tends to be more trustworthy if it provides hitherto-unknown facts which are not only verifiable, but also consistent with known facts."). What is more, Mr. Fontenot fully recanted just two days later, accusing the police of feeding him a false narrative of his own involvement—a narrative that matched the confession they had previously obtained from Mr. Ward. Almost right after that recantation, the investigators discredited a critical element of Mr. Fontenot's confession when they concluded Mr. Titsworth was physically incapable of having been involved. Any evidentiary value of Mr. Fontenot's confession was further diminished by the discovery of Ms. Haraway's remains between Mr. Fontenot's first and second trials, which disproved what he told police about the location and disposal of Ms. Haraway's body and the cause of her death.

The State's picture of the events at McAnally's and J.P.'s on April 28 also contained major holes. The prosecution argued in closing at the new trial that "[Mr.] Ward and a man closely resembling Mr. Fontenot were in J.P.'s on April the 28th . . . in a primer colored pickup," which "left and within moments thereof arrived at McAnally's where Mr. Moyer was." N/T, Vol. 37 at 342. Mr. Moyer was in McAnally's

---

[43] The OCCA disallowed use of Mr. Ward's confession against Mr. Fontenot at Mr. Fontenot's new trial. *See Fontenot I*, 742 P.2d at 32–33.

around 7:30 p.m. But Ms. Wise testified at the preliminary hearing that the two men came back to J.P.'s. around 7 p.m. and were there "[a]bout a[n] hour and a half." P/H, Vol. 32 at 167. When Mr. Peterson questioned Ms. Wise whether it was possible these two men left for a time during that period before later returning—clearly anticipating the issue of fitting Mr. Moyer's 7:30 sighting at McAnally's into her timeline—Ms. Wise replied that she did not believe so. *Id.* at 172. The State's explanation of the two sightings at the two stores was in direct contradiction to the testimony of a key witness.[44]

A second major discrepancy in the State's case stems from the physical details Ms. Wise gave regarding the second man in J.P.'s. She originally described Suspect #1 as a white male in his early twenties, of slender build, approximately 6′0″ to 6′2″, with sandy brown hair. Mr. Fontenot, however, is 5′8″ to 5′9″ with black or dark brown hair.

Yet another piece of "old" evidence that looms large is the testimony of Mr. Paschal, the only witness other than Ms. Wise who saw the two men in J.P.'s. He had an excellent chance to observe both men, because he "was standing right by the door" when they exited. P/H, Vol. 32 at 213–14. He also saw the two men get into a primered pickup and drive away. At both the preliminary hearing and the new trial, Mr. Paschal gave a description of the man the State asserted to be Mr. Fontenot. Yet at no point did he identify Mr. Fontenot as being this "brownish hair[ed]" man of "slender build" who was

---

[44] The OCCA made a factual finding, after the joint trial, "that two men . . . played pool at J.P.'s . . . from about 7:00 p.m. until about 8:30 p.m. on the evening of April 28, 1984," then left around 8:30 p.m. *Fontenot I*, 742 P.2d at 32. This fact is presumptively correct under § 2254(e)(1), and no clear and convincing evidence rebuts it.

with the other man "of stockier build [and] sandier complexion," despite viewing a live

lineup that included Mr. Fontenot. P/H, Vol. 32 at 213, 215; N/T, Vol. 35 at 610.

Mr. Paschal admitted to having no idea who this brown-haired man was.

And finally, returning to McAnally's, of the three eyewitnesses present when

Ms. Haraway was led to the primered pickup, none saw a second man beside the blond-

haired man who took her from the store (the man who resembled Mr. Ward), either inside

or outside the truck.

Our assessment of Mr. Fontenot's actual innocence assertion combines these

weaknesses in the State's case with his newly presented evidence. In doing so, we derive

the following picture of events at McAnally's and J.P.'s on the night of April 28, 1984:

| McAnally's | | J.P.'s | |
|---|---|---|---|
| | | **4:00 p.m.** | Ms. Wise testifies that she first sees the two men in J.P.'s. They buy beer and wine and then depart at some point thereafter. She does not see them leave. |
| **5:00-6:00 p.m.** | Mr. Boardman sees two suspicious men in McAnally's—one blond, one with brown hair—driving an old, light-colored Chevy or Ford pickup. He fails to identify Mr. Fontenot from a photo lineup. | | |
| **7:30** | Mr. Moyer sees two men pull up in a gray-primered pickup; a dark-haired man enters first, followed by a blond-haired man. Mr. Moyer told an investigator in 1985 that the dark-haired man was not Mr. Fontenot, and now similarly swears he is "95%" | **7:00-8:30** | Ms. Wise testifies that the two suspicious men return to the store and shoot pool in the back room. She does not believe they left at any point during this hour-and-a-half window. She now swears there were four men hanging out together in the store throughout the evening, and that one of them was Mr. Howard, who testified at |

122

| | | | |
|---|---|---|---|
| | confident this man was not Mr. Fontenot. | | the preliminary hearing to not knowing Mr. Fontenot. |
| 7:30-7:45 | Mr. Holkum sees a gray-primered pickup with a conventional bed parked outside the store. | | |
| 7:50-8:00 | Mr. McKinnis sees a light-colored Chevy pickup with gray primer spots parked outside the store, and an unknown man standing behind the counter with Ms. Haraway. | 8:00 | Mr. Paschal arrives at J.P's and speaks with Ms. Wise. He sees a primered pickup in the lot; something about the tailgate stands out to him. |
| | | 8:10-8:20 | The two men in J.P.'s leave. Mr. Paschal, standing by the door, gets a good look at both. He fails to identify Mr. Fontenot as the slender, brown-haired man he sees leaving the store. |
| 8:40-8:45 | The Timmons brothers and Mr. Whelchel see a blond-haired man leading Ms. Haraway to a gray-primered pickup. None of the three see a second man, either inside or outside the pickup. | | |
| **Pickup Descriptions:** | | | |
| • A conventional-side, full-size pickup with solid gray (or greenish gray, or blue) primer paint and a normal tailgate. | | • A step-side, short-bed pickup with spotted red and gray primer paint down the driver's side and an irregular tailgate. | |
| **Fontenot v. Suspect #1:** | | | |
| *Fontenot:* • 5′8″-5′9″, black or dark brown hair, 19 years old. | | *Suspect #1:* • 6′0″-6′2″, sandy brown hair, early 20s. | |

If presented with this picture, no reasonable juror would lack reasonable doubt that Mr. Fontenot was involved in the abduction and murder of Ms. Haraway. Specifically, a reasonable juror would be led to doubt whether the two men seen in McAnally's by

Mr. Moyer were the same two men seen in J.P.'s by Ms. Wise and Mr. Paschal, whether the pickups seen in each location were the same truck, and, most critically, whether Mr. Fontenot ever set foot in either store that night. Newly presented evidence of the phone calls Ms. Haraway received at the store, the forensic pathologist's report on her remains, and Mr. Fontenot's presence at the Calhoun keg party would further enhance that doubt, suggesting that someone else had a motive for the crime and that Mr. Fontenot could not have committed it. When combined with the plethora of inconsistencies and inaccuracies strewn throughout Mr. Fontenot's confession, the holistic judgment about all the evidence required by *Schlup* would erode the credibility of that confession beyond repair. *See Fontenot III*, 402 F. Supp. 3d at 1220 (characterizing the discrepancies "between Mr. Fontenot's confession and the known facts of the case" as a "chasm").

In crediting Mr. Fontenot's showing of actual innocence, we do not eschew *Perkins*'s teaching on the role of diligence. Mr. Fontenot waited two decades from the State's disclosure of the OSBI material in 1992 to first bring his claims in state court, which cuts against allowing the innocence gateway to open. The items of new evidence particularly susceptible to being discounted on diligence grounds are the affidavits from witnesses procured nearly thirty years after the events in question. *See Schlup*, 513 U.S. at 332 ("[T]he court may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence.").

Were such late-arriving affidavits the sole evidence presented in support of Mr. Fontenot's innocence, this lack of diligence might devalue the credibility of his submission enough to bar provision of procedural relief. But they are instead

124

supplemented with a significant amount of contemporaneous documentary evidence. Additionally, the two most important statements—those of Mr. Moyer and Ms. Wise—draw their evidentiary strength primarily from how they interlock with statements made at or prior to Mr. Fontenot's new trial. Given this corroboration, we deem the Moyer and Wise affidavits to be "trustworthy eyewitness accounts," *Schlup*, 513 U.S. at 324, notwithstanding their procurement decades after the crime. *See id*. at 330 ("[T]he habeas court may have to make some credibility assessments."). While there may be some questions about the credibility of Mr. DePrater's affidavit, the sworn statements from the partygoers are consistent in corroborating the description of the party provided by Mr. Fontenot both before his polygraph and in his undelivered letters to counsel. And even were we to discount the partygoers' affidavits, we would nevertheless determine there to be ample evidence of actual innocence outside of that material, especially in light of the manifest weaknesses in the case the State presented against Mr. Fontenot in 1988.

In sum, the district court was correct in finding this to be "the rare case where—had the jury heard all the conflicting testimony—it is more likely than not that no reasonable juror viewing the record as a whole would lack reasonable doubt." *House*, 547 U.S. at 554; *cf. Floyd v. Vannoy*, 894 F.3d 143 (5th Cir. 2018) (opening the actual innocence gateway based on newly discovered evidence that would lead a reasonable juror to doubt the credibility of petitioner's confession to murder). While this may not be "a case of conclusive exoneration," *House*, 547 U.S. at 553—a virtual impossibility given the lack of any physical evidence—Mr. Fontenot has nevertheless presented "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless

the court is also satisfied that the trial was free of nonharmless constitutional error,"

*Schlup*, 513 U.S. at 316.

We therefore proceed to assess whether Mr. Fontenot's new trial was free of

nonharmless constitutional error.

## IV.    MERITS

We need reach only one of Mr. Fontenot's constitutional claims to resolve this

appeal—that the State suppressed favorable, material evidence in violation of *Brady v.*

*Maryland*.[45] Before turning to that issue, we address the State's contention that it was

denied an opportunity to address the merits of Mr. Fontenot's claims before the district

court and that we should therefore remand with instructions to afford it that opportunity.

---

[45] The State appeals the district court's conditional grant of habeas relief, which was ordered to issue unless Mr. Fontenot is granted a new trial or, in the alternative, is permanently released from custody. Since the standard remedy for a *Brady* violation mirrors this grant of relief, *see Giglio v. United States*, 405 U.S. 150, 154 (1972), *infra* Part IV.D, our resolution of the *Brady* claim in Mr. Fontenot's favor doubles as a resolution of the State's appeal. This is also the remedy sought by Mr. Fontenot: In briefing before this court, he urges affirmance of the conditional habeas relief granted by the district court, *see* Appellee Br. at 38, without requesting any additional relief on appeal—such as direction of a judgment of acquittal, the proper remedy for a determination that the evidence at trial was insufficient to convict. *See McDaniel v. Brown*, 558 U.S. 120, 131 (2010); *Burks v. United States*, 437 U.S. 1, 16–17 (1978). To be clear, we do not hold that Mr. Fontenot has waived or forfeited the right to such additional relief. *See Burks*, 437 U.S. at 17–18. We do, however, exercise our discretion to address only Mr. Fontenot's *Brady* claim, without reaching his insufficiency claim or any other constitutional assertion, based on our determination that the standard remedy for a *Brady* violation is also the remedy that is "just under the circumstances." *Burks*, 437 U.S. at 17–18 (quoting 28 U.S.C. § 2106). *See also infra* note 50.

## A. *Chance to Address Merits*

The State argues it was not given an opportunity to respond to the merits of Mr. Fontenot's second amended petition after filing its procedural motion to dismiss. It claims that by proceeding to rule on the merits of the petition after rejecting the State's procedural arguments, without first directing the State to file an answer specifically addressing the substance of Mr. Fontenot's constitutional claims, the district court deviated from "established habeas corpus procedure." Appellant Br. at 47.

Under the Rules Governing Section 2254 Cases in the United States District Courts, the district court has "ample discretionary authority to tailor the proceedings." *Lonchar v. Thomas*, 517 U.S. 314, 325 (1996). Specifically, if the court determines that a § 2254 petition is not plainly meritless, Rule 4 provides that "the judge must order the respondent to file an answer, motion, or other response within a fixed time, or to take other action the judge may order." As originally promulgated, Rule 4 spoke in terms of "an answer or other pleading." *See, e.g.*, *O'Blasney v. Solem*, 774 F.2d 925, 926 (8th Cir. 1985). In 2004, the word "motion" was added, and "response" was substituted for "pleading," in order "to reflect the view of some commentators that it is common practice in some districts for the government to file a pre-answer motion to dismiss."[46] Rules

---

[46] An answer is a pleading, but a motion is not. *See* Fed. R. Civ. P. 7(a) ("Pleadings"); 7(b) ("Motions and Other Papers"). Thus, use of the phrase "or other pleading" as a referent to "answer [and] motion" would technically be incorrect. "Response" is presumably a more inclusive term, covering both pleadings (e.g., an answer) and motions, such that the phrase "or other response" is a proper referent to "answer [and] motion." That is, a judge can order some "other response," whether that be a specific type of pleading or motion.

127

Governing § 2254 Cases, Rule 4, advisory committee's note to 1976 adoption. The

Committee Notes further clarify that the discretion to order a motion

> is designed to afford the judge flexibility in a case where either dismissal or an order to answer may be inappropriate. For example, the judge may want to authorize the respondent to make a motion to dismiss . . . . on procedural grounds, which may avoid burdening the respondent with the necessity of filing an answer on the substantive merits of the petition.

*Id.*; *see also White v. Lewis*, 874 F.2d 599, 602 (9th Cir. 1989) (reading Rule 4 to convey

"the intention that the judge be given 'flexibility' in dealing with habeas petitions").

Rule 5 of the Rules Governing Section 2254 Cases concerns "The Answer" to a

habeas petition filed by a prisoner in state custody, as well as the petitioner's reply. Per

Rule 5(a), the state "is not required to answer the petition unless a judge so orders." But if

a judge so orders, Rule 5(b) states that "[t]he answer must address the allegations in the

petition. In addition, it must state whether any claim in the petition is barred by a failure

to exhaust state remedies, a procedural bar, non-retroactivity, or a statute of limitations."

Rule 5(b) thus clearly differentiates between the merits of a habeas petition and any

potentially applicable procedural defenses, and mandates that a state *must* address both in

its answer. However, the Rule 5 Committee Notes also "address the practice in some

districts" of having "the respondent file[] a pre-answer motion to dismiss the petition,"

and point out that "revised Rule 4 permits that practice and reflects the view that if the

court does not dismiss the petition, it may require (or permit) the respondent to file a

motion." Rules Governing § 2254 Cases, Rule 5, advisory committee's note to 2004

amendments.

Here, the district court did not "authorize" the State to file a motion to dismiss instead of an answer in response to Mr. Fontenot's second amended petition, or to address only procedural issues. Rule 4, advisory committee's note to 1976 adoption. Nor did it expressly "require (or permit) the respondent to file a motion." Rule 5, advisory committee's note to 2004 amendments. Rather, the court simply directed the State to "file a response." Vol. 29 at 896. This order was somewhat ambiguous, as it reflected the generic "other response" language of Rule 4 rather than more specifically ordering either a pleading or a motion. *See Ebert v. Clarke*, 320 F. Supp. 2d 902, 910 (D. Neb. 2004) (stating that the Rule 4 Committee Note "does not indicate what types of 'other responses' might be appropriate"). Reading Rules 4 and 5 together, however, the district court's general directive should have put the State on notice that it must, per Rule 5, "address the allegations in the petition." *See Fontenot III*, 402 F. Supp. 3d at 1119 n.1 ("Once the Respondent was ordered to respond, the Respondent was required to address all allegations in the Second Amended Petition.").

Instead of seeking clarification of the district court's order to "file a response," adopting a conservative approach by "address[ing] the allegations in the petition" in its response, *see* Rule 5, or requesting an opportunity to submit additional briefing, the State elected to omit a comprehensive response to the merits of Mr. Fontenot's claims and focus exclusively on arguing that he failed to overcome various procedural bars to relief. The State must live with the consequences of that decision. That the district court had discretion to either order an initial motion to dismiss on procedural grounds or request an additional merits brief after rejecting the State's procedural motion to dismiss, does not

129

mean it was required to do either. Rather, the plain language of Rules 4 and 5, as well as their Committee Notes and interpretive caselaw, indicate that the district court was entitled to rule on the merits of Mr. Fontenot's petition after giving the State an open-ended chance for "response."

In its opening brief, the State points to an unpublished case from the Eastern District of Oklahoma where the district court granted the State's motion to dismiss a habeas petition "for failure to state a cognizable federal habeas corpus claim." *Lowe v. Bear*, No. CIV-17-406, 2019 WL 1756283, at *3 (E.D. Okla. Apr. 19, 2019). But in *Lowe*, the state was expressly given the option to file a motion to dismiss "[a]s an alternative to filing a Rule 5 answer." No. CIV-17-406, Dist. Ct. ECF No. 5. Likewise, in *Bryant v. Dowling*, also cited by the State in its opening brief, the court directed that the "respondent may file a motion to dismiss," based on alleged procedural defects, "[i]n the alternative" to an answer. No. 17-CV-468, 2019 WL 3304812 (N.D. Okla. July 23, 2019) (unpublished), Dist. Ct. ECF No. 11, at *2. Here, the State was given no such alternative option.[47] Furthermore, nothing in the Eastern District's local rules speaks to "established

---

[47] In its reply brief, the State cites another unpublished case from the Eastern District of Oklahoma, but there, too, the respondent was expressly given the option of filing a motion to dismiss "[a]s an alternative to filing a Rule 5 answer." *Sutton v. Dep't of Corr.*, No. 08-CV-134, 2008 WL 5155657 (E.D. Okla. Dec. 8, 2008), Dist. Ct. ECF No. 5. The same goes for seven of the eight other cases cited by the State in its reply brief from the Northern and Western Districts of Oklahoma. Of the eleven cases cited by the State across its two briefs in support of this procedural argument, in only one was the State allowed to file an answer on the merits after its motion to dismiss was denied without also having received express authorization to file that motion in the first instance. *See Robinson v. Patton*, No. 14-CV-548, 2014 WL 3865388 (W.D. Okla. Aug. 5, 2014) (unpublished), Dist. Ct. ECF No. 7. By responding to an order to answer the petition with an unauthorized motion to dismiss, without addressing the "allegations" of the petition,

130

procedure" regarding Rules 4 and 5—while Local Civil Rule 9.2(e) does address

"Responses to Petitions for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254," it

concerns only the electronic filing of court records by the respondent. *See* E.D. Okla. Civ.

R. 9.2(e), available at

http://www.oked.uscourts.gov/sites/oked/files/Local_Civil_Rules.pdf.

We thus reject the State's argument that the district court did not provide it with a

sufficient opportunity to address the merits of Mr. Fontenot's claims, in violation of

established procedure in the Eastern District of Oklahoma. Although the district court

could, and perhaps should, have crafted a more specific Rule 4 directive by expressly

calling for an "answer," it did not abuse its considerable discretion to tailor § 2254

proceedings. *See Lonchar*, 517 U.S. at 325.[48] Unless a district court expressly authorizes

---

the State in *Robinson* contravened Rule 5, and therefore the court's subsequent allowance for the filing of an additional merits brief was discretionary. Regardless, one unpublished case from the Western District of Oklahoma does not demonstrate "established procedure" in the Eastern District.

The dissent's contention that "Oklahoma district courts routinely allow habeas respondents . . . to file answers after denying their pre-answer motions to dismiss" is similarly unpersuasive. Dissent at 7. Further, the dissent's assertion that "the district court judge in this case has often benefited from the efficiency of pre-answer motions to dismiss" is beside the point. *Id.* at 8. The question before us is whether the district court was required to request an additional merits brief after rejecting the State's procedural motion to dismiss. It was not.

[48] The dissent agrees that, "as a general matter[,] it was in the [district] court's ultimate discretion whether to allow a merits response after denying the State's motion to dismiss." Dissent at 9; *see also id.* at 11 (conceding the district court's "considerable discretion"). It would hold, however, that the district court abused this discretion because the "complexity" of this case called for additional briefing. *Id.* at 9–11.

We note as an initial matter that the State does not make this argument. The State argues only that the district court abused its discretion because it "ignor[ed] the routine practice in the federal courts of Oklahoma" of allowing such briefing. Oral Arg. at

a respondent to file a specific motion of some type, the respondent should interpret any ambiguous Rule 4 order—such as a directive to file only a "response" to a petition—as calling for the full-blown answer contemplated by Rule 5.[49]

5:22-6:27. This court "ordinarily consider[s] only the grounds presented by the appellant, wary of searching out our own reasons to reverse when the ground is not presented by the appellant." *United States v. Tee*, 881 F.3d 1258, 1269 (10th Cir. 2018); *see also Greenlaw v. United States*, 554 U.S. 237, 243–44 (2008) (noting courts generally "follow the principle of party presentation").

    And there are good reasons the State did not make the argument. First, the dissent fails to cite any decision from this circuit in support of its contention. Moreover, none of the out-of-circuit decisions the dissent relies upon address analogous circumstances. *See* Dissent at 10 (citing *Hall v. Quarterman*, 534 F.3d 365, 366–72 (5th Cir. 2008) (holding district court abused its discretion in not holding an evidentiary hearing on the issue of whether a prisoner was intellectually disabled and therefore ineligible for death penalty); *Ameritox, Ltd. v. Millennium Lab'ys, Inc.*, 803 F.3d 518, 541 (11th Cir. 2015) (holding district court's decision to retain supplemental jurisdiction over state-law claims was an abuse of discretion because "it resulted in the needless creation of new law for nine states and permitted parties that were either ignorant of the law or disingenuous to waste scarce judicial resources"); *U.S. ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 254 (9th Cir. 1992) (holding district court abused its discretion in imposing sanctions because district court incorrectly deemed plaintiff's claims frivolous); *United States v. Badwan*, 624 F.2d 1228, 1231–32 (4th Cir. 1980) (holding district court did *not* abuse its discretion in denying a defense continuance motion that was based on the asserted complexity of the case—a criminal tax case—which was set for trial about three weeks after arraignment). In short, it appears no appellate court has found an abuse of discretion in these or similar circumstances.

    Finally, even if "complexity" may afford a proper ground on which to find a district court has abused its discretion, we would not find that standard satisfied here. There are many complex aspects of Mr. Fontenot's case, but the merits of the *Brady* claim that is the subject of the additional-briefing issue is not one of them. As discussed in Part IV. C, *infra*, we have little trouble concluding, based on well-established precedent, that the State violated *Brady* by suppressing numerous pieces of material evidence with exculpatory and impeachment value.

    [49] Even if we determined the district court had erred, such error would be harmless given our resolution of this appeal. After a full round of briefing was completed in the district court on Mr. Fontenot's first amended petition—consisting of the petition, the State's motion to dismiss, and Mr. Fontenot's reply—the court, in an October 2, 2018, minute order, directed the State to file an additional response "specifically address[ing]

## B. *Standard of Review*

While a successful gateway claim can override both a procedural default and

AEDPA's limitations period, it does not alter the standard of review applied to a

petitioner's underlying constitutional claims. "[T]he correct standard of review under

AEDPA is not waivable. It is, unlike exhaustion, an unavoidable legal question we must

ask, and answer, in every case." *Gardner v. Galetka*, 568 F.3d 862, 879 (10th Cir. 2009).

"[O]ur review of the claims in this appeal [is] governed by AEDPA's standards to

the extent that the claims were adjudicated on the merits by an Oklahoma state court."

*Douglas v. Workman*, 560 F.3d 1156, 1170 (10th Cir. 2009); *see* 28 U.S.C. § 2254(d)

(directing that for claims adjudicated on the merits in state court, relief may be granted

only if that adjudication "resulted in a decision that was contrary to, or involved an

unreasonable application of, clearly established Federal law, as determined by the

---

Petitioner's alleged Brady violations and the newly discovered evidence outlined" by Mr. Fontenot. Dist. Ct. ECF No. 108. The State did so, submitting a 35-page brief with supporting exhibits on October 17, 2018. *See* Okla. *Brady* Br. The dissent notes this 35-page brief was filed in response to Mr. Fontenot's first amended petition that was later mooted by his second amended petition. At oral argument before this court, however, when asked whether the State would have said anything further about *Brady* if given the opportunity, counsel for the State conceded that "[t]he *Brady* issue was thoroughly briefed." Oral Arg. at 7:55–8:30. Mr. Fontenot's *Brady* claim is the most significant of his constitutional assertions, and it is the only substantive claim we reach. Thus, the State was expressly granted an additional opportunity to address the dispositive claim in this appeal, which it concedes was sufficient.

Moreover, according to the State, the main error flowing from the district court's decision to rule on the merits without additional briefing from the State was its failure to accord AEDPA deference to the OCCA's resolution of the claims Mr. Fontenot brought on direct appeal. *See* Appellant Br. at 47–48; Appellant Reply at 13. Our decision to reach only Mr. Fontenot's *Brady* claim moots this concern, because the *Brady* claim was not adjudicated on the merits by the OCCA.

Supreme Court," § 2254(d)(1), or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," § 2254(d)(2)).[50] But "[t]he § 2254(d) standard does not apply to issues not decided on the merits by the state court." *Bland*, 459 F.3d at 1010. "If the state courts have not heard the claim on its merits, we review the district court's legal conclusions de novo and its factual findings, if any, for clear error." *Smallwood*, 191 F.3d at 1264. "However, if the district court based its factual findings entirely on the state court record, we review that record independently." *Bland*, 459 F.3d at 1010.

Claims to which the state court applied a procedural bar were not decided on the merits. *See, e.g.*, *Brecheen v. Reynolds*, 41 F.3d 1343, 1354 (10th Cir. 1994). Thus, because the OCCA applied laches to deny Mr. Fontenot's application for postconviction relief, we are not bound by § 2254(d) deference regarding those claims Mr. Fontenot presented for the first time in that application, including his *Brady* claim. *See* Appellant Br. at 7 (referencing "the state's procedural bar of *laches*"); *see also Smith v. Addison*, No. 06–468, 2009 WL 3075650, at *4 (N.D. Okla. Sept. 21, 2009) (unpublished) (finding that by affirming the denial of postconviction relief based on laches, "the OCCA did not adjudicate the merits of the post-conviction claims, including the *Brady* claim raised in

---

[50] Because our disposition of the *Brady* issue resolves this appeal, we do not reach the district court's analysis regarding any of Mr. Fontenot's remaining constitutional claims. We note, however, that regarding several of those claims, the district court failed to accord proper AEDPA deference under § 2254(d) and (e) to the various state court decisions in this matter. Nothing in this opinion, or in our decision to affirm the grant of habeas relief, should be construed as affirmation or approval of the district court's approach to and resolution of any of those remaining constitutional claims.

the instant habeas corpus petition"); *cf. Fairchild*, 579 F.3d at 1148 n.6 ("To dispose of a claim without considering the facts supporting it is not a decision on the merits." (quotation marks omitted)).

"When we are not bound by AEDPA deference, we review de novo the existence of a *Brady* violation. The subsidiary question of whether suppressed evidence is material is a mixed question of law and fact which we also review de novo." *Douglas*, 560 F.3d at 1172 (citations omitted). Even when reviewing a habeas claim de novo rather than under § 2254(d), state-court factfinding still receives the benefit of doubt under § 2254(e)(1): that is, "[a]ny state-court findings of fact that bear upon the claim are entitled to a presumption of correctness rebuttable only by 'clear and convincing evidence.'" *Hooks v. Workman*, 689 F.3d 1148, 1164 (10th Cir. 2012) (quoting 28 U.S.C. § 2254(e)(1)).

### C. *Brady* Claim

In *Brady v. Maryland*, the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). The Court subsequently clarified that the duty to disclose favorable evidence in the hands of the state arises regardless of whether a request for such evidence has been made by the defense. *See United States v. Agurs*, 427 U.S. 97, 107 (1976); *see also Douglas*, 560 F.3d at 1172 ("The government's obligation to disclose exculpatory evidence does not turn on an accused's request."). "There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that

135

evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999). "The defense needs to establish these elements by a preponderance of the evidence." *United States v. Durham*, 902 F.3d 1180, 1221 (10th Cir. 2018).

## 1. **Suppressed by the State**

Evidence is "suppressed by the State, either willfully or inadvertently," when it is "known to the [State] but not disclosed to trial counsel." *Strickler*, 527 U.S. at 282. Evidence suppressed by the state includes "evidence known only to police investigators and not to the prosecutor." *Kyles v. Whitley*, 514 U.S. 419, 438 (1995); *see also Strickler*, 527 U.S. at 281 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf . . . , including the police.'" (quoting *Kyles*, 514 U.S. at 437)). Thus, this element is satisfied when the "evidence was known by police investigators—and by inference the prosecution—before [the petitioner's] trial but was nevertheless not given to [the petitioner]." *Scott v. Mullin*, 303 F.3d 1222, 1230 (10th Cir. 2002) (citation omitted).

### a. *Known but not disclosed*

The State does not dispute that the "additional documents . . . released by the OSBI and the [APD] in the time since Petitioner initiated his collateral proceedings" were not turned over prior to trial, nor does it contest suppression with respect to most of the 860 pages disclosed by the OSBI in 1992. *See* Appellant Br. at 14–15. However, it does contest whether the "prosecutorial" file prepared by the OSBI for use by the Pontotoc County D.A. in the prosecution of Mr. Fontenot and Mr. Ward was known but not

disclosed. *Compare* Appellant Br. at 25 (claiming that the prosecutorial "was always available to the defense, even prior to trial") *with* SAP, Vol. 30 at 68 ("Even more egregious was the pattern of not disclosing the prosecutorial or any other discovery to defense counsel.").[51] The prosecutorial comprises around 160 of the 860 pages of material turned over by the OSBI in 1992. *See* Ex. 44 (860 pages of 1992 OSBI disclosure); Vol. 7 at 63 through Vol. 10 at 33 (Prosecutorial; OSBI Bates-stamped documents 225–385 of 860).

In its 2014 postconviction order, the state district court found that Mr. Fontenot "has had possession of the 860 pages of OSBI material *since 1992*." Vol. 31 at 675 (emphasis added). This factual finding is presumed correct under § 2254(e)(1). And implicit in this finding is its inverse corollary: that Mr. Fontenot did *not* have access to any of those 860 pages of material—which included the prosecutorial—*before* 1992. Thus, a determination that any of the investigative reports and interview summaries

---

[51] The parties also dispute whether Mr. Fontenot had pretrial possession of the two OCME files discussed *supra* Part III.C.3.f—Dr. McWilliams's analysis of Ms. Haraway's remains and the report of mishandling of the Gerty site. The State's position is bolstered by the postconviction court's finding that Mr. Fontenot had access to the medical examiner report since 1986. It also draws record support from notes by Dr. Balding documenting meetings with Ms. Hull in July 1986, *see* Ex. 46, Vol. 23 at 76 (reporting that Ms. Hull "looked thru the case, took some notes"), and Mr. Butner in May 1988, *see id.* at 54 (reporting that "I showed [Mr. Butner] our file & we discussed my findings"). Mr. Fontenot's position is supported by affidavits from both Ms. Hull and Mr. Butner stating that they did not see the full medical examiner's report. *See* Ex. 11, Vol. 1 at 210; Ex. 16, Vol. 2 at 76. It is also corroborated by circumstantial evidence—namely, that none of the information contained in the two reports was presented at the 1988 new trial. We need not resolve this dispute, however, for Mr. Fontenot does not advance these two reports in support of his *Brady* claim.

found in the prosecutorial were disclosed to Mr. Butner prior to Mr. Fontenot's 1988 new trial would require rebutting the state court's finding via clear and convincing evidence.

The State has not produced such evidence. In his 2017 deposition, Mr. Peterson stated that the Pontotoc County D.A. had an "open file policy," which he defined to mean that "if we have it in our files [defense attorneys] have access to it, everything but our work product. They would be entitled to come in and look through the files and make copies of whatever they wanted to." Ex. 78, Vol. 27 at 33–34; *see Strickler*, 527 U.S. at 283 n.23 ("[I]f a prosecutor asserts that he complies with *Brady* through an open file policy, defense counsel may reasonably rely on that file to contain all materials the State is constitutionally obligated to disclose under *Brady*."). But in response to a question whether it "was the policy that a defense attorney had access to the entirety of the prosecutorial," Mr. Peterson responded, "He would not have access to my prosecutorial report. That's my work product. I make notes in it. I make research in it." Ex. 78, Vol. 27 at 34; *see also id.* at 56 ("Q: Well, you couldn't tell us if they had access to the prosecutorial? A: No, they did not, not the one I had."); *id.* at 68 ("As a matter of policy I wouldn't give [defense attorneys] my prosecutorial report."). And in response to a follow-up question inquiring whether he had a policy to give the defense access to the prosecutorial before claiming work product privilege, Mr. Peterson responded, "No, I did not." *Id.* at 34. Furthermore, Mr. Peterson said he was not aware of "any other documents in [his] file *other* than the prosecutorial." *Id.* at 57 (emphasis added). Thus, the "open file" on Mr. Fontenot's case was essentially empty. *See Fontenot III*, 402 F. Supp. 3d at

1163; Ex. 81, Vol. 28 at 84 (Mr. Butner's deposition testimony that he "came to realize that [the Pontotoc County D.A.'s] open file policy meant absolutely nothing").

At the time of Mr. Fontenot's trials, Oklahoma law viewed unsworn statements of prosecution witnesses and police investigative reports to fall within the work-product privilege, making them non-discoverable. *Nauni v. State*, 670 P.2d 126, 133 (Okla. Crim. App. 1983); *see also Moore v. State*, 740 P.2d 731, 736 (Okla. Crim. App. 1987). Consistent with this authority, the prosecution referenced non-discoverable law enforcement work product on several occasions at the preliminary hearing. *See* P/H, Vol. 32 at 521–22, 784–85. That the prosecutorial is composed almost exclusively of unsworn witness statements and police investigative reports helps to explain why Mr. Peterson viewed the prosecutorial as his office's "work product," and thus why he "d[idn't] think it's discoverable." Ex. 78, Vol. 27 at 68. But of course, regardless of the designation of various reports as work product, Oklahoma courts still recognized that "the work-product privilege may not be applied in derogation of a criminal defendant's constitutional rights to disclosure of evidence favorable to the defendant." *Nauni*, 670 P.2d at 133.

There is also no indication that the prosecutorial was turned over on any voluntary basis. When pressed at the deposition about his office's policy on the timing of voluntary disclosures, Mr. Peterson's response indicated that, effectively, it had none: "normally a defense attorney files his motion under Brady, *gets a court order. . . . to divulge exculpatory evidence.*" Ex. 78, Vol. 27 at 35–36 (emphasis added); *see id.* at 73 ("Q: [P]olicy wise, how do you know what materials from your file were provided to the defense? A: I don't know that there was a policy. . . . I don't have a general policy.").

139

This fundamental misunderstanding of the prosecution's obligation under *Brady*—which requires the State to disclose material exculpatory and impeachment evidence regardless of whether a motion compelling such disclosure is filed or granted—is consistent with Mr. Peterson's statement during the preliminary hearing that the prosecution "would object to any discovery prior to a trial judge's order on discovery, if there is to be any at all." P/H, Vol. 32 at 786; *see also id.* at 518 ("Counsel is saying that he has a right to discovery at preliminary hearing, that's not the law. Preliminary hearing is for the purpose of putting on sufficient evidence, has nothing to do with discovery."[52]). In short, as the preliminary hearing transcript makes clear, Pontotoc County prosecutors repeatedly "stonewalled against providing any evidence" to Mr. Fontenot's defense. *Fontenot III*, 402 F. Supp. 3d at 1167; *see, e.g.*, P/H, Vol. 32 at 784, 927 (consistently responding to defense requests for the production of relevant information with a directive to file motions for discovery).

Far from revealing clear and convincing evidence that the prosecutorial was turned over by the State before trial, the record "strongly suggests and supports a contrary

---

[52] *Contra Beaird v. Ramey*, 456 P.2d 587, 589 (Okla. Crim. App. 1969):

> [The preliminary hearing] is a procedure whereby defendant may discover what testimony is to be used against him at the trial, as he may examine witnesses in detail and be prepared to cope with their testimony at the time of trial in case defendant is bound over.

> Since the hearing is conducted for benefit of an accused, he should be given broad latitude in the cross-examination of State's witnesses and in producing evidence that would tend to obtain defendant's release, or that which would be material or relevant.

finding, namely, that the report was not disclosed." *Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 829 (10th Cir. 1995). In a 2013 affidavit, Mr. Butner concluded, after a review of the 860 pages of OSBI disclosures, that he "did not receive any of the OSBI Reports from the Pontotoc County District Attorney's Office or from OSBI prior to either of Mr. Fontenot's trials." Ex. 16, Vol. 2 at 76. Specifically, Mr. Butner swore he had not seen key material in the prosecutorial relating to Mr. Fontenot's alibi, including the interviews of Ms. Roberts and Mr. Calhoun, the police report on the Calhoun party noise complaint, and Mr. Fontenot's October 21 statement asserting his presence at the party and recanting his confession. Ex. 16, Vol. 2 at 77; *see also* Ex. 81, Vol. 28 at 109 (Mr. Butner's deposition statement that he could not recall ever seeing the police report on the Calhoun party). He also swore to having never seen statements from Monroe Atkeson, Janet Weldon, and James David Watts documenting the obscene calls received by Ms. Haraway. Ex. 16, Vol. 2 at 77; *see also* Ex. 81, Vol. 28 at 103–04 (Mr. Butner's deposition testimony that he did not recall being aware "that there had been threatening or obscene phone calls to Ms. Haraway while she was working at McAnally's").

Mr. Butner's statements are supported by circumstantial evidence—chiefly, the fact that he presented no alibi defense at trial nor any evidence of the harassing phone calls. *Cf. Smith*, 50 F.3d at 829 ("[P]erhaps the most highly probative evidence relating to the disclosure *vel non* of this report is the conspicuous absence of any cross-examination . . . on the matters contained in [the] report, matters that were extremely relevant to [the] defense."). And he lacked this evidence despite filing detailed pretrial discovery motions on December 20, 1984, *see* Ex. 74, Vol. 26 at 306 (motion for the discovery of seven

141

categories of information filed in preparation for the preliminary hearing); February 13, 1985, *see* Ex. 73, Vol. 26 at 304 (motion for the discovery of "all police and sheriff's reports regarding this case," filed in preparation for the joint trial); February 20, 1985, *see* Ex. 75, Vol. 26 at 309 (comprehensive discovery motion filed in preparation for the joint trial, requesting 15 categories of information); and December 2, 1987, *see* Ex. 72, Vol. 26 at 297 (comprehensive discovery motion filed in preparation for the new trial, requesting 40 categories of information, and moving for a judicial determination of any information asserted to be work product); *see also* Ex. 81, Vol. 28 at 85 (Mr. Butner's deposition testimony that "I tried to cover my posterior with motions that would make them give me anything and everything"). While the defense is not required to file such motions to ensure the disclosure of favorable, material evidence, *see Agurs*, 427 U.S. at 107, it was clear in 1988 that "[t]he prosecution violates the *Brady* rule if after a request by the defense it suppresses evidence which is both favorable to the defense and material to guilt or punishment," *Bowen*, 799 F.2d at 602; *see Agurs*, 427 U.S. at 106 ("When the prosecutor receives a specific and relevant request, the failure to make any response is seldom, if ever, excusable.").

We thus determine that the investigative reports contained in the prosecutorial, in addition to the rest of the 860 pages of 1992 OSBI disclosure, were "known to the [State] but not disclosed to trial counsel." *Strickler*, 527 U.S. at 282.

b. *Knew or should have known*

The State argues that evidence in its possession regarding Mr. Fontenot's alibi was not suppressed "because evidence of Petitioner's alibi would have been within [his] own

142

knowledge," Appellant Br. at 23, and thus "information from the prosecution has never been required to investigate or substantiate [that alibi]," Okla. *Brady* Br. at 20. The State also argues it did not suppress evidence of the harassing phone calls, because Mr. Butner was notified of these calls via Mr. Kerner's investigative report, delivered several weeks before the new trial, which summarized the conversation in McAnally's between Ms. Haraway and Mr. Johnson. *See* Appellant Br. at 29–30. The State cites a Seventh Circuit case for the proposition that "evidence is suppressed only if the evidence was not otherwise available to the defendant through the exercise of due diligence." *Id.* at 23–24; Okla. *Brady* Br. at 20 (citing *Harris v. Kuba*, 486 F.3d 1010, 1015 (7th Cir. 2007)).

It is true that many of our sister circuits deem evidence "suppressed" under *Brady* only if "the evidence was not otherwise available to the defendant through the exercise of reasonable diligence." *United States v. O'Hara*, 301 F.3d 563, 569 (7th Cir. 2002). In these circuits, "[e]vidence is not 'suppressed' if the defendant either knew or should have known of the essential facts permitting him to take advantage of any exculpatory evidence." *United States v. LeRoy*, 687 F.2d 610, 618 (2d Cir. 1982) (citations omitted).

But that is not the law in this circuit. In *Banks v. Reynolds*, 54 F.3d 1508, 1516–17 (10th Cir. 1995), we rejected the state's argument "that *Brady* only requires the prosecution to disclose information which is otherwise unknown to the defendant." Instead, we held that

> the prosecution's obligation to turn over the evidence in the first instance stands independent of the defendant's knowledge. Simply stated, if the prosecution possesses evidence that, in the context of a particular case is obviously exculpatory, then it has an obligation to disclose it to defense counsel whether a general request is made or whether no request is made.

143

In this case, the fact that defense counsel "knew or should have known" about the [pertinent] information, therefore, is irrelevant to whether the prosecution had an obligation to disclose the information. The only relevant inquiry is whether the information was "exculpatory."

*Id.* at 1517 (internal quotation marks and citations omitted); *see also United States v. Quintanilla*, 193 F.3d 1139, 1149 (10th Cir. 1999).

This reasoning is sound. The Supreme Court has framed the prosecution's duty to disclose as "broad," *Strickler*, 527 U.S. at 281, and "has never required a defendant to exercise due diligence to obtain *Brady* material," *Lewis v. Conn. Comm'r of Corr.*, 790 F.3d 109, 121 (2d Cir. 2015). To the contrary, in *Banks v. Dretke*, while analyzing *Brady* as cause for excusing procedural default, the Court rejected a rule "declaring 'prosecutor may hide, defendant must seek'" as "not tenable in a system constitutionally bound to accord defendants due process." 540 U.S. 668, 696 (2004). Following *Banks v. Dretke*, several circuits have held that a defendant's diligence in discovering evidence plays no role in a substantive *Brady* claim. *See Dennis v. Sec'y, Penn. Dep't of Corr.*, 834 F.3d 263, 291 (3d Cir. 2016) (en banc) (clarifying that "the concept of 'due diligence' plays no role in the *Brady* analysis"); *Amado v. Gonzalez*, 758 F.3d 1119, 1135 (9th Cir. 2014) ("The prosecutor's obligation under *Brady* is not excused by a defense counsel's failure to exercise diligence with respect to suppressed evidence."); *United States v. Tavera*, 719 F.3d 705, 712 (6th Cir. 2013) (stating that *Banks v. Dretke* "should have ended th[e] practice" of imposing "a broad defendant-due-diligence rule" in *Brady* cases). In sum, "[t]he *Brady* rule imposes an independent duty to act on the government," *Tavera*, 719 F.3d at 712—an obligation to disclose favorable evidence when it reaches the point of

materiality, regardless of the defense's subjective or objective knowledge of such evidence. "Any other rule presents too slippery a slope." *Dennis*, 834 F.3d at 292.

However, "[w]hether the defense knows or should know about evidence in the possession of the prosecution certainly will bear on whether there has been a *Brady* violation." *Banks (Reynolds)*, 54 F.3d at 1517. While it has no bearing on whether the evidence was "suppressed by the state," a defendant's knowledge instead implicates the element of prejudice, or materiality. That is, "if the defense already has a particular piece of evidence, the prosecution's disclosure of that evidence would, in many cases, be cumulative and the withheld evidence would not be material." *Id.* We therefore conclude that both the alibi and phone call evidence was suppressed, but we will consider its availability to the defense in evaluating materiality.

## 2. **Favorable to the Defense**

Evidence favorable to the defense encompasses exculpatory evidence, which "tend[s] to establish a criminal defendant's innocence." *Exculpatory Evidence*, Black's Law Dictionary (11th ed. 2019). It also encompasses impeachment evidence, used to undermine a witness's credibility, for "if disclosed and used effectively," such evidence "may make the difference between conviction and acquittal." *United States v. Bagley*, 473 U.S. 667, 676 (1985). "Impeachment evidence merits the same constitutional treatment as exculpatory evidence." *Bowen*, 799 F.2d at 610.

Mr. Fontenot cites five categories of favorable evidence that the State suppressed. We analyze each category, in addition to a sixth, pertaining to Ms. Haraway's blouse.[53]

a. *Alibi evidence*

Mr. Butner "was unaware of the numerous OSBI reports supporting Mr. Fontenot's alibi of attending Gordon Calhoun's party during the time Mrs. Haraway went missing." Ex. 16, Vol. 2 at 77. As discussed in connection with actual innocence, these reports include an October 1984 interview of Ms. Roberts; a summary of Mr. Fontenot's statements to the OSBI before and after administration of a polygraph test on October 21, 1984;[54] and a police report documenting the 12:40 a.m. response on April 29, 1984, to a noise complaint about the Calhoun party on South Townsend. *See supra* Part III.C.3.a.

---

[53] We can affirm the district court's finding of a *Brady* violation on any ground supported by the record. *See Hernandez v. Starbuck*, 69 F.3d 1089, 1093 (10th Cir. 1995) (a court of appeals has "freedom to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court" (quotation marks omitted)); *see also Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011) ("[W]e may affirm on any basis supported by the record, even if it requires ruling on arguments not reached by the district court or even presented to us on appeal. . . . [W]e are ready to affirm whenever the record allows it.").

[54] At the preliminary hearing, Mr. Peterson acknowledged that the defense is entitled to "any statements by the Defendants to law enforcement." P/H, Vol. 32 at 926. Yet the summary of Mr. Fontenot's October 21 statement, included in the prosecutorial, was never disclosed. *See* Ex. 16, Vol. 2 at 77 (Mr. Butner's affidavit statement that he "was not provided Karl's poly-graphed statement w[h]ere he admits being at the party"); P/H, Vol. 32 at 1017–23 (Mr. Butner's cross-examination regarding what occurred during the exam); Ex. 81, Vol. 28 at 128 (Mr. Butner's deposition testimony that Mr. Fontenot did not advise him of the polygraph, despite his specific request for that information).

Also not disclosed were summaries of two 1984 interviews of Mr. Calhoun conducted by D.A. Investigator Loyd Bond and included in the prosecutorial. *See* Ex. 11, Vol. 2 at 53 (Terry Hull's affidavit statement that she had no recollection of ever seeing these interview summaries). On November 13, Mr. Calhoun told Investigator Bond that he could not remember a party at his apartment on April 27 or 28. He also stated he was close friends with Bruce DePrater. In a follow-up one month later, Mr. Calhoun recalled going to Texas to buy a keg for a party at his apartment, which he believed could have been on April 27 or 28.

This evidence was favorable because it would have helped establish Mr. Fontenot's alibi for the night of April 28. Ms. Roberts's October 19 statement provided independent corroboration of Mr. Fontenot's October 21 assertion that he was at the party all night, and that Mr. Ward, "Bruce" from Konawa, and Ms. Roberts were also in attendance. Further, several details of Ms. Roberts's statement were in turn corroborated by Mr. Calhoun's two interviews—that he traveled to Texas to buy the kegs for the April 28 party, and that the "Bruce" identified by both Mr. Fontenot and Ms. Roberts was most likely Mr. Calhoun's friend Bruce DePrater. The Calhoun interview reports would have strengthened the credibility of Ms. Roberts, and possibly led Mr. Butner to call her as an alibi witness. *See* Ex. 16, Vol. 2 at 77 (Mr. Butner's statement that he would have called Ms. Roberts to testify during the defense case-in-chief had these reports been disclosed).

The information in several of the suppressed reports also would have provided considerable alibi value when combined with other evidence. For example, the withheld

147

APD noise complaint would have verified Mr. Ward's October 12 statement that the police came to the Calhoun party "and told us to quiet it down." J/T, Vol. 41 at 49; *cf.* Ex. 89, Vol. 28 at 332 (reporting that the Calhoun partiers "advised they would quieten down"). And the APD radio log entry from 12:40 a.m. on April 29 of a "loud drummer at 515 S. Townsend," Ex. 42, Vol. 4 at 168, would have verified Mr. Fontenot's withheld October 21 statement that someone was playing drums at the Calhoun party.

The only testimony the jury heard at the new trial about the April 28 keg party was Mr. Calhoun's assertion that neither Mr. Fontenot nor Mr. Ward attended. Had these documents been disclosed, not only would Mr. Butner have been able to mount a robust alibi defense, he also would have been able to impeach Mr. Calhoun with his statements during the two 1984 interviews. *See* Ex. 11, Vol. 2 at 53 (Ms. Hull's assertion that the interviews carried impeachment value). That is, Mr. Butner could have asked how Mr. Calhoun was now sure that Mr. Fontenot was not at this party when in November 1984 he could not even remember if and when the party occurred.

Mr. Fontenot's October 21 statement is also favorable apart from its alibi value. The OSBI summary of this interview, which occurred just two days after Mr. Fontenot's confession, recounted that he "denied any involvement and stated he only gave the statement to the agent because the agent told him the story he was supposed to have been involved in and he simply agreed to it." Ex. 43, Vol. 4 at 325. Furthermore, "[h]e adamantly stated that none of the statement he gave to the agent involving him in the crime is true and that he also lied when the video confession was taped." *Id*. Not only did this information fit with Mr. Fontenot's defense—that he gave a false confession after

148

being fed information by the police—but the timing of his complete recantation significantly increased the credibility of such defense. As the district court found, "Mr. Fontenot's recantation within days of his confession . . . drastically undercut the reliability of the confession and would have aided defense counsel in proving Mr. Fontenot's confession was false." *Fontenot III*, 402 F. Supp. 3d at 1170. Without benefit of the full statement prepared by law enforcement regarding the October 21 interview, however, Mr. Butner failed to call as a witness the OSBI agent who administered the polygraph, Agent Featherstone, or to introduce any evidence of Mr. Fontenot's immediate recantation to mitigate the damaging effect of his confession.[55]

b. *Witness statements*

The district court agreed with Mr. Fontenot that several witness statements included among the APD documents disclosed in 2019 were favorable to the defense:

*James Boardman and James Moyer*

A few days after Ms. Haraway disappeared, James Boardman told police that he saw two men inside McAnally's on April 28 between 5 and 6 p.m. who were acting suspiciously. One of the men had brown hair and the other had sandy blond hair.

---

[55] In his 2017 deposition, Mr. Butner discussed the significant communication difficulties that plagued his representation of Mr. Fontenot, in the context of addressing Mr. Fontenot's failure to inform him of his October 21, 1984 polygraph exam. *See supra* note 7. These difficulties highlight the damage done by the State's suppression of Mr. Fontenot's own statements to police, despite being aware of the obligation to turn those statements over. They also indicate that here, damage was likely done by withholding alibi evidence even if certain of those underlying facts were within Mr. Fontenot's knowledge, and thus potentially discoverable via due diligence.

Mr. Boardman thought they were driving an old, light-colored pickup, a Chevy or a Ford. Around November 1, 1984, Mr. Boardman came to the Ada police station to view photo lineups of Mr. Ward, Mr. Fontenot, and Mr. Titsworth, with Agent Rogers and D.A. investigator Bond present. Mr. Boardman failed to identify Mr. Fontenot. *See* Ex. 93, Vol. 30 at 516.

This information is exculpatory. Mr. Boardman's report of seeing a suspicious-looking pair of men together in McAnally's on the evening of April 28, one blond and one with darker hair, who drove an old, light-colored pickup, fits with the reports of other witnesses who saw a similar pair of men driving a similar pickup later that night. Further, the fact that he was in McAnally's between 5 and 6 p.m. coincides with the State's timeline, indicating that the men he saw could have been the men at J.P.'s—Ms. Wise testified that the suspicious pair of individuals first entered her store at 4 p.m., left at some point thereafter, then returned around 7 p.m. And most critically, the suppressed report states that Mr. Boardman identified "#1 out of the Ward folder and could not identify anyone from the Fontenot and Titsworth folders." *Id.*

It is unclear if "#1 out of the Ward folder" was a photo of Mr. Ward or of another blond-haired man. Regardless, around five days later—on November 6, 1984—Mr. Moyer was also shown photo lineups and also picked out "#1 in the Ward folder" as the picture most resembling the blond-haired man he saw in McAnally's, a fact documented by another APD report first disclosed in 2019. Ex. 102, Vol. 30 at 552. It thus seems apparent that Mr. Boardman and Mr. Moyer selected the same photograph from the Ward folder when asked to identify the blond-haired man they saw in

150

McAnally's on the night of April 28, 1984. In combination with the other similarities between their accounts, this alignment in photo identification provides strong evidence that the two suspicious men Mr. Boardman saw in McAnally's between 5 and 6 p.m. were the same two suspicious men Mr. Moyer saw in the store at around 7:30 p.m. Thus, Mr. Boardman's failure to identify Mr. Fontenot as the brown-haired man is in turn strong evidence that Mr. Fontenot was not the companion of the blond-haired man whom both witnesses selected from the photo lineup.

As Mr. Bond, the D.A. investigator, was present at Mr. Boardman's photo lineup, there is no question the prosecution knew of this failed identification. *See* Ex. 72, Vol. 26 at 301 (Mr. Butner's request for any "information of misidentification of the Defendant by any source or witness" included in December 1987 discovery motion). If this report had been disclosed, Mr. Butner could have called Mr. Boardman as a witness to cast further doubt on the State's tenuous identification. And if Mr. Butner had received both the Boardman and Moyer reports, he could have developed the information each report contained about photo #1 in the Ward folder to further establish that Mr. Fontenot was not the dark-haired man seen by various witnesses at J.P.'s and McAnally's that night.

*John McKinnis*

John McKinnis spoke with the APD the day after Ms. Haraway's abduction. Notes taken of this phone call indicate that Mr. McKinnis was in the store at 8:05 p.m. the prior evening, and that he saw a "man standing at counter. Large guy with full beard. WM 5′11″, 195–200[,] 26–30 years old. Dark jeans buttoned up shirt." Ex. 94, Vol. 30 at 519. While somewhat cryptic, these notes indicate that Mr. McKinnis felt it necessary to pass

151

along information about a man he saw standing at the counter with Ms. Haraway less than an hour before she disappeared.

Mr. McKinnis provided an affidavit in 2013, six years before the notes of his original phone call were uncovered in APD files. Mr. McKinnis stated that he told Detective Baskin that there was a man standing "behind the counter with Haraway" when he was in the store around 8 p.m. on April 28. Ex. 5, Vol. 2 at 36. Detective Baskin allegedly told Mr. McKinnis that this information was not relevant to the investigation, because whatever happened to Ms. Haraway occurred later on, and that the police already knew the identity of the man he had seen behind the counter.

Mr. McKinnis's information was favorable to Mr. Fontenot. A report of an unknown individual seen standing behind the McAnally's counter with Ms. Haraway around 8 p.m. could have led to the development of an alternate suspect. With this information, Mr. Butner could have interviewed Mr. McKinnis to potentially identify this unknown man and called Mr. McKinnis to testify that the man he saw with Ms. Haraway within roughly 45 minutes of her disappearance was neither Mr. Fontenot nor Mr. Ward. (An Ada native, Mr. McKinnis knew both defendants by sight and could not identify the man behind the counter as either of them. *See id.*) Further, disclosure of Mr. McKinnis's call could have led to more information regarding the gray-primered Chevy pickup, as Mr. McKinnis recalls seeing such a vehicle during his trip to McAnally's.

\*\*\*

One additional suppressed report also warrants discussion:

152

<u>Karen Wise's April 30 interview:</u>

A summary of an interview of Karen Wise by Agent Rogers on April 30, 1984 was included in the prosecutorial. Ms. Wise told the OSBI that two white males came into J.P.'s around 7:15 p.m. and asked to use the phone, before requesting two dollars in quarters to play pool. The descriptions Ms. Wise gave of these men helped form the composites of the two suspects later alleged to be Mr. Fontenot and Mr. Ward. Ms. Wise said that she thought these two men could have left the store then returned a little later, shortly after 8 p.m. Upon returning, they got more quarters for pool, and sometime after that bought a six pack of Budweiser and a bottle of wine. The two men then departed in an older model pickup, which had light color spots and reddish-brown primer, and headed west, back toward town and McAnally's.

Ms. Wise told the OSBI that she thought these two men looked familiar, and that they had been in the store the week prior, also to play pool, driving the same pickup. On this prior trip, they also bought a six-pack of Budweiser, and Ms. Wise remembered that "she checked the tall subject's driver's license and she feels that he was possibly twenty-four years old or close to it," which she recalled because his birthday was close to hers. Ex. 44, Vol. 8 at 30.

This statement provided exculpatory and impeachment evidence which Mr. Butner could have made significant use of at both the preliminary hearing and trial. On the impeachment front, Ms. Wise's description of the two visits made to J.P.'s by these two men in her April 30 interview differs markedly from her testimony at the preliminary hearing and the new trial. In the interview, she stated the two men first arrived around

153

7:15 p.m., got quarters to play pool, left for a brief time, returned shortly after 8 p.m., got more quarters, bought beer and wine, then left. At the preliminary hearing and at trial, she testified that these two men were first in the store at 4 p.m., bought the beer and wine during that initial visit, then left, before returning at around 7 p.m. She further testified that they were in the store continuously for the next hour and a half before leaving again at around 8:30, and that they made no purchases during this period.

Also favorable was the fact that Ms. Wise told the OSBI on April 30 that she thought she remembered the tall suspect—the man alleged to be Mr. Fontenot—from checking his ID a week earlier, and believed he was around 24 years old. Further, Ms. Wise's April 30 statement seems to indicate that it was also the tall man who bought the wine on April 28. *See id.* at 29 ("[T]he tall man asked Wise where was the wine and she showed them. They bought a half a gallon of red Reunite Wine . . . ."); *cf.* P/H, Vol. 32 at 182–83 (Ms. Wise's testimony that the taller subject picked out the wine); *id.* at 179 ("Q: Did you check the identification, driver's license, or anything of the person who bought the beer or the wine? A: On the wine, I certainly did."). This was exculpatory information, given that Mr. Fontenot was 19 at the time of the crime. Mr. Butner came close to eliciting this inference at the preliminary hearing:

> Mr. Butner: A twenty year old couldn't get into your establishment. Is that right?
> Ms. Wise: No . . . . But like I told them, I remember the I.D. was old enough. I can't recall the picture on it. I just remember it was old enough. I looked—was trying to make sure that they weren't, you know, using someone else's I.D.
> Mr. Butner: . . . And so, when you say that they were old enough, that would put them over the age of twenty-one.
> Ms. Wise: Yes.

154

> Mr. Butner: And that identification and that I.D. matched the person giving it to you. Is that right?
>
> Ms. Wise: Yes, it did.

P/H, Vol. 32 at 203. Without Ms. Wise's April 30 statement, however, Mr. Butner could not inquire about her recollection of the taller suspect from a prior visit as being around 24 years old. He also could not drill down further into the issue of photo ID to establish that both of the two men—or at least the taller man—must have been at least 21 years old. And he could not impeach her testimony that she could not recall ever having seen the gray-and-red-primered pickup prior to the night of April 28 with her statement in the April 30 interview that she believed the two men were in the store a week prior and had been driving the same pickup.

At the preliminary hearing, Ms. Wise was nonresponsive when Mr. Butner asked what she told the police when she first spoke to them. His cross-examination at the hearing and at the new trial would have been significantly enhanced by the ability to impeach Ms. Wise on the details of her April 30 interview, for "[a] jury would reasonably have been troubled by the adjustments to [Ms. Wise's] original story by the time of the second trial." *See Kyles*, 514 U.S. at 443. The material in that report was of obvious value to the defense, despite Mr. Peterson's objection that Ms. Wise's original identification was irrelevant. *See* P/H, Vol. 32 at 198 ("Mr. Peterson: I don't see why what [Ms. Wise] said on the night of the 28th is relevant to her description."). The trial court rightly overruled him: "There might be something that she described that doesn't fit the characteristics of one of the witnesses." *Id.*

155

Given the discrepancies and inconsistencies outlined above, Mr. Butner could have used Ms. Wise's April 30 statement to significantly damage her credibility at the new trial, and to eliminate all corroborative value from her testimony regarding Mr. Fontenot's confession. *See Fontenot II*, 881 P.2d at 78 (finding that Ms. Wise's testimony that she saw two men who "resembled Fontenot and Ward" corroborated the confession); *cf. Kyles*, 514 U.S. at 443 (access to contemporaneous reports "would have fueled a withering cross-examination, destroying confidence in [the witness's] story"). Damaging Ms. Wise's credibility would erode one of two pillars supporting the State's theory of Mr. Fontenot's involvement—that he was one of the two suspicious men hanging out in J.P.'s on the night of April 28.

***

In sum, these undisclosed statements of April 28 witnesses were favorable to Mr. Fontenot. "Since the evolution over time of a given eyewitness's description can be fatal to its reliability," *Kyles*, 514 U.S. at 444, Mr. Butner could have made significant use of Ms. Wise's OSBI interview to discredit her trial testimony and cast doubt on the State's timeline, while using the information provided by Mr. Boardman, Mr. Moyer, and Mr. McKinnis to cast more doubt on the identity of the dark-haired man seen in McAnally's.

c. *Floyd DeGraw*

Among the 1992 OSBI disclosures were approximately seventy-five pages of reports concerning an alternate person of interest, Floyd DeGraw, who emerged as a suspect in Ms. Haraway's abduction in the first few days after her disappearance.

156

In arguing for the favorability of these reports, Mr. Fontenot points to *Bowen v. Maynard*, 799 F.2d at 612, where suppressed evidence of an alternate suspect created reasonable doubt that the defendant committed the murders in question, and "could have been used to uncover other leads and defense theories and to discredit the police investigation of the murders." In *Bowen*, however, the alternate suspect had direct ties to the victim, giving him a motive to commit the crime, and "had a distinct opportunity to commit the murders." *Id.* at 612. Furthermore, the evidence of the alternate suspect helped bolster the defendant's alibi. *Id.* at 612–13. And in *Smith v. New Mexico Dep't of Corrections*, another *Brady* case cited by Mr. Fontenot, the suppressed alternate-suspect evidence was both highly exculpatory—it indicated that the victim's common-law husband was "near the vicinity of the bodies on two separate occasions"—and impeaching—the alternate suspect testified as a witness for the state. 50 F.3d at 829–30.

Here, the connection between Mr. DeGraw and the crime is far more speculative. Mr. DeGraw was arrested in Texas on May 3, 1984, for raping a woman, and a search of his car turned up belongings of women from several Oklahoma cities, including Ada. But OSBI technicians conducted an extensive search of this car and found no evidence linking Mr. DeGraw to Ms. Haraway's murder. Mr. Fontenot also highlights the fact that Mr. DeGraw was "deceptive" when answering polygraph questions about Ms. Haraway's murder, and later became emotional when shown her picture. Ultimately, however, the officer who administered the exam did not believe Mr. DeGraw was involved in the abduction. Furthermore, polygraph tests are inadmissible for any purpose under Oklahoma law, *see Paxton v. State*, 867 P.2d 1309, 1323 (Okla. Crim. App. 1993),

157

meaning that the results of Mr. DeGraw's polygraph "is not 'evidence' at all," *Wood v. Bartholomew*, 516 U.S. 1, 6 (1995) (per curiam).

Mr. Fontenot argues that Mr. DeGraw had opportunity to commit the crime. Late on April 27, 1984, or early the next morning, Mr. DeGraw headed west on Interstate 40 from Memphis, Tennessee, bound for California, and likely passed through Oklahoma the day of Ms. Haraway's abduction. Ada, however, is 40 miles from I-40. *See* Vol. 31 at 531. And the record reveals that Mr. DeGraw received a traffic citation in California at 4 p.m. on April 30, making it unlikely he spent time in Ada on the night of April 28. Additionally, Mr. DeGraw traveled cross-country in a Fiat Renault; nothing in the record links him to any model of gray pickup.

There is "no constitutional requirement that the prosecution make a complete and detailed accounting to the defense of all police investigatory work on a case." *Moore v. Illinois*, 408 U.S. 786, 795 (1972). Because not enough evidence tied Mr. DeGraw to Ms. Haraway's murder, law enforcement was justified in abandoning this lead. Thus, contrary to the district court's finding, the investigation of Mr. DeGraw was not "ripe ground for impeachment of law enforcement." *Fontenot III*, 402 F. Supp. 3d at 1182. In our assessment, the OSBI reports on Mr. DeGraw do not rise to the level of *Brady* material.

d. *Jeff Miller & Terri McCartney*

The prosecutorial includes a table of contents listing "exhibits not attached and in possession of [Agent] Rogers." Ex. 43, Vol. 4 at 178. Among the exhibits in this category are two videotaped interviews of Jeff Miller, which have never been disclosed.

158

Months after Ms. Haraway's abduction, the investigation's focus shifted back to Mr. Ward based on "some additional information that came in" from Mr. Miller, whom the police interviewed several days prior to October 12, 1984. P/H, Vol. 32 at 520, 729–30. Detective Baskin testified at the preliminary hearing that Mr. Miller's information was pertinent, informative, and useful. The information Mr. Miller gave police was relayed to him from several others. The defense attempted to discover these names at the hearing, to which Mr. Peterson objected based on work product, an objection the State concedes "might be debatable." Vol. 31 at 279. The trial court denied the request and directed the defense to move for discovery after the hearing. In later testimony, Detective Smith revealed that Mr. Titsworth first became known to the police based on the information provided by Mr. Miller.

As mentioned, the prosecution need not "make a complete and detailed accounting to the defense of all police investigatory work on a case." *Banks (Reynolds)*, 54 F.3d at 1517 (quoting *Moore*, 408 U.S. at 795). And the defense "has no constitutional right to conduct [its] own search of the State's files to argue relevance." *Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987). But as the gatekeeper of the state's evidence, and thus the main arbiter of *Brady* materiality, the prosecutor "must resolve close cases and 'doubtful questions in favor of disclosure.'" *Banks (Reynolds)*, 54 F.3d at 1517 (quoting *Agurs*, 427 U.S. at 108). That is, "a prosecutor anxious about tacking too close to the wind will disclose a favorable piece of evidence." *Kyles*, 514 U.S. at 439.

A trial court may order an in camera review of any evidence suppressed by the state and claimed to be favorable and material if the defendant establishes a basis for that

claim. *See Ritchie*, 480 U.S. at 58 n.15. "[T]he degree of specificity" of a request may bear upon whether the defendant has established such a basis. *Id.* The defendant "must at least make some plausible showing of how th[e evidence] would have been both material and favorable to his defense." *United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982). Mere speculation that the evidence will be favorable is insufficient to compel disclosure. *See United States v. Holloway*, 939 F.3d 1088, 1105 (10th Cir. 2019).

As Mr. Miller's taped interviews have never been disclosed, whether they contain information favorable to the defense is a matter of speculation. Mr. Fontenot contends that a plausible showing of favorability was established by Detective Smith's testimony that the police first connected Mr. Titsworth to Mr. Fontenot and Mr. Ward via information from Mr. Miller. Given Mr. Titsworth's lack of involvement in the crime, Mr. Fontenot argues, whatever Mr. Miller told police should be viewed as highly suspect. We agree that this reasoning would have been sufficient to establish a basis for the trial court to conduct an in camera review of the disputed tapes. However, the record does not contain any indication that the defense specifically requested that the trial court review them on that basis. *See* P/H, Vol. 32 at 522 (trial court's invitation "to make that motion after preliminary hearing" with respect to Mr. Miller's information). Thus, while we strongly disapprove of the State's failure to turn over the recorded interviews of Mr. Miller—and reiterate that close cases should always be resolved in favor of disclosure— in the absence of a contemporaneous request for court review setting forth a plausible basis for their favorability, we will not presume the tapes contained information that was both favorable and material to Mr. Fontenot.

Also listed in the prosecutorial's table of contents, but never disclosed, is a videotaped statement of Terri McCartney taken by Agent Rogers. Ms. McCartney testified at the preliminary hearing that Mr. Fontenot confessed his involvement in Ms. Haraway's murder on the first day he was booked into the Pontotoc County jail. Because she was not called back to testify in 1988, the State argues "there can be no finding of a material *Brady* violation based on Ms. [McCartney]," for "she did not testify at the only trial that matters." Appellant Br. at 37. But Mr. Fontenot only received one preliminary hearing in this case, which determined whether there was probable cause to bind him over for trial. Ms. McCartney's testimony at that hearing certainly mattered.

The defense made a request at the preliminary hearing to view Ms. McCartney's videotaped interview for any inconsistencies with her testimony, which the trial court overruled. While this specific request militates in favor of requiring disclosure, here, too, we find that the defense did not establish a substantial basis for claiming materiality or make a plausible showing that the withheld interview would be favorable. While it is possible Ms. McCartney's prior interview would reveal impeachment evidence, "[a] *Brady* claim fails if the existence of favorable evidence is merely suspected." *United States v. Erickson*, 561 F.3d 1150, 1163 (10th Cir. 2009).

Furthermore, Ms. McCartney was vigorously impeached at the hearing, regarding not just her prior criminal history, but the fact that Mr. Fontenot told her many different stories in jail. *See* P/H, Vol. 32 at 922–24; *id.* at 924 ("I heard so many stories, I wasn't going to believe any of them."). Thus, this is a situation where "defense counsel had extensively and thoroughly cross-examined the witness and raised questions about h[er]

161

reliability." *Nuckols*, 233 F.3d at 1267 n.8. "When a witness's credibility has already been substantially called into question in the same respects by other evidence, additional impeachment evidence will generally be immaterial and will not provide the basis for a *Brady* claim." *Id.* (quoting *Tankleff v. Senkowski*, 135 F.3d 235, 250 (2d. Cir. 1998)).

Mr. Fontenot's related argument that significant impeachment material would have been provided by a transcript in the prosecutorial of a November 6, 1984, interview of Ms. McCartney by a Pontotoc County sheriff's deputy fails for the same reason. This interview, in which Ms. McCartney also recounted what Mr. Fontenot allegedly told her in jail, is generally consistent with her testimony and would have added only "an incremental amount of impeachment evidence on an already compromised witness." *United States v. Cooper*, 654 F.3d 1104, 1120 (10th Cir. 2011) (quotation marks omitted).

The district court credited Mr. Fontenot's additional argument that it "appears" Ms. McCartney "got rewarded for her testimony by the prosecutor . . . though it has never been admitted by the prosecution." *Fontenot III*, 402 F. Supp. 3d at 1187. Mr. Fontenot cites an affidavit from Randy Holland, former husband of Ms. McCartney (now deceased), who claims she made a deal with the prosecution on his behalf: In exchange for her testimony against Mr. Fontenot and Mr. Ward, Mr. Holland would receive a sentencing break on his pending case, and the two would be allowed to marry while he was in jail.

This alleged deal is not borne out by the record. Mr. Holland was charged with committing second degree burglary in April 1985, then charged with committing another

162

burglary in August 1985. The referenced plea deal, via which Mr. Holland received a seven-year sentence, was entered on April 6, 1987. Both the relevant offenses and the plea deal occurred *after* Ms. McCartney testified against Mr. Fontenot in the preliminary hearing, on January 16, 1985. The deal described in Mr. Holland's affidavit, if it was ever struck, has no bearing on the case against Mr. Fontenot, given that Ms. McCartney did not testify at the new trial in 1988.

e. *Obscene phone calls*

The suppressed reports documenting the harassing calls received by Ms. Haraway in the weeks prior to her abduction are discussed *supra* Part I.A.4 and III.C.3.b.

The State asserts Mr. Butner was made aware before the new trial, via the information obtained by private investigator Richard Kerner from Anthony Johnson, that shortly before she disappeared, Ms. Haraway was receiving strange calls at work and had asked where to buy a gun. But far from "add[ing] nothing to what defense counsel learned from his investigator," Appellant Br. at 30, additional corroboration of these calls from people close to Ms. Haraway would have been of significant value to Mr. Fontenot's defense. Mr. Butner might have discounted Mr. Johnson's information— the alleged conversation took place three years earlier, and Mr. Johnson's account was largely hearsay. But if this report, from a random McAnally's customer one week before Ms. Haraway's disappearance, was validated by reports from her family and coworkers, a powerful defense could have emerged: that Ms. Haraway was receiving strange calls in the weeks before her abduction which led her to become increasingly uneasy at work, and that whoever made the calls was involved in her murder.

163

The suppressed reports of harassing phone calls were exculpatory, and "in the hands of the defense, . . . could have been used to uncover other leads and defense theories[.]" *Bowen*, 799 F.2d at 612; *see* Ex. 11, Vol. 2 at 53 (Terry Hull's affidavit statement that "[t]hese reports would have been helpful to further the defense investigation into alternate suspects or people in the vicinity of McAnally's who were watching or stalking Ms. Haraway"). "Thus, we may draw reasonable inferences as to what those other lines of defense may have been." *Banks (Reynolds)*, 54 F.3d at 1519. The most basic defense that might emerge, had Mr. Butner received the full cache of relevant reports, is that Ms. Haraway was familiar with her abductor(s). *Cf.* Ex. 15, Vol. 2 at 72 (speculation by Mr. Watts after speaking with Ms. Haraway that the caller was a regular McAnally's customer); Ex. 22, Vol. 2 at 260 (speculation by Mr. Johnson after speaking with Ms. Haraway that she knew who was making the calls). Another potential theory, which might have emerged after the preliminary hearing testimony of Ms. Wise, is that whoever murdered Ms. Haraway was subsequently threatening Ms. Wise to keep silent about what she knew while Mr. Fontenot was in custody. *Compare* P/H, Vol. 32 at 1085–86 (preliminary hearing testimony by Ms. Wise detailing "several phone calls" she has received "since this whole mess started," which included "some breathers" and a threatening call at work) *with* Ex. 22, Vol. 2 at 260 (statement by Mr. Johnson that Ms. Haraway told him "the caller never really said anything, just did some heavy breathing on the phone"); *see also* N/T, Vol. 35 at 581 (Ms. Wise's trial testimony that when she called the police on the man watching her from the alley late one night in January 1985, she told them "I was involved in a case and it could be people that were

aware of where I was"); P/H, Vol. 32 at 1091–92 (testimony by Ms. Wise that the phone calls caused her apprehension about her safety).

"A common trial tactic of defense lawyers is to discredit the caliber of the investigation or the decision to charge the defendant, and we may consider such use in assessing a possible *Brady* violation." *Bowen*, 799 F.2d at 613. These reports could also have been used "to discredit the police investigation of the murder[]," *id.* at 612, because "[t]he withheld evidence also raises serious questions about the manner, quality, and thoroughness of the investigation that led to [Mr. Fontenot's] arrest and trial," *id.* at 613. It appears the police conducted no investigation into the identity of the unknown man (or men) making obscene phone calls to Ms. Haraway at work. Anyone who read Ms. Weldon's account and was familiar with the facts of the case would likely flag the man who told Ms. Haraway that "he was going to come out to the store some night and wait outside while she was working," Vol. 4 at 294, as a prime suspect in her abduction. This is especially so given the multiple eyewitnesses' reports of a gray-primered pickup parked outside McAnally's for up to an hour before she disappeared. Yet there is no indication the APD or OSBI followed up on this obvious lead by conducting further interviews or auditing store telephone records. These investigatory failures could have been attacked by Mr. Butner to cast doubt on whether the police identified the right culprit.

Not only were these reports exculpatory, they also carried impeachment value. The State asked Ms. Weldon at the new trial about the phone conversation she had with Ms. Haraway on the night of April 28, and whether Ms. Haraway gave "any indication

165

that anything was wrong or she was upset or disturbed about anything." N/T, Vol. 36 at 170. Ms. Weldon stated it was just a normal conversation. *Id.* Given the information Ms. Weldon told police about Ms. Haraway's uneasiness working at McAnally's, her testimony painted an unrealistic picture. The defense could have inquired into the conversation between the two sisters, which likely occurred only a day or so before April 28, when Ms. Haraway did indicate that something was wrong and that she was upset and disturbed over the obscene phone calls.

The State also argues that the exculpatory nature of the undisclosed reports outlining the obscene phone calls is neutralized because Mr. Fontenot "has never discounted the possibility that he and/or his co-defendant could have been responsible for the harassing phone calls." Appellant Br. at 29. This argument "is at best speculation and at worst fantasy." *Bowen*, 799 F.2d at 612. The State presented no evidence at trial—and points to none now—that Mr. Fontenot had been in McAnally's prior to April 28, 1984, knew Ms. Haraway, or, indeed, had ever even seen her before. *See, e.g.*, Ex. 43, Vol. 4 at 324 (Mr. Fontenot's October 21, 1984 statement that he has never been in McAnally's and never seen Ms. Haraway). Furthermore, the State cannot tenably argue that the phone call evidence "was incapable of exculpating anyone," Appellant Br. at 31, while at the same time floating the possibility that Mr. Fontenot himself made the calls.

In sum, the State-suppressed reports detailing the obscene phone calls Ms. Haraway received in the weeks before her disappearance constitute favorable evidence that should have been disclosed to Mr. Fontenot prior to his new trial.

### f.  *Floral blouse*

In their confessions, Mr. Fontenot and Mr. Ward gave descriptions of the blouse worn by Ms. Haraway that were striking in their level of detail and in their similarity. *See supra* Part I.C. Mr. Fontenot described the blouse as having short sleeves with "elastic like in them" and "ruffles around the buttons and the sleeves," P/H, Vol. 32 at 689, while Mr. Ward described it as having "little fringe deals" around both the collar and the "end of the sleeves," *id.* at 671.

The OCCA determined that this description corroborated Mr. Fontenot's confession. *See Fontenot II*, 881 P.2d at 79. The district court went further, finding that "the only arguable evidence of guilt independent of Mr. Fontenot's confession was the blouse description," *Fontenot III*, 402 F. Supp. 3d at 1229, a characterization that is borne out by the new trial transcript. For example, in cross-examining Detective Smith, Mr. Butner inquired whether it was correct that "the only evidence that you have at this point in time as to what transpired is the blouse, the description of the blouse," to which Detective Smith responded, "Well, the blouse did match." N/T, Vol. 36 at 336. On redirect, Detective Smith stated that Mr. Fontenot and Mr. Ward "both described the blouse nearly identically, close enough that you knew or we would know that they had seen it." *Id.* at 355. And in closing argument, the prosecution asserted that "it would be impossible for someone to make up that description of the blouse. Doubly impossible for two and that leaves us with only one alternative, and that is that this Defendant was there, just like he confessed he was." N/T, Vol. 37 at 328.

167

There was, of course, another alternative—that police fed Mr. Fontenot the facts

of the crime to bolster a confession of highly questionable validity, including details of

the blouse, as Mr. Butner asserted at trial. *See* N/T, Vol. 36 at 234; Vol. 37 at 145; *cf.*

*Pavatt*, 159 P.3d at 288 ("While the letters were detailed, they were perhaps *too* detailed,

appearing to parrot certain key features of the State's case."). This contention hinged on

establishing that the police had a detailed description of this blouse prior to the two

confessions.

The police did receive a description of the floral blouse immediately following

Ms. Haraway's disappearance, which was given to them by Mr. Holkum, the off-duty

APD officer who stopped at McAnally's between 7:30 and 7:45 p.m. on April 28. At the

new trial, Mr. Holkum testified as to what he remembered Ms. Haraway wearing that

night:

> I observed her wearing a gray sweater type jacket of the type worn with a
> sweat suit, it had a hood and a zipper. She had on blue jeans. . . . The blouse
> she was wearing was a light colored lavender or light blue, what I would
> call a pastel colored with small print or design on it.

N/T, Vol. 36 at 160. Mr. Holkum believed this blouse "had a lace design around the

collar." *Id.* at 161. The next day, April 29, after learning Ms. Haraway was missing,

Mr. Holkum told Detectives Smith and Baskin what Ms. Haraway had been wearing the

night before. On cross-examination, Mr. Holkum confirmed that he was certain he gave

this information to Detectives Smith and Baskin on April 29.

Detective Baskin testified after Mr. Holkum. On cross-examination, Mr. Butner

asked whether he was the one who took down Mr. Holkum's April 29 blouse description.

Detective Baskin stated that he had "no written notes or any recollection of taking the description." *Id.* at 403; *see also id.* at 354 (Detective Smith's testimony that the description of the blouse provided to the APD by Mr. Holkum was not written down). The 1992 disclosures, however, contain an April 29, 1984 OSBI missing person report filled out by Detective Baskin, which provides a "Clothing Description" of Ms. Haraway's blouse as "possibly lavender w/ blue flowers, lace." Ex. 44, Vol. 10 at 36. The missing person report introduced into evidence by the prosecution at trial did not contain these details in its "Clothing Description." *See* N/T, Vol. 36 at 388.

Although in possession of a description of Ms. Haraway's floral blouse since the day after the abduction, the prosecution maintained that several key details of this blouse remained unknown to the police prior to the confessions in October 1984. In particular, the prosecution emphasized that Mr. Holkum could not have seen the sleeves of Ms. Haraway's blouse because she had on a sweatshirt over it when he saw her. *See* N/T, Vol. 36 at 162 ("Q: Since she had on a long sleeved sweat shirt, you never had occasion to see the sleeves of her shirt? A [Mr. Holkum]: No, sir."). Thus, according to the prosecution, it would have been impossible for the interrogating detectives—including Agent Rogers—to feed the two suspects information regarding the blouse's sleeves:

> Q [Prosecutor Ross]: How could [Mr. Fontenot and Mr. Ward] have had the description, Agent, of the short sleeve with elastic around them if she had on a long-sleeved shirt over it?
> A [Agent Rogers]: They couldn't have, unless they were there.

N/T, Vol. 37 at 128. This point was reiterated by the State in closing argument:

> Mr. Holkum said she had on a long sleeved sweat shirt. He could not see the sleeves. How could the police possibly have told [Mr. Fontenot] it was

169

short-sleeved and had elastic around the biceps, I suppose and puffs, if they couldn't have seen it?
. . . There is no one who could have told him that it was short sleeved with elastic around it from the police department.

*Id.* at 326.

Documents suppressed by the State reveal this to be untrue. The police in fact did have a complete description of the blouse, including its sleeves, prior to the October confessions. Just "[a] few days after" the abduction, Mr. Boardman told the APD he "was pretty sure Deni[c]e was wearing a blue short sleeve T shirt" on the evening of April 28. Ex. 93, Vol. 30 at 516. And in a May 17, 1984, hypnosis session, conducted at Agent Rogers's request, David Timmons described the woman he saw leaving McAnally's as wearing a white top that "may have ruffles around sleeves shoulders." Ex. 44, Vol. 23 at 19, 21. Most critically, in August 1984, Janet Weldon informed Detective Baskin about the missing blouse in an interview summarized in the prosecutorial:

> Janet said she gave Donna a light lavender blouse that was very lightly tinted. It had blue flowers on it and had lace around the collar *with elastic around the sleeves*. The shirt was made of thin material and buttoned down the front. . . . *Janet checked Donna's clothes and could not find the shirt.* She checked her own clothes to make sure that she had given it to Donna and she is positive she gave the shirt to Donna.

Ex. 43, Vol. 4 at 238 (emphasis added).

This August 1984 investigative report was highly favorable to the defense. It was exculpatory, because it shows that prior to the arrests, the police knew each specific detail about the blouse that was later recounted in the two confessions and also knew the blouse was missing from Ms. Haraway's wardrobe. And it carried major impeachment value,

170

because Ms. Weldon, Agent Rogers, and Detective Smith all testified that the police did

not receive any information from Ms. Weldon on the blouse until after the confessions.

Ms. Weldon testified when she told police about the blouse on direct examination:

Q: Did you have, Mrs. Weldon, an occasion, prior to the time these men
were arrested, to tell the police department or any representative of law
enforcement that that shirt was missing?
A: No, I didn't.
Q: You never told any of them?
A: No.

N/T, Vol. 36 at 172–73. She further testified that it was only after Mr. Fontenot and

Mr. Ward were arrested that her mother told her "about this blouse that [Ms. Haraway]

supposedly had on[.]" *Id.* at 171. On cross-examination, Mr. Butner asked Ms. Weldon

whether it was correct that she "had not given a description of this blouse to any law

enforcement officers" until after her mother notified her about the blouse—that is, until

after the arrests. *Id.* at 174. She responded, "That's right." *Id.*

On cross-examination, Agent Rogers corroborated this testimony, stating that he

was unaware of Ms. Weldon's description of the blouse until after the confessions:

I did not even know the identification of that blouse that she was wearing
until, probably, November, when the victim's sister appeared at the police
department in an interview with [Detective] Baskin. . . .
    [I]t was some time in November when Detective Baskin was
interviewing Donna's sister that the description of this blouse came up. . . .
And then that is when the light bulb come on as far as really any important
significance was even attached to the description of the blouse.

N/T, Vol. 37 at 50–51. Likewise, Detective Smith testified on cross-examination that

Ms. Weldon gave a description of the blouse to the police after the confessions, which

171

"matched the description that Mr. Fontenot had given us that, you know, initially we didn't place any value on[.]" N/T, Vol. 36 at 359.

This testimony appears to be false, because the interview with Ms. Weldon in which she provided a description of the blouse is documented as taking place in August 1984, not November or any other point after the arrests. And because this documentation was included in the prosecutorial, the prosecution either knew or should have known that the picture presented at trial regarding what and when the police knew about the blouse, including its sleeves, was inaccurate. *See Giglio v. United States*, 405 U.S. 150, 153 (1972) ("[T]he presentation of known false evidence is incompatible with 'rudimentary demands of justice.'" (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)); *Napue v. Illinois*, 360 U.S. 264, 269 (1959) ("The same result obtains when the State, although not soliciting false evidence, allows it to go uncorrected when it appears."). Rather than correct this picture, the prosecution proceeded to argue falsely in closing that no one from the police could have told Mr. Fontenot that the blouse "was short sleeved with elastic around it[.]" N/T, Vol. 37 at 326. Had it been disclosed, the report detailing Ms. Weldon's August 1984 transmittal to the APD of information on the floral blouse— not to mention the other suppressed reports documenting early police knowledge of that blouse—would have allowed Mr. Butner to effectively impeach State's witnesses, cast doubt on the motives and integrity of the police and the prosecution, and bolster the defense that Mr. Fontenot was fed details about the blouse in a coordinated effort to apply a patina of independent corroboration to his confession.

172

3. **Prejudice**

"Prejudice satisfying the third element exists 'when the suppressed evidence is material for *Brady* purposes.'" *Douglas*, 560 F.3d at 1173 (quoting *Banks*, 540 U.S. at 691). "[R]egardless of request, favorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a *reasonable* probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles*, 514 U.S. at 433 (quoting *Bagley*, 473 U.S. at 682) (emphasis added). "A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682. "[T]he adjective is important. The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Strickler*, 527 U.S. at 289–90 (alteration in original) (quoting *Kyles*, 514 U.S. at 434).

Thus, "this is not a requirement that the evidence be sufficiently strong to *ensure* an acquittal had it been presented at trial." *Douglas*, 560 F.3d at 1173. "Nor is the materiality requirement a sufficiency of the evidence test." *Id*. "[T]he question is not whether the State would have had a case to go to the jury if it had disclosed the favorable evidence, but whether we can be confident that the jury's verdict would have been the same." *Kyles*, 514 U.S. at 453. Therefore, a defendant establishes a *Brady* violation "by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435.

"In evaluating the materiality of withheld evidence, we do not consider each piece of withheld evidence in isolation. Rather we review the cumulative impact of the withheld evidence, its utility to the defense as well as its potentially damaging impact on the prosecution's case." *Simpson v. Carpenter*, 912 F.3d 542, 572 (10th Cir. 2018) (quotation marks omitted). That is, "we evaluate the materiality of withheld evidence in light of the entire record in order to determine if 'the omitted evidence creates a reasonable doubt that did not otherwise exist.'" *Banks (Reynolds)*, 54 F.3d at 1518 (quoting *Agurs*, 427 U.S. at 112). As a result, "if the verdict is already of questionable validity, additional evidence of relatively minor importance might be sufficient to create a reasonable doubt." *Agurs*, 427 U.S. at 113; *United States v. Robinson*, 39 F.3d 1115, 1119 (10th Cir. 1994).

As discussed above, Mr. Fontenot's verdict is already of highly questionable validity. *See infra* Part III.C.4. And, when viewed in light of the entire record, the cumulative impact of the favorable evidence discussed above is sufficient to create reasonable doubt. Confidence that the jury's verdict would have been the same "cannot survive a recap of the suppressed evidence and its significance[.]" *Kyles*, 514 U.S. at 453:

*First*, the suppressed evidence casts serious doubt on whether Mr. Fontenot was the dark-haired man seen in McAnally's by Mr. Moyer. Mr. Boardman's failure to identify Mr. Fontenot as one of the two men he saw in the store that evening was material, exculpatory evidence, given how Mr. Boardman's description of the two men (and their pickup) aligned with Mr. Moyer's description, and how both picked out #1 from the Ward folder. Suppressing the report on Mr. Boardman's information denied the

174

defense a strong counter to the State's emphasis at trial on the fact that Mr. Moyer had previously identified Mr. Fontenot at both the preliminary hearing and a live lineup.

*Second*, the suppressed evidence casts further doubt on whether Mr. Fontenot was the dark-haired man seen in J.P.'s by Ms. Wise. Her April 30 statement to the OSBI—that she thought she remembered the taller, dark-haired suspect from checking his ID in the store a week earlier, and that she believed he was around twenty-four years old—could have aided in establishing that the nineteen-year-old Mr. Fontenot was not in J.P.'s that night.

*Third*, the suppressed evidence carries impeachment value regarding one of the State's key witnesses. If the defense had access to those statements made by Ms. Wise in her April 30, 1984, interview that differed significantly from her trial testimony, the value of her testimony "would have been substantially reduced or destroyed." *Kyles*, 514 U.S. at 441. This suppressed statement would have "significantly enhance[ed] the quality of the impeachment evidence," *Douglas*, 560 F.3d at 1174, satisfying the materiality standard. *Cf. Smith v. Cain*, 565 U.S. 73, 76 (2012) ("[E]vidence impeaching an eyewitness may not be material if the State's other evidence is strong enough to sustain confidence in the verdict. That is not the case here." (citation omitted)).

*Fourth*, the suppressed evidence points to an alternate suspect—whoever targeted Ms. Haraway in the weeks leading to her abduction by making obscene calls to McAnally's—and thus deprived the defense of a critical investigatory lead.

*Fifth*, the evidence of these obscene calls would also raise an opportunity to attack "the thoroughness and even the good faith of the investigation." *Kyles*, 514 U.S. at 445.

175

The defense could have probed why the police failed to conduct any investigation into the evidence of the harassing calls, despite "its obvious relevance to the case." *Fontenot III*, 402 F. Supp. 3d at 1139.

*Sixth*, the suppressed evidence denied an opportunity to establish Mr. Fontenot's alibi. In particular, by failing to turn over Mr. Fontenot's statement from October 21, 1984, the APD write-up of the noise complaint regarding the Calhoun party, Ms. Roberts's October 19 statement, and Mr. Calhoun's two 1984 interviews, the prosecution prevented the defense from rebutting Mr. Calhoun's testimony at the new trial that neither Mr. Fontenot nor Mr. Ward attended the keg party on April 28, 1984.

And *seventh*, the suppressed evidence prevented Mr. Fontenot from establishing that the police did indeed have each detail contained in the confessions about Ms. Haraway's floral blouse by the time of the arrests, including a description of the shirt's sleeves. This evidence would have significantly strengthened the defense's contention that the police fed these highly specific facts to Mr. Fontenot during his interrogation. Lacking the summary of information provided to police by Ms. Weldon in August 1984 also deprived the defense of material that could have been used to impeach key witnesses and question whether the interrogators and the prosecution were acting in good faith.

*\*\*\**

The absence of this evidence was prejudicial. Its disclosure would have created a reasonable probability of acquittal, for the suppressed evidence is significant enough to disturb an already highly questionable verdict by fostering a reasonable doubt that did not

176

otherwise exist. In short, the absence of this evidence ensured that Mr. Fontenot did not receive a fair trial. We thus determine that "[t]he conviction before us, hanging on the barest of threads and dependent on the omission of exculpatory evidence, is 'inconsistent with the rudimentary demands of justice.'" *United States v. Ford*, 550 F.3d 975, 995 (10th Cir. 2008) (Gorsuch, J., dissenting) (quoting *Brady*, 373 U.S. at 87).

### D. *Remedy*

"We review the district court's formulation of an appropriate habeas corpus remedy for abuse of discretion." *Douglas*, 560 F.3d at 1176. The issue of harmless error is reviewed de novo under the habeas standard established in *Brecht v. Abrahamson*, 507 U.S. 619 (1993). *See Willingham v. Mullin*, 296 F.3d 917, 931 (10th Cir. 2002).

*Brecht* held that "the *Kotteakos* harmless-error standard applies in determining whether habeas relief must be granted because of constitutional error of the trial type." 507 U.S. at 638. "The test under *Kotteakos* is whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 637 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). A finding of material *Brady* error equates to nonharmless error under *Brecht*, "because a reasonable probability of a different result in the proceeding 'necessarily entails the conclusion that the suppression must have had substantial and injurious effect or influence in determining the jury's verdict.'" *Douglas*, 560 F.3d at 1173–74 (quoting *Kyles*, 514 U.S. at 435).

We thus affirm the district court's finding of nonharmless error based on *Brady* violations, without reaching the rest of Mr. Fontenot's constitutional claims. *See Scott*, 303 F.3d at 1232; *Nuckols*, 233 F.3d at 1267. Based on Mr. Fontenot's meritorious

177

showing of actual innocence, and the State's suppression of material, favorable evidence, the district court did not abuse its discretion in ordering either Mr. Fontenot's permanent release from custody or a new trial as the remedy for this violation of his right to due process under law. *See Giglio*, 405 U.S. at 154 ("A new trial is required if '[the suppressed evidence] could . . . in any reasonable likelihood have affected the judgment of the jury . . .'" (ellipses in original) (quoting *Napue*, 360 U.S. at 271)).

## V.   CONCLUSION

The State "is the representative not of an ordinary party to a controversy, but of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935). In our determination, Mr. Fontenot did not receive the benefit of that interest. We **AFFIRM** the district court's grant of habeas relief and lift our stay of the district court's order granting a new trial. If the State wishes to try Mr. Fontenot once again for the kidnapping and murder of Ms. Haraway, it must do so within 120 days of the issuance of this order.

178

*Fontenot v. Crow, No. 19-7045*

EID, J., dissenting.

In order to avoid procedural default, petitioner-appellee Karl Fontenot must prove that "it is more likely than not that no reasonable juror would have convicted him," "in light of all the evidence," including newly discovered evidence. *Bousley v. United States*, 523 U.S. 614, 623 (1998) (quotations omitted). The majority does a meticulous job of recounting the evidence in this case, and it states that it is applying the "no reasonable juror" standard. Yet in practice it views the evidence in the light most favorable to Fontenot, failing to account for the reality that the relevant new evidence is either peripheral, cumulative of trial evidence, or based on recollections that are three decades old. Because a reasonable juror would take these evidentiary weaknesses into account, Fontenot has not met his burden to show that no reasonable juror would have convicted him. But even if I were to reach the merits in this case, I would still part ways with the majority. The majority resolves Fontenot's claim pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), in his favor even though the district court decided the issue without the benefit of briefing from the State, which in my view is a fundamental error. Respectfully, I dissent.

## I.

Fontenot's application under § 2254 faces three threshold issues that we review on appeal: exhaustion, procedural default, and untimeliness. The majority holds Fontenot can overcome all of them—exhaustion through anticipatory procedural default, Maj. Op. at 71, and procedural default and untimeliness through actual innocence, *id.* at 125–26. I

1

agree with the majority's exhaustion analysis. But because I do not believe Fontenot has met the "demanding" standard for an actual innocence claim, which "permits review only in the extraordinary case," I would not excuse his procedural default or time bar. *House v. Bell*, 547 U.S. 518, 538 (2006) (quotations omitted).

To make an actual innocence claim, Fontenot must prove that "in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley*, 523 U.S. at 623 (quotations omitted). I do not, as the majority states, read this standard to require Fontenot to make "a case of conclusive exoneration." Maj. Op. at 78 n.20 (quoting *House*, 547 U.S. at 553). However, I do understand this standard to be satisfied only in "exceptional cases involving a *compelling* claim of actual innocence." *House*, 547 U.S. at 522 (emphasis added). The majority acknowledges these principles, but, in my view, fails to apply them in practice. Instead of viewing the relevant evidence as a reasonable juror would, the majority views it in the light most favorable to Fontenot.

For example, the two affidavits relied upon by the majority—the James Moyer and Karen Wise affidavits—were written by trial witnesses *nearly three decades* after the affiants' original testimony. We know that recanted testimony, especially after such a long amount of time, is "notoriously unreliable." *Case v. Hatch*, 731 F.3d 1015, 1044 (10th Cir. 2013). Such testimony is "easy to find but difficult to confirm or refute: witnesses forget, witnesses disappear, witnesses with personal motives change their stories many times, before and after trial." *Id.* (quoting *Carriger v. Stewart*, 132 F.3d 463, 483 (9th Cir. 1997) (Kosinski, J., dissenting)). For these reasons, a reasonable juror would tend to discount the two affidavits in this case.

2

But perhaps even more problematic is that the two affidavits barely state anything of value. The jury already had serious cause to deemphasize Moyer's identification of Fontenot at trial because it was riddled with hedging and admissions of uncertainty. *See* R. Vol. XXXI at 890–92. And Wise's affidavit does not directly recant anything about Fontenot. She said: "My belief is that if Tommy Ward and Karl Fontenot committed this crime (and I don't know that they did), they didn't do it alone. I'm still very afraid someone will come after me." R. Vol. I at 219. A reasonable juror would put little weight on the two affidavits because they do not add much to what was already presented at trial.

Overemphasizing peripheral evidence is something the majority does in other contexts as well. For example, the majority assumes that a report about problems with the medical examiner's process—most of which came out at trial—would undermine a juror's confidence in the *entire* police investigation. Maj. Op. at 116 ("After seeing this report, a reasonable juror's confidence in the competence of the investigation into Ms. Haraway's murder would decrease, which would in turn decrease confidence that law enforcement identified the right culprits."). At most, a reasonable juror would see this evidence as cumulative.

Another issue in the majority's opinion is that it repeatedly draws inferences in support of Fontenot's innocence without considering whether a reasonable juror would draw the opposite inference. For example, the majority concludes that interviews placing Fontenot at a party during the night of the murder create an alibi. The majority does not consider that a reasonable juror could conclude that Fontenot could have attended the

3

party *and* committed the crimes. In fact, in his confession, he discusses being at a party before leaving to kidnap the victim, Donna Haraway. And his co-defendant was found to have been at both.

Similarly, the majority assumes that reports of obscene phone calls that Haraway received prior to her abduction would have led the jury to believe that someone other than Fontenot had motive to abduct her. The calls were never confirmed or investigated by police. In my view, a reasonable juror presented with information about suspicious calls that were never investigated by law enforcement would most likely deem the calls irrelevant to the case. Or, the jury would view the calls in light of the other evidence against Fontenot and infer that he was the caller. The majority's attempt to classify this wholly unexplored evidence as exculpatory ignores the limits of our review under the reasonable juror standard.

The Supreme Court has suggested that, in order to show actual innocence, a petitioner must present new evidence that is consequential. *See Schlup v. Delo*, 513 U.S. 298, 324 (1995) (explaining the petitioner must present "new reliable evidence—whether it be *exculpatory* scientific evidence, *trustworthy* eyewitness accounts, or *critical* physical evidence—that was not presented at trial" (emphases added)). Fontenot has failed to do so. The majority acknowledges that there is a "lack of any physical evidence" in this case, and that this is not "a case of conclusive exoneration." Maj. Op. at 125. Instead of pointing to some paramount piece of consequential new evidence, it relies on many small pieces—each with a problem of its own. One might then ask how the new evidence leads the majority to find Fontenot proved his actual innocence claim. Perhaps the answer is

4

that the majority finds the case against Fontenot to be so weak and insignificant that the slightest new piece of evidence—no matter how peripheral, cumulative, or remote in time—would have changed the outcome. *See id*. at 119 (characterizing the evidence at trial against Fontenot as "extremely weak"); *id.* at 125 (noting the "manifest weaknesses" in the State's case at trial).

The majority's understanding, however, fails to give sufficient weight to the fact that Fontenot confessed. It notes that "[t]he State, of course, did have the statement given by Mr. Fontenot." *Id*. at 120. But according to the majority, that confession was "shot through with clear falsehoods and inconsistencies, produced no independently verifiable information, and provided the police no new facts about the crime. . . . What is more, Mr. Fontenot fully recanted just two days later, accusing the police of feeding him a false narrative of his own involvement . . . ." *Id*. A reasonable juror would take these factors that the majority identifies into account when considering the confession. However, the majority misses the fact that a reasonable juror would give substantial weight to the confession in the first instance. The majority's under-appreciation of the impact that Fontenot's confession would have on a reasonable juror then leads it to over-appreciate the value of the new evidence he presents.

Without actual innocence, Fontenot's claims can be heard only if he demonstrates cause and prejudice to excuse his procedural default *and* equitable tolling to excuse his time bar under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2244(d). As the majority correctly notes, Fontenot provided "negligible briefing" on the "cause" element of cause and prejudice and forfeited the equitable tolling

5

argument. Maj. Op. at 75. Even without those issues, both arguments would fail due to Fontenot's inability to demonstrate diligence. Cause must be "something *external* to the petitioner" that impeded his compliance with the state procedure. *Maples v. Thomas*, 565 U.S. 266, 280 (2012). Such objective factors include "a showing that the factual or legal basis for a claim was not reasonably available to counsel, or that some interference by officials made compliance impracticable." *Simpson v. Carpenter*, 912 F.3d 542, 571 (10th Cir. 2018) (quoting *Scott v. Mullin*, 303 F.3d 1222, 1228 (10th Cir. 2002)). Since Fontenot could have avoided the procedural default imposed on his petition in 2013 by initiating his collateral proceedings when the Oklahoma State Bureau of Investigation material was released in 1992, he cannot prove something external caused the default. Similarly, his inability to demonstrate diligence prevents him from taking advantage of equitable tolling under AEDPA. *McQuiggin v. Perkins*, 569 U.S. 383, 391 (2013). In sum, in my view, his failure to establish actual innocence is procedurally fatal to his case.

## II.

Even assuming Fontenot could succeed in getting around his procedural bar by demonstrating actual innocence, I still would not consider the merits of his *Brady* claim and instead would reverse and remand the case to permit the State to brief the issue.

Fontenot filed his second amended habeas petition with the district court on March 15, 2019. R. Vol. XXX at 17. On April 29, the State moved to dismiss Fontenot's petition, urging that it contained unexhausted claims and was procedurally barred by the statute of limitations and laches. R. Vol. XXXI at 211. Then, on August 21, the district court in a single Opinion and Order resolved all of the issues in the State's motion to

6

dismiss in favor of Fontenot and—without ordering further response—proceeded to the merits of Fontenot's petition, which contained nearly a dozen separate claims for relief. *Id*. at 857.

Rules 4 and 5 of the Rules Governing Section 2254 Cases in the United States District Courts outline the district court's authority to manage pleadings in a habeas case. When a § 2254 petition is not plainly meritless, the district court "must order the respondent to file an answer, motion, or other response within a fixed time, or to take other action the judge may order." Rules Governing Section 2254 Cases, Rule 4. The Committee Notes for Rule 5 "address the practice in some districts" of having "the respondent file[] a pre-answer motion to dismiss the petition," and clarify that "revised Rule 4 permits that practice and reflects the view that if the court does not dismiss the petition, it may require (or permit) the respondent to file a motion." *See also Scott v. Romero*, 153 F. App'x 495, 498 (10th Cir. 2005) (unpublished) ("The rules do not prohibit the State from filing a motion to dismiss prior to filing an answer and the Advisory Committee Notes specifically recognize the district court's discretion [here].").

The district court abused its discretion by failing to "follow[] the traditional procedure of allowing Respondent to file a merits response after denying a procedural motion to dismiss." Aplt. Br. at 46. Indeed, Oklahoma district courts routinely allow habeas respondents such as the State in this case to file answers after denying their pre-answer motions to dismiss. *See, e.g.*, *Bryant v. Dowling*, No. 17-CV-0468-CVE-JFJ, 2019 WL 3304812, at *6 (N.D. Okla. July 23, 2019) (denying Respondent's motion to dismiss for untimeliness and ordering Respondent to file an answer in accordance with

7

Rule 5); *Roberts v. McCollum*, No. 15-CV-0406-JED-FHM, 2016 WL 447499, at \*6 (N.D. Okla. Feb. 4, 2016) (denying Respondent's motion to dismiss for failure to exhaust state remedies and ordering Respondent to answer the exhausted claims); *Draper v. Farris*, No. CIV-16-1231-R, 2017 WL 5711408, at \*1 (W.D. Okla. Nov. 27, 2017) (adopting Magistrate's recommendation to deny Respondent's motion to dismiss and allow Respondent time to answer the petition); *Boyd v. Allbaugh,* No. CIV-15-1236-HE, 2016 WL 1559174 (W.D. Okla. Apr. 18, 2016) (same); *Carter v. Jones*, No. CIV-08-1119-C, 2009 WL 455433, at \*1–3 (W.D. Okla. Feb. 23, 2009) (same).

This practice promotes judicial economy and the conservation of judicial resources because it prevents respondents and courts from engaging with the merits of dismissible claims. In fact, the district court judge in this case has often benefited from the efficiency of pre-answer motions to dismiss. *See, e.g.*, *Green v. Pettigrew*, No. CIV-19-014-JHP-KEW, 2020 WL 618823, at \*4 (E.D. Okla. Feb. 10, 2020) (granting Respondent's pre-answer motion to dismiss as time-barred); *Martin v. Bear*, No. CIV-18-134-JHP-KEW, 2019 WL 1437603, at \*5 (E.D. Okla. Mar. 29, 2019) (granting Respondent's pre-answer motion to dismiss due to untimeliness and failure to exhaust claims); *McCarroll v. Rudek*, No. CIV-10-364-JHP, 2011 WL 2112389, at \*2 (E.D. Okla. May 26, 2011) (granting Respondent's pre-answer motion to dismiss as time-barred). It is worth noting that these successful Respondents neither asked permission to bifurcate their responsive pleadings nor included merits responses as a backup plan in case their motions were denied. *See* Maj. Op. at 129 (suggesting that respondents take these steps).

8

In this case, the district court exercised its discretion and allowed the State to file a "response." R. Vol. XXIX at 896. A "response" meant either an answer or a motion. *See* Rules Governing Section 2254 Cases, Rule 4 (differentiating between "an answer, motion, or other response"). The State filed a motion to dismiss. But once the court denied the State's motion to dismiss, it went on to consider the merits of the case without giving the State an opportunity to file a further response addressing the merits. Its only explanation for this decision was provided in a footnote, which said:

> Respondent was ordered to respond to the Second Amended Petition on February 14, 2019. (Dkt.# 118). Pursuant to Rule 5(a) of the Rules Governing Section 2254 Cases Respondent was not required to answer the petition unless ordered to do so by the court. **Once the Respondent was ordered to respond, the Respondent was required to address all allegations in the Second Amended Petition. "The answer must address the allegations in the petition. In addition, it must state whether any claim in the petition is barred by a failure to exhaust state remedies, a procedural bar, nonretroactivity, or a statute of limitations."** *Id*. **at [5(b)]** (emphasis added).

R. Vol. XXXI at 857 n.1.

The district court is incorrect in its assertion that the State "was required to address all allegations in the Second Amended Petition." *Id*. The court did not order the State to respond to *all* allegations. By using the word "response" rather than "answer," the court gave the State the option of responding to only procedural issues in a pre-answer motion or responding to all points in an answer.

Certainly, as a general matter it was in the court's ultimate discretion whether to allow a merits response after denying the State's motion to dismiss. There is no doubt that "[d]istrict courts generally are afforded great discretion regarding trial procedure

9

applications (including control of the docket and parties), and their decisions are reviewed only for abuse of discretion." *Garza v. Davis*, 596 F.3d 1198, 1205 (10th Cir. 2010) (quoting *United States v. Nicholson*, 983 F.2d 983, 988 (10th Cir. 1993)). But that discretion is not unbounded. An appellate court may disturb a lower court's decision about trial procedure where it has "a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *McEwen v. Norman*, 926 F.2d 1539, 1553–54 (10th Cir. 1991).

Those "circumstances" can include the complexity of a case. *See Hall v. Quarterman*, 534 F.3d 365, 372 (5th Cir. 2008) (holding the district court abused its discretion by relying on "affidavits unaired in court and shielded from cross examination" and failing to conduct a meaningful hearing in "unusual and unique circumstances"); *Ameritox, Ltd. v. Millennium Lab'ys., Inc.*, 803 F.3d 518, 520 (11th Cir. 2015) (holding the district court abused its discretion by taking supplemental jurisdiction over state-law claims that were "novel and complex"); *United States ex rel. Robinson Rancheria Citizens Council v. Borneo, Inc.*, 971 F.2d 244, 254 (9th Cir. 1992) (holding the district court abused its discretion in awarding sanctions against a litigant in a "highly unusual and procedurally complex case"); *United States v. Badwan*, 624 F.2d 1228, 1231 (4th Cir. 1980) (explaining the "complexity of a case is undoubtedly one of the circumstances to be considered in deciding whether to grant or deny a motion for continuance" when reviewing a district court's decision for an abuse of discretion).

This case touches upon two circuit splits—the definition of "new reliable evidence" required for an actual innocence claim and the standard for reviewing a finding

10

of actual innocence. Maj. Op. at 79, 84. It addresses a dozen legal issues. The underlying facts involve a 30-year-old conviction that was the result of two full trials. The record on appeal—which includes the petitioner's trial, direct appeals, postconviction hearings, and other proceedings—spans 43 volumes. The district court's order is 190-pages long. And the majority opinion nearly matches that page count.

If ever there was a case that was "novel," "highly unusual and procedurally complex," and "unique," this is it. Even the majority states that "the district court could, and perhaps should, have crafted a more specific Rule 4 directive by expressly calling for an 'answer,'" although it ultimately finds that the district court did not abuse its "considerable discretion." *Id*. at 131. I think it did. I would hold that the district court's decision to proceed to the merits without a merits response from the State was outside the bounds of its considerable discretion.[1]

Finally, I disagree with the majority's contention that, even if the district court abused its discretion, the error would be harmless. The only substantive claim the majority reaches is Fontenot's *Brady* claim. Because the State, acting pursuant to the district court's directive, submitted an additional brief addressing the *Brady* claim, the majority concludes the issue was sufficiently briefed. The problem with the majority's

---

[1] The majority asserts that the State did not specifically include the complexity of this case as a reason the district court abused its discretion. It is true that the State's argument focused on the district court's unanticipated divergence from the routine practice of allowing pre-answer motions to dismiss in Oklahoma. However, I find this case's complexity to fall within the State's briefing on this issue. The State's argument is that the district court abused its discretion in failing to follow established procedure particularly in this complex case where merits briefing was warranted.

11

conclusion is that the *Brady* brief was mooted before the district court decided the merits. The majority's retelling of oral argument portrays the State as conceding that the "*Brady* issue was thoroughly briefed." *Id*. at 133 n.49 (quoting Oral Arg. at 7:55–8:30). That is not accurate. Yes, the State admitted it had filed a thorough brief during the course of litigation at the district court. But it also stated that the *Brady* brief "related to the State's first motion to dismiss . . . which was later deemed moot because Petitioner was permitted the opportunity to amend his petition yet again." Oral. Arg. at 07:20–07:53.

The State is correct. Fontenot filed his amended petition for writ of habeas corpus on August 18, 2017, R. Vol. I at 518, which the State moved to dismiss, R. Vol. XXIX at 142. Then, upon the district court's directive, the State filed a response specifically addressing Fontenot's "alleged Brady violations and the newly discovered evidence" outlined in his response. *Id*. at 10, 728. Subsequently, on March 15, 2019, Fontenot submitted a second amended petition. R. Vol. XXX at 17. That prompted the district court in a minute order to deem moot the State's original motion to dismiss. R. Vol. XXXI at 37. The State then filed a motion to dismiss the second amended habeas petition, which underlies the district court's opinion and order granting Fontenot's second amended petition. *Id*. at 211. The district court never referenced the mooted *Brady* brief in its opinion. Therefore, it cannot be said that the State had an opportunity to file a merits response regarding Fontenot's *Brady* claim, and the district court's abuse of discretion for deciding the case without such a response is not harmless. In sum, even if I were to excuse Fontenot's procedural default because he has satisfied the actual

12

innocence standard, I would reverse and remand the case to permit the State to file a merits response.

## III.

For the foregoing reasons, I respectfully dissent.